**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, | |
| AMERICAN COUNCIL ON EDUCATION, | |
| ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, | |
| AZ BOARD OF REGENTS ON BEHALF OF ARIZONA STATE UNIVERSITY, | Case No. _____ |
| BROWN UNIVERSITY, | **COMPLAINT** |
| CALIFORNIA INSTITUTE OF TECHNOLOGY, | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| CARNEGIE MELLON UNIVERSITY, | |
| UNIVERSITY OF CHICAGO, | |
| CORNELL UNIVERSITY, | |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
| REGENTS OF THE UNIVERSITY OF MICHIGAN, | |
| REGENTS OF THE UNIVERSITY OF MINNESOTA, | |
| UNIVERSITY OF PENNSYLVANIA, | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, | |
| Plaintiffs, | |

v.

NATIONAL SCIENCE FOUNDATION, and

BRIAN STONE, in his official capacity as Acting
Director of the National Science Foundation,

Defendants.

1.    This suit challenges the unilateral decision of the National Science Foundation ("NSF") to slash "indirect cost rates" for government-funded research.  This policy is identical in key respects to policies of the National Institutes of Health ("NIH") and Department of Energy ("DOE") that district courts have already enjoined.  *Massachusetts v. Nat'l Insts. of Health ("NIH")*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025); *Ass'n of Am. Univs. ("AAU") v. Dep't of Energy*, No. 25-cv-10912, 2025 WL 1119791, at *1 (D. Mass Apr. 16, 2025).  NSF's action is unlawful for most of the same reasons, and it is especially arbitrary because NSF has not even attempted to address many of the flaws the district courts found with NIH's and DOE's unlawful policies.  As with those policies, if NSF's policy is allowed to stand, it will badly undermine scientific research at America's universities and erode our Nation's enviable status as a global leader in scientific research and innovation.

2.    For decades, universities have built their research institutions on the government's settled approach to funding the actual costs of the research it sponsors.  Some of those costs are "direct;" that is, they are readily attributable to specific projects.  Others are "indirect;" that is, they are necessary for the research to occur but harder to attribute to individual projects.  Computer systems to analyze enormous volumes of data; information-technology and utility systems providing the backbone for those efforts; building, maintaining, operating, and keeping up to date

the buildings in which funded research occurs, including their specialized electrical, plumbing, and waste-management systems; and researchers and administrative staff who keep the systems running—all are critical to cutting-edge research, but their costs typically cannot be allocated to any single project.  Because of caps on administrative costs, moreover, universities contribute much of their own funds to cover such costs, thereby subsidizing the work funded by grants and cooperative agreements.  In the 2023 fiscal year, universities bore $6.8 billion in unrecovered indirect costs.[1]

3.      Congress authorized agencies to "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates" via a bespoke process accounting for each institution's unique cost structures and grants, 41 U.S.C. § 4708, and it delegated to the Executive Branch the task of identifying institution-specific metrics.  The Office of Management and Budget ("OMB") exercised its authority to promulgate regulations requiring agencies to negotiate indirect cost rates with individual funding recipients through a carefully regulated process based on each institution's unique needs and cost structure.  *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]").  By regulation, this negotiation yields a rate that is intended to reflect the actual, verified indirect costs incurred by the institution.  Then, "[n]egotiated indirect cost rates must be accepted by all Federal agencies," unless one of the narrow exceptions applies.  2 C.F.R. § 200.414(c)(1).

4.      The purpose of this process is to ensure that the negotiated rate correctly captures the actual indirect costs incurred in the conduct of research.  Differences in indirect cost rates

---

[1] Nat'l Ctr. for Sci. & Eng'g Statistics, *Higher Education R&D Expenditures Increased 11.2%, Exceeded $108 Billion in FY 2023* (Nov. 25, 2024), https://ncses.nsf.gov/pubs/nsf25313.

reflect the reality that institutions engage in different types of research and have unique mixes of fixed and variable costs that are allocated across multiple research projects. Government funding agencies may deviate from the negotiated rates only in limited circumstances, and only via procedures that provide ample notice and protections to ensure that the basic terms of engagement are not changed precipitously. The regulatory framework recognizes that there is no one-size-fits-all approach and that participating institutions have profound reliance interests in the negotiated rates—rates that are tailored to their circumstances and that facilitate the work that makes the United States a world leader in cutting-edge research.

5.     This is not the first time an administration has considered limiting indirect cost rates and superimposing a one-size-fits-all regime on what has long been a tailored, negotiated process. In 2017, the Administration proposed in the appropriations process slashing the indirect cost rate to 10% for all NIH grants. The reaction in Congress was swift and bipartisan, and Congress identified serious problems immediately. It observed that the proposal would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965"; emphasized that Congress had "not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray," S. Rep. No. 115-150, at 109 (2017); and concluded that this proposal was "misguided and would have a devastating impact on biomedical research across the country," H.R. Rep. No. 115-244, at 50 (2017).

6.     In February 2025, the Administration nonetheless tried to impose a similar limit through executive action: NIH issued a notice stating that it was "imposing a standard indirect cost rate on all grants of 15%." NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/

4

guide/notice-files/NOT-OD-25-068.html.  A federal district court quickly enjoined that policy, finding that the Administration had not only violated an appropriations rider that Congress had enacted in the wake of the 2017 NIH episode, but also had violated the government-wide regulations governing indirect cost rates and the reasoned decisionmaking requirements of the Administrative Procedure Act ("APA").  *NIH*, 2025 WL 702163, at *1.

7.    Even so, the Administration on the heels of that decision nonetheless issued an almost identical policy at DOE.  The policy states that "hereinafter, the Department [of Energy] will no longer use the negotiated indirect cost rate" for universities; "set[] a standardized 15 percent indirect cost rate for all grant awards to" universities; and announced that DOE "is undertaking action to terminate all grant awards to [universities] that do not conform with this updated policy." DOE, *Policy Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025), https://www.energy.gov/management/pf-2025-22-adjusting-department-energy-grant-policy-institutions-higher-education-ihe.  Again, a federal district court quickly enjoined the policy. *AAU*, 2025 WL 1119791, at *1.

