# EXHIBIT 2

## DECLARATION OF PETER MCDONOUGH

I, Peter G. McDonough, declare as follows:

1. I am Vice President and General Counsel for the American Council on Education ("ACE"), having joined ACE in January 2015.

2. I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information gathered by ACE personnel, and could testify thereto.

3. Founded in 1918, ACE is a membership organization composed of more than 1,600 colleges and universities, related associations, and other organizations in America and abroad. ACE is the only major higher education association to represent all types of U.S. accredited, degree-granting colleges and universities. Its members educate two out of every three students in all accredited, degree-granting U.S. institutions.

4. ACE's mission includes collaborating across the higher education sector to design solutions for today's challenges and shape effective public policy. A core reason for the organization's existence is to advocate for public policies that support its members' interests, including their interests in obtaining support for academic research.

5. ACE has members in all 50 states and the District of Columbia.

6. Among ACE's more than 1,600 member institutions are Arizona State University, Brown University, California Institute of Technology, Carnegie Mellon University, the University of Illinois, and many others. I understand that some or all these ACE members may be submitting declarations in this litigation, which provide institution-specific detail on the matters described below.

7. The federal government has selected ACE member universities to conduct a wide variety of vital research on behalf of the United States and its citizens, funded in part by agency

1

awards from across the federal government, including but not limited to the National Science Foundation ("NSF"). ACE member universities receive significant research funding from NSF. In the aggregate, our members received approximately $6,167,068,000 from NSF in research and development funding for grants and contracts in 2023. We know this based upon ACE's analysis of publicly available Higher Education Research and Development (HERD) Survey data by the NSF/NCSES (National Center for Science and Engineering Statistics) from 2023. ACE member universities rely on these funds to advance fundamental research and accelerate technology and innovation that ensure national security. As examples, in 2023 the NSF funded these ACE member institutions' research and development activities: Texas A&M University - $142.7 million; Purdue University - $84.6 million; Georgia Institute of Technology - $79 million; Xavier University in Louisiana - $1.5 million. And many ACE members have plans to apply for future NSF awards.

8.   On May 1, 2025, NSF issued a policy notice titled "Implementation of Standard 15% Indirect Cost Rate. ("NSF Policy"). The NSF Policy provides that "[e]ffective May 5, 2025," instead of using the negotiated indirect cost rate for universities, "NSF will apply a standard indirect cost rate not to exceed 15% to all grants . . . awarded to [universities] for which indirect costs are allowable." The Rate Cap Policy applies this limit on indirect cost rates only with respect to universities, not to other recipients of NSF grants.

9.   If the NSF Policy is permitted to remain in effect, it will irreparably harm research at ACE member institutions, Americans' interests in the outcomes of that research, and local economic activity. ACE members' research drives economic activity across the country and advances American competitiveness by increasing scientific knowledge. The facilities, infrastructure and staff supporting this research that are paid for as indirect costs are essential to the continuation of this research.

10. The drastic decrease in indirect cost reimbursement announced in the NSF Policy will immediately impair ACE members' ability to conduct research. ACE members have applications for NSF grants currently under review and/or are in the process of submitting new grant proposals. These proposals are predicated on the existing negotiated indirect cost rate for each member institution. If these awards suddenly impose a 15% indirect cost cap, it will be impossible to complete the projects as proposed. Many ACE members will be forced to reject offers of awards for pending proposals that include a 15% indirect cost cap and abandon future proposals that they cannot sustain at the 15% indirect cost rate. This will mean forgoing crucial scientific research.

11. If the NSF Policy remains in place, ACE member schools will no longer be able to carry out all their sponsored activities, including supporting the next generation of research scientists and properly maintaining facilities and equipment currently in use. At least some work will have to stop. ACE member institutions do not have sufficient budgeted operational funds to cover a sudden structural decrease in indirect cost recovery for a large number of awards on an ongoing basis. They will have to implement layoffs, both for researchers, staff scientists, post-doctoral trainees, research administration officers and other employees of the institutions who perform critical but indirect work in support of sponsored activity (such as custodians, security guards, and so forth); and implement reductions in administrative costs that are necessary for research services. Further, the NSF Policy will have drastic implications for institutional capacity to enroll current and future doctoral students and support their progression to degree completion. This harm is not limited to monetary damages that can be rectified with a compensatory award. For example, even if the indirect cost rate was increased at a later date, if a research facility must be closed in the interim because there is no money to support its operation and maintenance, that harm cannot be undone.

12. The declarations submitted by ACE members in this litigation will vividly illustrate the types of harms felt by all ACE members with NSF grant funding.

13. Moreover, the harmful impact of the NSF Policy is not limited to colleges and universities. Many of ACE's members are the largest employers in their local areas. Where the lower indirect cost reimbursement rate requires layoffs, that loss of employment will be harmful not only to the affected employees and their families, but to the overall economic stability of the ACE member institutions' hometowns as a whole.

14. The NSF Policy will make it economically unfeasible to carry out much of the sponsored activity that results in scientific breakthroughs that provide significant social and economic value to the country, sometimes opening up entirely new areas of commercial development. The United States is a stronger, more secure, and more economically vibrant country as a result of the collective benefits arising from federally sponsored research. Additionally, the next generation of scientists, physicians, engineers, and other skilled workers develop their vitally important expertise while engaging in and learning from research they conduct at ACE member institutions. The NSF Policy would drastically reduce the positive impact of this work and the pipeline of educated professionals that United States industry requires to be internationally competitive. Slowdowns or halts in research by ACE member colleges and universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening our nation's national security and its economic dominance

15. Quick relief is vital to protect against these devastating consequences. Even if the NSF Policy is ultimately rescinded or held invalid, nothing known to me or my colleagues at ACE suggests that our affected members will have the ability to cover such radical reductions in indirect cost reimbursement on planned projects during the course of protracted litigation.

Even ACE members with significant endowments do not have the ability simply to use those funds to make up these losses. For example, my long and deep experience regarding endowed funds informs my certainty that the vast majority of our members' endowed funds are restricted by the terms on which the funds were donated, and they cannot legally be redirected to cover research infrastructure costs. Moreover, an ACE member institution may only draw down the portion of the endowment that is unrestricted at a rate that complies with applicable law.

16. ACE's private and public member institutions reinvest nearly all of their revenues into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, ACE member institutions do not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

17. Moreover, absorbing the cost of a lower indirect cost rate on future awards, even if it were possible, would create long-term budget pressures on ACE member institutions, which would in turn force reductions in key investments supporting ACE members' faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain ACE member institutions' academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 7, 2025

_____
Peter G. McDonough