8.    Now the Administration has brought the same approach to NSF.  On Friday, May 2, 2025, NSF issued a new policy imposing a categorical cap on all new grant and cooperative agreement awards to universities.  That policy states that "[e]ffective May 5, 2025, NSF will apply a standard indirect cost rate not to exceed 15% to all grants and cooperative agreements awarded to [universities] for which indirect costs are allowable."  NSF, *Policy Notice: Implementation of Standard 15% Indirect Cost Rate* (May 2, 2025) (attached as Ex. A) ("Rate Cap Policy" or "Policy").  The announcement acknowledges that "[i]ndirect costs support the infrastructure and administrative functions necessary for the conduct of federally supported research," but then imposes without explanation a categorical limit on indirect cost rates of 15%. *Id.*  The Rate Cap

Policy applies this supposedly necessary limit on indirect cost rates only to universities, not to other institutions that participate in NSF grants and cooperative agreements.[2]

9.      As with the similar policies at NIH and DOE, NSF's Rate Cap Policy is clearly unlawful.  First, it violates the governing statutes in myriad respects.  The Policy sets "a predetermined fixed-percentage rate[]" of 15% that is not based on an estimate of actual "reimbursable indirect costs."  41 U.S.C. § 4708.  And with Congress having preserved a tailored approach to indirect cost rates since 1965, it beggars belief to suggest that Congress—without saying a word—impliedly authorized NSF to enact a sweeping, one-size-fits-all command that will upend research at America's universities.  *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994).

10.     Second, the Rate Cap Policy violates the indirect cost regulations that OMB promulgated to provide stability, protect reliance interests, and ensure that recipients can cover the *actual costs* of conducting the research the government has selected them to undertake.  Those regulations provide, in no uncertain terms, that the "[n]egotiated indirect cost rates must be accepted by all Federal agencies."  2 C.F.R. § 200.414(c)(1).  NSF's reading of that mandate's narrow exceptions would nullify that command, effectively replace the word "must" with "may," and allow any agency to reject those negotiated rates simply by announcing a different across-the-board policy.  Moreover, Plaintiffs collectively have thousands of proposals pending before the NSF that were prepared in reliance on their individually negotiated indirect cost rates.  To the extent the new rate will be applied to awards that did not include notice of the 15% rate, the Rate Cap Policy separately violates the regulations' requirement that any departure from the negotiated rate appear upfront in the notice of funding opportunity.

---

[2] This Complaint uses "universities" as a shorthand for the "institutions of higher education" that are subject to the Rate Cap Policy.

11.     Third, the Rate Cap Policy's conclusory explanation falls far short of satisfying the APA's reasoned-decisionmaking requirements.   The Policy ignores that the process of approximating indirect costs is inherently individualized and is—at its core—incompatible with its one-size-fits-all approach.  The Policy ignores the immense harms from jettisoning an approach dating from 1965—harms that Congress itself emphasized in rejecting a materially identical proposal in 2017.   The Policy ignores the reliance interests of the universities that carry out federally sponsored research, which have structured their budgets and investment decisions on the durable approach to indirect cost rates that Congress has embedded in statute and that the Executive Branch has protected in regulation.  And the Policy ignores the NSF's policy on cost sharing and the findings underlying that policy, which recognize that NSF should generally fund the full costs of the research it sponsors and that attempts to impose mandatory cost sharing create immense problems.   Meanwhile, the Policy inexplicably singles out universities and does not explain why it exempts other recipients.

12.     The effects will be immediate and irreparable.  If indirect cost rates are cut to 15%, the amount and scope of future research by universities will decline precipitously.  Vital scientific work will come to a halt, training will be stifled, and the pace of scientific discoveries will slow. Progress on national security objectives, such as maintaining strategic advantages in areas like AI and quantum computing, will falter.  And because of all this, America's standing as a world leader in scientific discovery will decline.  The proposals that are pending before the NSF, which responded to notices of funding opportunity, all assumed in their scopes of work and budgets that their home institutions' indirect cost rates would be used.  These include not only fundamental research into scientific understanding, but also projects pioneering cutting-edge innovations in artificial  intelligence,  quantum  computing,  cybersecurity,  semiconductors,  virtual  reality,

cryopreservation of living tissue, and other technology fields.  Many of these proposals will no longer be viable.

## JURISDICTION AND VENUE

13.    This action arises under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and regulations governing federal grants and cooperative agreements.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the APA.

14.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and a Plaintiff resides in this District.

## PARTIES

15.    Plaintiff Association of American Universities ("AAU") is an association composed of 71 leading research universities with the goal of transforming lives through education, research, and innovation.  AAU's member organizations are public and private research universities that are world-renowned centers of scientific and technological research and innovation.  Much of their scientific work is supported by NSF grants and cooperative agreements.  AAU's members intend to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

16.    Plaintiff Association of Public and Land-Grant Universities ("APLU") is a membership organization that fosters a community of university leaders collectively working to advance the mission of public research universities.  A core mission of the APLU is fostering research and innovation, specifically by "promoting pathbreaking scientific research."[3] APLU's

---

[3] Ass'n of Pub. & Land-Grant Univs., *About Us*, https://www.aplu.org/about-us/ (last visited

membership consists of over 200 research universities, land-grant institutions, and affiliated organizations across the United States.  Much of their scientific work is supported by NSF grants and cooperative agreements.  APLU's members intend to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

17.     Plaintiff American Council on Education ("ACE") is a nonprofit association composed of more than 1,600 colleges, universities, and higher education-related associations, organizations, and corporations with the goal of enabling higher education institutions to flourish. ACE's member organizations are accredited, degree-granting colleges and universities, as well as related associations, organizations, and corporations that also serve as world-renowned centers of scientific technological research and innovation.  Much of their scientific work is supported by NSF grants and cooperative agreements. ACE's members intend to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

18.     Plaintiff Arizona Board of Regents is the governing body of Arizona State University ("ASU"), a public university with four campuses in Maricopa County, Arizona.  ASU is a comprehensive research university committed to advancing research and discovery of public value and has one of the fastest-growing research enterprises in the United States.  In fiscal year 2024, ASU received 172 awards from NSF, totaling over $110.5 million in anticipated funding and $87 million in obligated funding. The on-campus facilities and administrative rate applicable to NSF awards for ASU's 2026 fiscal year, as negotiated with the Department of Health and Human Services, is 57.0%.  ASU intends to apply for new funding awards, and/or renewals and

May 5, 2025).

continuations of existing funding awards, in the next year and in future years to come.

19.    Plaintiff Brown University ("Brown") is a private university located in Providence, Rhode Island.  Brown conducts fundamental and applied research directed at the forefront of national priorities. In the 2024 fiscal year, Brown expended $34.4 million in grants from NSF to support nearly 250 projects in every scientific discipline represented by NSF. Through the 2027 fiscal year, Brown's predetermined indirect cost rate is 59.5% for on-campus research.  If—contrary to what Brown has negotiated with the federal government—the indirect cost rate was reduced to 15% for new awards, that would significantly reduce Brown's anticipated annual indirect cost recovery.  For example, applying the 15% rate to the anticipated modified direct costs over the next five years, Brown's anticipated annual indirect cost recovery would be reduced by $11.25M from $9M each year to $6.75M a year.  Brown intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

20.    Plaintiff California Institute of Technology ("Caltech") is a private university located in Pasadena, California.  Caltech leads research in areas such as neuroscience, biology and health, quantum science and engineering, advanced computing and artificial intelligence, and planetary and earth science.  Caltech has 210 active NSF awards and subawards.  In the 2024 fiscal year, Caltech expended $93,411,998 in conducting research supported by NSF; of this total, $71,709,654 were expended as direct costs, $21,702,344 as indirect costs.  NSF's planned cap of 15% for indirect cost expenditures would result in an annual loss of approximately $14.8 million to Caltech's planned research budget.  Caltech intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

21.     Plaintiff The Regents of the University of California ("UC") is a public corporation that owns and operates the University of California system as a public trust, and is located in Oakland, California.  In the 2024 fiscal year, UC spent $435.7 million in direct costs on NSF contracts and grants, for which it received $138.6 million in indirect cost recovery.  If—contrary to what UC has negotiated with the federal government—the F&A cost rate for NSF grants was reduced to 15%, UC calculates, based on 2023-2024 modified total direct costs, that would reduce the University's anticipated annual F&A cost recovery by approximately $94.4 million.  UC intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

22.     Plaintiff Carnegie Mellon University ("CMU") is a private university located in Pittsburgh, Pennsylvania.  A leading research institution and global leader in computer science, engineering, robotics, the arts, and design, CMU fosters and supports groundbreaking interdisciplinary research that impacts society in transformative ways.  CMU has 690 active research awards from NSF totaling $332.6 million in total funding, made up of $296.3 million in grants and $36.3 million in cooperative agreements.  CMU's indirect cost rate for on-campus research for the fiscal year ending on June 30, 2025, is 51.8%.  If—contrary to what CMU has negotiated with the federal government—the indirect cost rate was reduced to 15% for new awards, that would in time reduce CMU's anticipated total annual indirect cost recovery by approximately $12.8 million to approximately $5.3 million.  CMU intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

23.     Plaintiff University of Chicago ("UChicago") is a private university located in Chicago, Illinois. UChicago is a leading academic and research institution driving field-defining

research that produces new knowledge and breakthroughs with substantial impact: NSF funding supports UChicago faculty, researchers, and students to make critical advancements promoting American innovation, economic growth, and national competitiveness in areas including AI and machine learning, particle physics, quantum sensors in industrial applications and healthcare, quantum computing, chemical biology and mechanistic organic chemistry, astronomy, economics, mathematical and statistical underpinnings of data science, nanomaterials and materials science, and the physics of living systems. NSF's planned cap of 15% for indirect cost expenditures would result in an approximately $14.5 million dollar loss annually to UChicago's planned research budget. UChicago intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

24.      Plaintiff Cornell University ("Cornell") is a private university located in Ithaca, New York. Cornell is a leading research institution that has been selected by the federal government to conduct a wide variety of vital forms of research on behalf of United States citizens, funded in part by agency awards, cooperative agreements, and contracts from across the federal government, including NSF. For the 2024 fiscal year, Cornell expended approximately $138 million on more than 580 grants and cooperative agreements from NSF. Cornell has negotiated an indirect cost rate of up to 64% for its Ithaca campus. Reducing the indirect cost recovery rate to 15%—instead of using the rate Cornell has negotiated with the federal government—would be devastating for achieving results in the type of research that NSF sponsors. If Cornell's NSF-sponsored portfolio remained stable, in a typical fiscal year the cap would reduce Cornell's indirect cost recovery on NSF-sponsored activities to approximately $8 million per year, a decrease of approximately $25 million each and every year. Cornell intends to apply for new funding awards, and/or renewals and continuations of existing funding awards,

in the next year and in future years to come.

25.    Plaintiff Board of Trustees of the University of Illinois ("Illinois") is the governing body of the University of Illinois, a public university with its flagship campus in Urbana-Champaign, Illinois.  Illinois receives substantial annual funding from NSF.  In the 2024 fiscal year, Illinois had 501 unique principal investigators receiving NSF funding, totaling $129,288,449 in NSF funding ($97,452,569 in direct costs and $31,838,880 in indirect costs, based on a 58.6% indirect cost rate).  NSF is the University's leading funder, and Illinois has received more NSF funding than any other university in the nation for six consecutive years.  Based on expenditures from the 2024 fiscal year, a 15% indirect cost rate would have resulted in an estimated loss of more than $23 million.  Illinois intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

26.    Plaintiff Massachusetts Institute of Technology ("MIT") is a private land-grant university located in Cambridge, Massachusetts.  Founded to accelerate the nation's industrial revolution, MIT faculty, researchers, and graduates have invented fundamental technologies, launched new industries, and advanced human understanding of science, technology, and other areas of scholarship.  In the 2024 fiscal year, MIT received $97 million in funding from NSF for performing sponsored research under grants and cooperative agreements. MIT conducts research under 469 grants and 19 cooperative agreements from NSF that are currently active for the 2025 fiscal year.  These awards involve 322 unique principal investigators.  The on-campus facilities and administrative rate applicable to NSF awards for MIT's 2025 fiscal year, as negotiated with the Office of Naval Research, is 59.0%. When fully implemented, MIT estimates that NSF's proposed cap of 15% for indirect cost recovery would result in a projected $18 million loss

annually to MIT's planned research budget, assuming fiscal year 2024 levels of NSF-funded campus modified total direct cost. MIT intends to apply for new funding awards in the next year and in future years to come.

27. Plaintiff Regents of the University of Michigan ("Michigan") is the governing body of the University of Michigan, a public university located in Ann Arbor, Michigan. In the 2024 fiscal year, Michigan received $169 million in NSF funding—approximately $119 million allocated for direct costs and $50 million for indirect costs. Through the 2025 fiscal year, Michigan's predetermined indirect cost rate is 56%. If—contrary to what Michigan has negotiated with the federal government—the indirect cost rate is reduced to 15%, that reduction, if applied to Michigan's entire NSF portfolio over the next five years, would reduce Michigan's anticipated annual indirect cost recovery by $36 million. Michigan intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

28. Plaintiff Regents of the University of Minnesota ("Minnesota") is the governing body of the University of Minnesota, an institution of higher learning established by the Territorial Laws of the State of Minnesota and perpetuated by the Minnesota Constitution as a constitutional corporation. Minnesota holds 543 active direct NSF grant and cooperative agreement awards valued at more than $387 million in total costs, including $291 million in direct costs and $96 million in indirect costs; Minnesota serves as a partner to other NSF recipients via 81 subawards with an additional $25 million in funding. Minnesota's predetermined indirect cost rate through fiscal year 2028 is 54% for on-campus organized research. If—contrary to what Minnesota has negotiated with the federal government—the indirect cost rate was reduced to 15%, that would significantly reduce Minnesota's anticipated annual indirect cost recovery. For

example, applying the 15% rate to the anticipated modified direct costs over the next five years would result in an increasingly greater reduction each year, ultimately estimated to be at least $21.1 million to $8.3 million in year five. Minnesota intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

29.    Plaintiff University of Pennsylvania ("Penn") is a private university located in Philadelphia, Pennsylvania. In the 2024 fiscal year, Penn's research expenditures were more than $73.3 million on NSF funded projects. There were 132 projects on grants supported by the NSF, with an awarded value of $47,467,560, and an additional 4 cooperative agreements with an awarded total value of $28,374,494. Through the 2027 fiscal year, the predetermined indirect cost rate for Penn is 62.5% for on-campus research. NSF's planned cap of 15% for indirect cost expenditures would result in an over $10 million-dollar loss annually to Penn's planned research budget. Penn intends to apply for new funding awards, and/or renewals and continuations of existing funding awards, in the next year and in future years to come.

30.    Plaintiff The Trustees of Princeton University ("Princeton") is the formal legal name of Princeton University, a private university located in Princeton, New Jersey. Princeton is a world-class research institution that aims to unite people, resources, and opportunities for the creation, preservation, and transmission of knowledge for the benefit of the nation and humanity. In the 2024 fiscal year, Princeton expended approximately $79 million in conducting research supported by NSF. Of this total, approximately $20.5 million were expended as indirect costs to support needs such as the infrastructure, research administration, compliance, and security expenses required to conduct the funded research. Princeton's negotiated on-campus indirect cost rate for fiscal year 2025 is 64%. Princeton intends to apply for new funding awards, and/or

renewals and continuations of existing funding awards, in the next year and in future years to come.  Princeton would therefore lose substantial dollars if Princeton's predetermined indirect cost rates were reduced to 15%.

31.    Defendant National Science Foundation ("NSF") is an independent agency of the federal government that supports fundamental research and education in all the non-medical fields of science and engineering.

32.    Defendant Brian Stone is the Acting Director of NSF.  He is sued in his official capacity.

## FACTUAL BACKGROUND

### A.  NSF's Grants And Cooperative Agreements.

33.    For decades, NSF-funded research at universities has made the United States a world leader in science.  The federal government awards billions of dollars to research universities that can most effectively further NSF's goals.  In fiscal year 2023, NSF awarded nearly $6.7 billion to over 621 universities.

34.    NSF awards have funded scientific research that has led to innumerable scientific breakthroughs, including the creation of 3D printing and major developments in artificial intelligence ("AI").  Two hundred sixty-eight NSF-supported scientists have earned Nobel Prizes for their groundbreaking scientific work.[4]

35.    Most NSF-funded research occurs at outside institutions, including universities, nonprofit institutions, tribal nations, for-profit organizations, and state and local governments. This approach allows NSF to fund a wide array of institutions, promote competition for research

---

[4] U.S. Nat'l Sci. Found., *NSF Continues Strong Legacy with Nobel Prize Winners*, U.S. Nat'l Sci. Found., https://www.nsf.gov/science-matters/nsf-continues-strong-legacy-nobel-prize-winners.

grants and cooperative agreements, and facilitate the training of the next generation of researchers.

36.    In fiscal year 2023, NSF's total research and development ("R&D") expenses were roughly $7,490,000,000. Of that, roughly $6,048,000,000 went to institutions of higher education, while the rest went to other recipients. This means that over 80% of NSF's total R&D obligations went to institutions of higher education. [5]

37.    NSF pursues its research goals by funding the critical scientific research of the organizational Plaintiffs' member universities and the university Plaintiffs. At any given time, individual research universities often depend on myriad NSF awards that support independent research projects across multiple university departments and centers.

**B.  The Indirect Cost System Structure**

38.    These NSF awards are issued pursuant to a well-established legislative and regulatory framework. Congress has authorized NSF to provide for grants and other forms of assistance under various statutes, *e.g.*, 42 U.S.C. § 1862(a), and it has authorized agencies to use "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs," *see* 41 U.S.C. § 4708. Congress also instructed OMB to issue general guidance on fiscal administration issues. *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]"). In turn, OMB has established uniform guidance for agencies to administer grants and cooperative agreements under the agencies' purview. *See* 2 C.F.R. pt. 200 (setting forth "Uniform Administrative

---

[5] Nat'l Ctr. for Sci. & Eng'g Statistics, *Survey of Federal Funds for Research and Development* (2023-2024), https://ncses.nsf.gov/surveys/federal-funds-research-development/2023-2024#tableCtr13393 (Table 7: "Federal obligations for research and experimental development, by agency and performer"); *see also id.* (Table 21: "Federal obligations for research, by agency and performer").

Requirements, Cost Principles, and Audit Requirements for Federal Awards"). NSF has expressly adopted OMB's guidance into its own regulations. *See* 2 C.F.R. § 2500.100 (adopting OMB guidance in 2 C.F.R. pt. 200).

39.    As provided by regulation, NSF's competitive grantmaking process begins with a notice of funding opportunities for a specific topic followed by new application submissions. *See* 2 C.F.R. § 200.204.

40.    After a formal review process that includes peer review, NSF issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested (*i.e.*, drawn down) from the agency. *See* 2 C.F.R. § 200.211(b)(7) (establishing that the award must include the "[a]mount of [f]ederal [f]unds [o]bligated by this [a]ction"). An NOA is issued for the initial budget period and each subsequent budget period. *See* 2 C.F.R. § 200.211(c)(1)(iv).

41.    Federal grant recipients generally do not receive lump-sum grants. Instead, they use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research.

42.    The costs of conducting NSF-funded research come in two types. The first is "direct costs"—costs that can be attributed to a specific research project. For example, the salary of a graduate student assigned to a particular research project, or the cost of a specialized piece of equipment purchased for a research project is a direct cost.

43.    The second is "indirect costs"—costs that are necessary for research but that support multiple research projects.

44.    "[I]ndirect costs" are comprised of "[f]acilities" and "[a]dministration" costs. 2 C.F.R. § 200.414(a). The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings,

equipment and capital improvements, and operations and maintenance expenses." *Id.* This category includes the costs of construction of physical equipment and building infrastructure and maintenance of that infrastructure necessary for carrying out federally funded research, including highly specialized facilities and laboratories. Those costs are indirect because a single building, such as a state-of-the-art nuclear facility, might house numerous research groups engaged in multiple distinct projects. Facilities costs typically account for the largest share of indirect costs.

45.     The "[a]dministration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" *Id.* This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as compliance activities like Institutional Review Boards required for research involving human subjects, information technology professionals, experts on safety and security, technical staff, and many others. These costs are indirect because a single employee or group of employees will handle these necessary administrative activities across multiple NSF awards. Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants and cooperative agreements.

46.     Federal regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs. *See* Appendix III to Part 200—Indirect (F & A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs). This methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect

costs.  As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs.  Suppose, too, that the laboratory's sole indirect cost is the cost of electricity, which costs $10,000 per year.  Because the cost of electricity ($10,000) is 10% of the overhead-bearing direct costs ($100,000), the indirect cost rate would be 10%.  Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 of electricity costs would be allocated to the second project.

47.    Federal regulations prescribe a detailed methodology for negotiating indirect cost rates.  *See* Appendix III to Part 200.  Typically, a single agency negotiates an indirect cost rate with an institution.  For universities, rates are generally negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1).

48.    That indirect cost rate then applies to all of that institution's grants and cooperative agreements across the entire federal government.  Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs.  For example, if an institution seeks to recover the cost of building maintenance related to federal research support, it must document those costs and then allocate those maintenance costs across research and non-research programs.

49.    The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate based on its judgment of which rate reflects actual, verified costs incurred by the institution.

50.    Typically, the negotiated rates remain in effect for two to four years.

51.    After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred.  The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.

52.    Negotiated rates vary significantly from institution to institution.  The primary reason for this variation is that different institutions conduct different types of research.  Scientific laboratories tend to be far more expensive to build and maintain than generic office buildings. As such, an institution engaging in cutting-edge physics research will likely have a higher indirect cost rate than an institution primarily engaged in social science research.  Even in the context of scientific research, some types of research are more expensive than others.  If a particular institution invests in an expensive piece of advanced lab equipment that supports multiple lines of research, that institution will have higher indirect cost rates than a different institution that does not use expensive lab equipment or uses such equipment for only one research project.

53.    Institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research.  State of the art nuclear, energy and computing research (including AI and quantum computing), for example, often requires higher indirect cost rates.  Past studies show that indirect cost rates for university research are slightly less than those for other research entities, *i.e.*, that universities had the lowest percentage of total research costs classified as indirect costs as compared to federal and industrial laboratories.[6]

---

[6] Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-

54.    The "[n]egotiated indirect cost rates must be accepted by all Federal agencies" unless a deviation therefrom "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation" or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]."  2 C.F.R. § 200.414(c)(1).

55.    The cross-referenced provision, 2 C.F.R. § 200.414(c)(3), in turn makes clear that the negotiated rates remain the baseline and that it authorizes only specific "deviations" for individual awards or classes of awards when specified criteria are met.  In particular, that provision specifies that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  2 C.F.R. § 200.414(c)(3).

56.    Pursuant to 2 C.F.R. § 200.414(c)(4), "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved."  Moreover, "the Federal agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity."  *Id.*

**C.  Congress's Refinements Of The Indirect Cost Structure And NSF's Response.**

57.    Congress has been active in determining what proportion of research costs universities should bear and when agencies may use fixed rates to approximate indirect costs.  In 1962, as explained above, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions.  Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.  This authorization was essential because, in 1956, the Comptroller General issued an opinion

issues/frequently-asked-questions-about-facilities-and-administrative-costs.

disallowing the "payment of overhead based on a stipulated percentage of direct labor or other costs . . . in lieu of reimbursement of the actual costs of overhead." 35 Comp. Gen. 434 (1956).

58.     Shortly thereafter, Congress imposed a 20% cap on the amount of indirect costs that agencies could reimburse.  Independent Offices Appropriation Act, 1965, Pub. L. No. 88-507, § 303, 78 Stat. 640, 666 (1964); *see* Independent Offices Appropriation Act, 1963, Pub. L. No. 87-742, § 304, 76 Stat. 716, 740 (1962).  But just a few years later, Congress lifted that cap and replaced it with more general language indicating that "[n]one of the funds provided herein shall be used to pay any recipient of a grant for the conduct of a research project an amount equal to as much as the entire cost of the project"—in short, requiring at least *some* cost sharing. Independent Offices Appropriation Act, 1966, Pub. L. No. 89-128, § 303, 79 Stat. 520, 543 (1965).  In 2005, Congress eliminated even that more general requirement.

59.     In the wake of these congressional actions, NSF until now has created policies that sought to carefully follow the lead that Congress by statute had set.  For example, NSF's *Proposal and Award Policies and Procedures Guide*—which is cross-referenced in NSF's regulations implementing OMB's uniform guidance, *see* 2 C.F.R. § 2500.100—specifies that "it is NSF policy that recipients are entitled to reimbursement from award funds for indirect costs" pursuant to the recipients' "current Federally negotiated indirect cost rate agreement." NSF, *Proposal and Award Policies and Procedures Guide* X-5 (effective May 20, 2024) ("*Award Guide*"), https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf.

60.     The *Award Guide* also narrowly limits "[m]andatory cost sharing"—which means that a recipient must cover part of the cost of the research.  *Id.* at II-21.  "Mandatory cost sharing will only be required for NSF programs when explicitly authorized by the NSF Director, the NSB, or legislation."  *Id.*  The *Award Guide* further states that "[e]xcept where specifically identified

in an NSF program solicitation, the applicable U.S. Federally negotiated indirect cost rate(s) must be used in computing indirect costs (F&A) for a proposal. *Use of an indirect cost rate lower than the organization's current negotiated indirect cost rate is considered a violation of NSF's cost sharing policy*." *Id.* at II-20 (emphasis added).

61.     The NSF's cost sharing policy—which appears to have recently disappeared from NSF's website—states that "[m]andatory programmatic cost sharing will rarely be approved for an NSF program," and that "[a]ny program that would like to request consideration of mandatory programmatic cost sharing requirement in an NSF solicitation must develop a compelling justification regarding why non-Federal financial support and commitment is considered foundational to programmatic success." NSF, *Implementation of the 2nd NSB Cost Sharing Report: NSF Revised Cost Sharing Policy Statement*, https://web.archive.org/web/20250307 184941/https://www.nsf.gov/bfa/dias/policy/csdocs/principles.pdf

**D. Recent Attempts By The Executive Branch To Limit Indirect Cost Rates.**

62.     In 2017, the Administration released a budget proposal that would have slashed the indirect cost rate for NIH grants to 10%. *See* Office of Management & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017), https://www.gov info.gov/content/pkg/BUDGET-2018-MSV/pdf/BUDGET-2018-MSV.pdf.

63.     The proposal spurred widespread and bipartisan criticism and alarm. Congress then enacted, on a bipartisan basis, an appropriations rider providing that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. The appropriations rider also prohibits spending appropriated funds "to develop or implement a

modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates," or to "intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.*

64.     The House Report noted that, "[w]hile the Committee appreciates the Secretary's efforts to find efficiencies in NIH research spending, the Administration's proposal to dramatically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. No. 115-244, at 50. The Senate Report noted, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable across NIH grantees for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide. The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray." S. Rep. No. 115-150, at 109.

65.     Congress has repeatedly reenacted the rider ever since. *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84

(2022).  And this rider remains in effect to this day, in the now-operative statute.  *See* Further

Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460,

677.

66.     The negotiated NIH indirect cost rates remained undisturbed until late on Friday,

February 7, 2025, when NIH issued a Supplemental Guidance to the 2024 NIH Grants Policy

Statement: Indirect Cost Rates ("NIH Rate Change Notice").  NIH purported to cap previously

negotiated indirect cost rates on all existing and future grant awards for biomedical research, with

an effective date of February 10, 2025.  Three groups—a group of 22 states, a group of five

medical associations, and a group of 17 higher education associations and individual universities,

including some of the plaintiffs in this case—filed complaints and motions for temporary

restraining orders.  Following briefing, the Court issued a nationwide preliminary injunction on

March 5, 2025.  *NIH*, 2025 WL 702163, at *1.  The Court held that the dispute was justiciable;

that the plaintiffs were likely to succeed on their arguments that the NIH Rate Change Notice

violated the applicable regulations, the appropriations rider, and the APA's reasoned-

decisionmaking requirements; that the plaintiffs demonstrated irreparable harm; and that the

balance of the equities and public interest favored an injunction.  The parties then jointly moved

to convert the preliminary injunction to a permanent injunction.  *See NIH*, No. 25-CV-10338 (D.

Mass. Apr. 4, 2025), ECF No. 96.  The government has not moved for a stay pending appeal.

67.     Despite this decision, on April 11, 2025, the DOE announced its own policy almost

identical to the one the NIH promulgated in February.  The policy declared that the DOE "will no

longer use the negotiated indirect cost rate" for universities, instead "setting a standardized 15

percent indirect cost rate for all grant awards." DOE, *Policy Flash: Adjusting Department of

Energy Grant Policy for Institutions of Higher Education (IHE), supra*.  DOE also stated that it

was "undertaking action to terminate all grant awards to [universities] that do not conform with this updated policy." *Id.* Faced with losing either a significant portion or all their grant funding, nine universities and three associations representing universities challenged the DOE policy under the APA. The universities and associations filed a motion for a temporary restraining order, which a federal district court granted on April 16, 2025, to prevent immediate and irreparable harm. *AAU*, 2025 WL 1119791, at *1. The parties filed further briefing on the motion for the temporary restraining order, and the court held a hearing on the motion on April 28, 2025. The temporary restraining order remains in place pending further order of the court.

### E. NSF's New Rate Cap Policy.

68.     On Friday, May 2, 2025, NSF issued its Rate Cap Policy, titled "Implementation of Standard 15% Indirect Cost Rate." The Rate Cap Policy announces that NSF "is updating its policy regarding the reimbursement of indirect costs in federally funded financial assistance," and that "[e]ffective May 5, 2025, NSF will apply a standard indirect cost rate not to exceed 15% to all grants and cooperative agreements awarded to IHEs for which indirect costs are allowable." Ex. A (footnote omitted). Although framed as a "maximum," the 15% cap is in fact vastly lower than universities' negotiated indirect cost rates and is thus in substance an across-the-board 15% mandate.

69.     The Rate Cap Policy provides that "[t]he 15% rate maximum applies only to new awards made to IHEs on or after May 5, 2025," and that "NSF funding opportunities issued after May 5, 2025, will include notice of this indirect cost rate policy." *Id.* (emphasis omitted).

70.     The Rate Cap Policy purports to rely on the authority of 2 C.F.R. § 200.414(c) for its setting of a single, uniform indirect cost rate maximum of 15% for all institutions of higher education.

71.     The Rate Cap Policy is a final agency action under the APA.  *See* 5 U.S.C. § 704. The Rate Cap Policy: (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).  In particular, the Rate Cap Policy marks the consummation of NSF's decision-making process because it announces NSF's decision to immediately impose a 15% across-the-board indirect cost rate maximum to institutions of higher education.  And the Rate Cap Policy is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to limit the percent of indirect costs for which a grant recipient can be reimbursed under the grant.

## CLAIMS FOR RELIEF

### Count I

### Violation of Administrative Procedure Act—Contrary to Law

### (Violation of Authorizing Statutes)

72.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

73.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

74.     NSF has congressionally delegated authority to award research funds pursuant to 42 U.S.C. § 1862.  Specifically, Congress has "authorized and directed" NSF to "initiate and support basic scientific research and programs to strengthen scientific research potential."  42 U.S.C. § 1862(a).  Congress has further authorized NSF to "initiate and support scientific and engineering research, including applied research, at academic and other nonprofit institutions."

*Id.* § 1862(c). Congress made clear that "[i]n exercising the authority and discharging [these] functions," one of NSF's "objectives" "shall be . . . to strengthen research and education in the sciences and engineering, including independent research by individuals, throughout the United States." *Id.* § 1862(e). In addition, NSF is required by statute to create and carry out programs to award funds for particular types of research, including "research leading to transformative advances in manufacturing technologies," *id.* § 1862p-1(a), and "research into green and sustainable chemistry," *id.* § 1862p-3.

75.    Congress has authorized "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions like those contemplated by NSF's authorizing statutes as described in the foregoing paragraphs. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.

76.    Congress has not authorized NSF to adopt a categorical rate cap that arbitrarily sets a 15% maximum regardless of actual indirect costs.

77.    The Rate Cap Policy violates 41 U.S.C. § 4708 because it imposes a "predetermined fix-percentage rate[]" that does not attempt to approximate actual "reimbursable indirect costs."

78.    The Rate Cap Policy exceeds NSF's statutory authority by reimposing, in more severe form, a categorical cap on indirect costs that Congress specifically eliminated in 1965 and has declined to reenact ever since.

79.    The Rate Cap Policy violates the governing statutes by replacing the tailored process Congress has created by statute with a categorical, one-size-fits-all cap. The Supreme Court has underscored that agencies may not enact sweeping rules of this sort without express congressional authorization. In considering whether agency action is authorized by statute, courts

consider whether the "'history and the breadth of the authority that [the agency] has asserted'" and the "'economic and political significance' of that assertion" counsel in favor of "'hesitat[ing] before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 597 U.S. at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000), *superseded by statute as stated in FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898 (2025)); *see also MCI Telecomms. Corp.*, 512 U.S. 218. In *Biden v. Nebraska*, 600 U.S. 477 (2023), for example, the Court held that the government could not use a tailored waiver authority to wipe out student loans wholesale and so "unilaterally alter large sections of the American economy." *Id.* at 507. Likewise here, no statute expressly authorizes NSF to depart from the tailored approach Congress has created to devastate the very research NSF has been authorized— and indeed required—to promote and fund.

80.     Because Congress did not expressly authorize NSF to make this unilateral change, the Rate Cap Policy is invalid.

## Count II

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Negotiated Cost Rates in Violation of 2 C.F.R. 200.414)

81.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

82.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

83.     2 C.F.R. § 200.414(c)(1) states that negotiated indirect cost rates "must be accepted by all Federal agencies. A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal

statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."

84.    In turn, 2 C.F.R. § 200.414(c)(3) states: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

85.    By pronouncing a single, uniform "policy" setting an indirect cost rate maximum for universities at 15% regardless of the otherwise applicable negotiated rate, NSF violated 2 C.F.R. § 200.414(c)(1) and (c)(3).

86.    First, these provisions authorize agencies to announce *procedures* governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate. They do not authorize NSF to make a unilateral decision to impose an arbitrary cap on the rate applicable to all universities that does not attempt to approximate actual indirect costs.

87.    Second, these regulations authorize deviations for "either a class of Federal awards or a single Federal award." 2 C.F.R. § 200.414(c)(1). The Rate Cap Policy jettisons negotiated rates for a class of recipients—universities—and not a class of awards. Moreover, even if the regulations permitted deviations for a "class of Federal award[] [recipients]," the Rate Cap Policy would violate this limit because it applies to universities that collectively account for over 80% of NSF's total R&D obligations.

88.    Third, Section 200.414(c)(3) authorizes "deviations" from negotiated rates. Authority to provide for "deviations" does not empower NSF to eliminate the standard use of negotiated rates across broad swathes of institutions; rather, negotiated rates must remain the norm, with deviations just narrow exceptions. *Cf. MCI Telecomms. Corp.*, 512 U.S. at 228-29

(holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Biden v. Nebraska*, 600 U.S. at 494-95 (similar).

89.    Fourth, insofar as NSF applies the Rate Cap Policy to new awards issued after May 5, 2025, for which the notice of funding opportunity did not identify the departure from the negotiated rate, the Policy violates Section 200.414(c)(4).

### Count III

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Cost Recovery Regulations)

90.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

91.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

92.    Federal regulations and decades of Executive Branch practice establish substantive and procedural guidelines governing the recovery of indirect costs, which NSF's Rate Cap Policy blatantly violates.

93.    Substantively, the governing regulations dictate that grantees will recover the actual indirect costs that are reasonable and allocable to federal projects.  The bedrock principle is: "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits."  2 C.F.R. § 200.402. The regulations establish detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs.  *See generally* 2 C.F.R. § 200.414; *accord* 2 C.F.R. pt. 200, app. III(A) ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity"); 2 C.F.R. pt. 200, app. III(A)(2)(e)(1) ("Indirect (F&A) costs are the broad

categories of costs discussed in Section B.1.").  By slashing indirect cost rates to 15% without regard to whether that percentage tracks actual indirect costs, NSF violated the regulations.

94.    Procedurally, federal regulations prescribe a complex process for negotiating an indirect cost recovery rate.  Institutions must document and submit costs in painstaking detail to support that process.  Subpart E of part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards."  2 C.F.R. § 200.100(c).  2 C.F.R. § 200.414(e) stipulates that a set of appendices will set forth in detail "[r]equirements for development and submission of indirect cost rate proposals and cost allocation plans."  Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal").  For universities, Appendix III to Part 200 establishes the criteria for identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs).  *Id.* § 200.414(e)(1).  The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among multiple government projects. Audits are the mechanism then used to determine what is charged to a federal award. 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it elects to have a program-specific audit. This audit is performed annually, and it must be conducted in accordance with articulated standards.  *See* 2 C.F.R. §§ 200.504, 200.514.  An auditor may identify any "[q]uestioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment:" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award;" (2) "[a]t the time of the audit, lacked adequate

documentation to support compliance;" or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results of the audit and any questioned costs are factored into negotiation of indirect cost rates. *See* Appendix III to Part 200.

95.    NSF ignored that detailed process. Instead, it arbitrarily determined that all universities would recover at most a 15% rate, violating the regulations' substantive commands and rendering that entire regulatory process meaningless.

## Count IV

### Violation of the Administrative Procedure Act – Arbitrary and Capricious

96.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

97.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

98.    The Rate Cap Policy is arbitrary and capricious for many reasons, including the following.

99.    First, NSF's justification is conclusory and violates NSF's obligation to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). One, the Policy says it "reduce[s] administrative burdens for awardee institutions," ignoring that institutions must still negotiate indirect cost rate agreements with other agencies, that NSF and other agencies must still negotiate

such agreements with non-university recipients, and that—in all events—slashing indirect cost-rates to a flat 15% imposes harms on awardees that vastly outweigh any reduced administrative burden. Ex. A. Two, the Policy says it "[e]nsures consistent treatment of all IHE financial assistance recipients," ignoring that the negotiated-rate process *does* treat universities consistently by tailoring indirect cost rates to actual indirect costs, that the Policy creates inconsistency by treating institutions with very different research portfolios the same, and that the Policy irrationally disfavors universities by capping their indirect cost rates when nonuniversity recipients seeking the very same awards may receive higher rates. *Id.* Three, the Policy says it "[i]ncrease[es] the proportion of federal funds allocated to direct research costs" and "ensure[s] that more resources are directed toward direct scientific and engineering research activities," ignoring that indirect costs are necessary for research to take place and often differ from direct costs only in that they fund multiple research projects. *Id.* The Policy also says it "align[s] with common federal benchmarks," apparently referring to the 15% "de minimis" rate in 2 C.F.R. § 200.414(f)—arbitrarily applying a rate for institutions that have not offered "documentation to justify" a particular rate to institutions that have documented substantially higher rates.

100.    Second, the Rate Cap Policy is arbitrary and capricious because it ignores obvious problems with its categorical 15% cap. The Policy does not provide a rationale for subjecting different institutions to a single uniform rate that ignores actual indirect costs, does not acknowledge that indirect costs are critical to supporting and maintaining world-class research, and ignores how imposing a categorical 15% rate cap will devastate research nationwide and will—in so doing—thwart the goals that NSF by statute must pursue. Moreover, an across-the-board 15% rate cap amounts to a decision to fund only some of the costs of research NSF supports,

and ultimately amounts simply to a decision to fund less research of particular types—including research that relies heavily on unique, expensive facilities and specially skilled staff, as cutting-edge research often does. NSF's failure to acknowledge these obvious problems is especially egregious because the Rate Cap Policy ignores Congress's on-point actions and statements: Not only did Congress expressly reject categorical caps in 1965 and 2017, but the reasons that Congress did so apply equally to NSF's categorical cap.

101.    Third, the Rate Cap Policy is arbitrary and capricious because it ignores the reliance interests of the research institutions receiving federal funding and does not provide an explanation that accounts for those reliance interests. Typical indirect cost rates negotiated with the government by research universities range from 50% to 65%. The Rate Cap Policy thus slashes indirect cost recovery by up to three quarters. Universities have structured their budgets on the understanding that federal agencies will pay their legally required cost reimbursements according to the longstanding practice of using negotiated indirect costs and rates. Universities have accordingly made costly decisions about long-term investments, such as what physical infrastructure should be built, in reliance on negotiated rates with federal agencies, as well as the OMB regulations generally requiring agencies to use a negotiated indirect cost rate and permitting deviations from that rate only in narrowly limited circumstances.

102.    Fourth, the Rate Cap Policy departs without acknowledgment or explanation from NSF's policy on mandatory cost sharing. NSF has narrowly limited mandatory cost sharing, recognizing the problems that cost sharing creates. For example, when NSF imposes cost-sharing, it fails to fund the full costs of the research it sponsors in a manner that NSF has acknowledged is rarely appropriate. And cost sharing favors certain applicants over others for reasons unrelated to their ability to effectively carry out the research. Moreover, NSF has long

acknowledged that limits on reimbursement of indirect costs are in effect mandatory cost-sharing. The Rate Cap Policy does not acknowledge how it conflicts with NSF's policy on mandatory cost sharing or the judgments underlying that policy.

103.    Fifth, the Rate Cap Policy is arbitrary and capricious because it reflects a new policy resting upon factual findings that contradict those which underlay the prior policy of OMB and NSF and that are also wrong. The prior policy rested on the view that a uniform indirect cost rate maximum was not appropriate, and that negotiated rates should be both institution-specific and—in most cases—substantially higher. The Rate Cap Policy provides no explanation for this reversal in course.

104.    Sixth, the Rate Cap Policy is arbitrary and capricious because NSF fails to explain why its own audits of indirect costs would not accomplish the task of "improv[ing] government efficiency." Ex. A. To the contrary, because audits look at specific costs, they can accomplish what NSF's indiscriminate policy cannot—identifying specific costs that can be appropriately curtailed.

105.    Seventh, the Rate Cap Policy is arbitrary and capricious because, without explanation, it imposes its new categorical 15% cap only on universities, and not on other NSF grant recipients. If (counterfactually) this categorical cap improved efficiency or reflected responsible stewardship of federal funds, NSF does not explain why it imposed that policy on only universities. This failure is especially irrational because universities and other institutions often seek the same NSF awards, and yet the Rate Cap Policy applies only to university awardees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.    Expedited resolution of this action to prevent harm to Plaintiffs;

b.  Vacatur of the Rate Cap Policy;

c.  Declaratory judgment finding the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law;

d.  An injunction permanently prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form; from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB; and from rejecting or otherwise treating adversely proposals for NSF funding submitted at universities' negotiated rates rather than the 15% rate;

e.  An order awarding Plaintiffs' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

f.  Any such further relief as the Court deems equitable, just, and proper.

*[Signatures on following page]*

Dated: May 5, 2025

JENNER & BLOCK LLP

By: /s/ Shoba Pillay

Shoba Pillay, BBO No. 659739
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice forthcoming*)
Lindsay C. Harrison (*pro hac vice forthcoming*)
Lauren J. Hartz (*pro hac vice forthcoming*)
Elizabeth Henthorne (*pro hac vice forthcoming*)
Anjali Motgi (*pro hac vice forthcoming*)
Zachary C. Schauf (*pro hac vice forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
AMotgi@jenner.com
ZSchauf@jenner.com

*Attorneys for All Plaintiffs*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: /s/ Paul D. Clement

Paul D. Clement (*pro hac vice forthcoming*)
James Y. Xi (*pro hac vice forthcoming*)
Kyle R. Eiswald (*pro hac vice forthcoming*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com

*Attorneys for Association of American Universities, Association of Public and Land-grant Universities, and American Council on Education*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ *Shoba Pillay*
Shoba Pillay, BBO No. 659739
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com