**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

ASSOCIATION OF AMERICAN UNIVERSITIES,
*et al.*,

       *Plaintiffs*,

          v.

NATIONAL SCIENCE FOUNDATION, *et al.*,

       *Defendants*.

Case No. 1:25-cv-11231-IT

**(Leave to File Granted May 8, 2025)**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION AND EXPEDITED SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................II

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS ............................................................................5

    A.    NSF's Grants and Funding for Indirect Costs ......................5

    B.    Congress's Refinements of the Indirect Cost Structure and NSF's Response ........................................................................9

    C.    Prior Executive Branch Attempts to Limit Indirect Cost Rates.........................11

    D.    NSF's Rate Cap Policy. .............................................................13

    E.    Plaintiffs and Member Universities' Federally Funded Research Programs .......................................................13

LEGAL STANDARD....................................................................................15

ARGUMENT ..............................................................................................16

I.      This Court Has Jurisdiction To Grant The Relief Requested. .......................16

II.    The Organizational Plaintiffs Have Standing. ..............................17

III.   Plaintiffs Are Entitled To Judgment On Their Claims. ...............18

    A.    The Rate Cap Policy Is Contrary To The Statutes Authorizing NSF To Make Grants................................19

    B.    The Rate Cap Policy Violates 2 C.F.R. § 200.414. ...............22

    C.    The Rate Cap Policy Violates Regulatory Requirements For Indirect Cost Recovery. ............................25

    D.    The Rate Cap Policy Is Arbitrary And Capricious. ...............27

IV.   Plaintiffs Are Entitled To A Preliminary Injunction. .................33

    A.    The Rate Cap Policy Is Inflicting Irreparable Harm...............33

    B.    The Balance of the Equities and Public Interest Overwhelmingly Favor Relief. ...................................41

CONCLUSION...........................................................................................41

# TABLE OF AUTHORITIES

**CASES**

*American Science & Engineering, Inc. v. Califano*, 571 F.2d 58 (1st Cir. 1978) .........................17

*Association of American Universities v. Department of Energy*, No. 25-cv-10912, 2025 WL 1119791 (D. Mass Apr. 16, 2025) .....................................................................2, 13

*Biden v. Nebraska*, 600 U.S. 477 (2023) .............................................................................22, 24

*Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041 (1st Cir. 1990).....................................37

*Boston Redevelopment Authority v. National Park Service*, 838 F.3d 42 (1st Cir. 2016) ..............................................................................................................................16

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)........................................................................17

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)................................................................41

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986)................................................................................................18

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).......................40

*Crowley Government Services, Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022)..............................17

*Department of Commerce v. New York*, 588 U.S. 752 (2019).....................................................3

*Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam)...............................17

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ..................................28, 30, 31

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) .......................................................................16

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................................32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)..............................................22, 32

*Housatonic River Initiative v. United States EPA, New Eng. Region*, 75 F.4th 248 (1st Cir. 2023)...........................................................................................................18

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ..................17, 18

*Intel Corporation Investment Policy Committee v. Sulyma*, 589 U.S. 178 (2020).......................21

*International Union, United Automobile, Aerospace & Agriculture Implement Workers of America v. Brock*, 477 U.S. 274 (1986) ................................................................19

*Littlefield v. United States Department of the Interior*, 656 F. Supp. 3d 280 (D. Mass. 2023) ................................................................................................................16

*Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986) ...........................19

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .............................................21

*Massachusetts v. National Institutes of Health*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025) ................................................................2, 12, 16, 23-26, 28, 30-34, 40

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994) ...............................................................................................3, 22, 24

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .......................................................................28, 33

*National Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714 (Fed. Cir. 1998) ................................................................................................................17

*National Council of Nonprofits v. OMB*, No. 25-239, __ F. Supp. 3d __, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ...............................................................................37, 40

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) .........................................................34

*Nken v. Holder*, 556 U.S. 418 (2009) ...........................................................................41

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ..............41

*Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005) ........19

*Plazzi v. FedEx Ground Package System, Inc.*, 52 F.4th 1 (1st Cir. 2022) ...................18

*Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005) ..................16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8 (1st Cir. 2000) ................34

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) ...........................................35

*Taylor v. United States*, 73 Fed. Cl. 532 (2006) ...........................................................16

*West Virginia v. EPA*, 597 U.S. 697 (2022) ..................................................................22

**STATUTES**

5 U.S.C. § 706(2)(A) ................................................................................................19, 28

41 U.S.C. § 4708 ...........................................................................................................1, 19

42 U.S.C. § 1862(a)(1) ...........................................................................................30

Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708 .........................................................................................................................9

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740 ...........................................................................................................................12

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677 ...............................................................................12

Independent Offices Appropriation Act, 1963, Pub. L. No. 87-741, § 304, 76 Stat. 716, 740 (1962) ........................................................................................................10

Independent Offices Appropriation Act, 1965, Pub. L. No. 88-507, § 303, 78 Stat. 640, 666 (1964) ........................................................................................................10

Independent Offices Appropriation Act, 1966, Pub. L. No. 89-128, § 303, 79 Stat. 520, 543 (1965) ...................................................................................................10, 21

LEGISLATIVE MATERIALS

*Independent Offices Appropriations, 1966: Hearings on H.R. 7997 Before the Subcomm. of the S. Comm. on Appropriations*, 89th Cong. (1965) ........................29

H.R. Rep. No. 89-320 (1965) ....................................................................10, 21, 29

H.R. Rep. No. 115-244 (2017) ...................................................................2, 12, 30

S. Rep. No. 87-1826 (1962) ....................................................................................20

S. Rep. No. 115-150 (2017) ................................................................. 2, 11-12, 21, 30

OTHER AUTHORITIES

2 C.F.R. pt. 200 app. III ...............................................................6, 7, 8, 26, 33

2 C.F.R. pt. 200 app. III(A)(2)(e)(1) ....................................................................26

2 C.F.R. pt. 200 app. III(C)(11)(a)(1) .....................................................................7

2 C.F.R. Part 200 app. IV(C)(1)(b) ......................................................................20

2 C.F.R. § 200.1 ...........................................................................6, 8, 26, 27, 33

2 C.F.R. § 200.100(c) ............................................................................................27

2 C.F.R. § 200.402 ...........................................................................................8, 26

2 C.F.R. § 200.413(a) ..................................................................................6

2 C.F.R. § 200.414 .........................................................................6, 7, 8, 26

2 C.F.R. § 200.414(a) ..................................................................................6

2 C.F.R. § 200.414(c)(1) ...............................................1, 3, 8, 22, 23

2 C.F.R. § 200.414(c)(3) ...............................................1, 8, 9, 23, 24

2 C.F.R. § 200.414(c)(4) ...........................................................................9, 25

2 C.F.R. § 200.414(e) ..................................................................................26

2 C.F.R. § 200.414(e)(1) ............................................................................27

2 C.F.R. § 200.414(f) ..................................................................................33

2 C.F.R. § 200.501 ...........................................................................6, 7, 8

2 C.F.R. § 200.501(b) ...................................................................6, 8, 27, 33

2 C.F.R. § 200.504 .........................................................................6, 8, 27, 33

2 C.F.R. § 200.514 .........................................................................6, 8, 27, 33

2 C.F.R. § 2500.100 ....................................................................................8, 10

35 Comp. Gen. 434 (1956) .......................................................................9

Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs ................................................... 13-14

*Criterion*, Webster's Third New International Dictionary 538 (1986) .......................................24

DOE, *Policy Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025) .........................................13

*Efficiency*, Webster's Third New International Dictionary 725 (1986) .......................................28

Motion to Convert, *Massachusetts v. NIH*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), Doc. No. 108..................................................................................13

NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html ...............................................12

NSF, *About Us*, https://www.nsf.gov/about (last visited May 8, 2025) ........................................5

NSF, *History* (last accessed May 4, 2025), https://www.nsf.gov/about/history# why-was-nsf-formed-bf0 ...................................................................................................5

NSF, *Implementation of the 2nd NSB Cost Sharing Report: NSF Revised Cost Sharing Policy Statement*, https://web.archive.org/web/20250307184941/ https://www.nsf.gov/bfa/dias/policy/csdocs/principles.pdf ................................11, 31

NSF, *NSF Grant Administration Manual* (1973), https://babel.hathitrust.org/cgi/pt? id=osu.32435001754233&seq=1 ............................................................................10

NSF, *NSF's Indirect Cost Rate Policies*, https://www.nsf.gov/funding/proposal-budget/indirect-costs (last visited May 6, 2025)....................................................21, 28

NSF, *Proposal and Award Policies and Procedures Guide* (effective May 20, 2024), https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf ......................................10, 11, 32

NSF, Sci. & Eng'g Statistics, *Survey of Federal Funds for Research and Development* (2023-2024), https://ncses.nsf.gov/surveys/federal-funds-research-development/2023-2024#tableCtr13393 ......................................................6

OMB Circular A-122, *Cost Principles for Nonprofit Organizations*, 45 Fed. Reg. 46,022, 46,026 (July 8, 1980) ...........................................................................20

Order, *AAU v. DOE*, No. 25-cv-10912 (D. Mass. Apr. 29, 2025), Doc. No. 55 ...........................13

*Principles for Determining Costs Applicable to Research and Development Under Grants and Contract With Educational Institutions*, 30 Fed. Reg. 9676 (Aug. 4, 1965) ......................................................................................................... 20-21

*Procedure*, Webster's Third New International Dictionary 1807 (1986).....................................24

*Provide*, American Heritage Dictionary of the English Language 1418 (5th ed. 2011) ...........................................................................................................20

*Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590 (Dec. 26, 2013) ....................................25

## INTRODUCTION

This case involves the Administration's latest effort to upend America's science dominance by sharply curtailing funding for the "indirect costs" of research at America's universities. When the National Institutes of Health ("NIH") and Department of Energy ("DOE") attempted to do so earlier this year, courts in this District quickly enjoined their policies. Now that the National Science Foundation ("NSF") has tried the same thing, the same result should follow.

The United States leads the world in science in large part thanks to our system of federally-funded research, honed over six decades. Some research costs are "direct"; that is, readily attributable to specific projects. Other costs are "indirect"—an accounting term capturing costs that are essential for research but shared among multiple projects, like advanced servers supporting cutting-edge AI research or hazardous waste storage and disposal. Since 1962, Congress has authorized agencies to use institution-wide "predetermined fixed-percentage rates" that approximate actual indirect costs. 41 U.S.C. § 4708. When the lead agency—typically the Department of Health and Human Services or the Department of Defense—negotiates rates, they "must be accepted by all Federal agencies," unless Congress has provided otherwise or a narrow exception applies. 2 C.F.R. § 200.414(c)(1). Under this narrow exception, agencies may promulgate "policies, procedures and general decision-making criteria" that they "will follow to seek and justify deviations." C.F.R. § 200.414(c)(3). Via that exception, agencies can arrive at different, individualized rates that accomplish the goal that indirect cost rates have pursued for 60 years—tailoring reimbursement to actual indirect costs.

Like the NIH and DOE before it, NSF announced a new policy on May 2, 2025, capping indirect cost rates for universities at 15% across the board no matter the actual indirect costs. *Implementation of Standard 15% Indirect Cost Rate* (May 2, 2025) (Compl. Ex. A) ("Rate Cap

Policy" or "Policy"). This Policy—replacing inherently individualized and carefully negotiated indirect cost rates with a one-size-fits-all flat rate—is the very definition of arbitrariness. Indeed, that arbitrariness is precisely why Congress, after briefly experimenting with a (higher) cap in 1962, emphatically rejected such caps just a few years later. It is also why, when the President in 2017 proposed reviving an indirect rate cap at NIH, a bipartisan Congress saw the threat and enacted an appropriations rider to stop it. Congress observed that such an arbitrary cap would "radically change the nature of the Federal Government's relationship with the research community." S. Rep. No. 115-150, at 109 (2017); *accord* H.R. Rep. No. 115-244, at 50 (2017) (similar). That arbitrariness, too, is why courts this year so decisively enjoined similar policies at NIH and DOE. *Massachusetts v. Nat'l Insts. of Health ("NIH")*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025); *Ass'n of Am. Univs. v. Dep't of Energy ("DOE")*, No. 25-cv-10912, 2025 WL 1119791, at *1 (D. Mass Apr. 16, 2025).

NSF's Rate Cap Policy differs from those now-enjoined policies only in that it carves out existing grants.[1] But the *NIH* and *DOE* courts properly enjoined those policies as to both existing and new grants. And similarly here, the Policy is unlawful for three reasons. First, Congress never gave NSF authority to enact an across-the-board 15% cap. The only authority Congress provided— to use "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs," 41 U.S.C. § 4708—does not permit NSF to declare by fiat a 15% cap that has nothing to do with the actual indirect costs of any institution or grant. Indeed, Congress specifically repealed a law that imposed a rate cap 60 years ago, and ever since, it has consistently rejected efforts to reenact such

---

[1] The Rate Cap Policy applies to both grants and cooperative agreements. This brief uses "grants" as a shorthand throughout.

a cap. Given Congress's explicit decision to preserve a tailored approach to indirect costs since 1965, it defies belief to suggest that Congress, without saying a word, impliedly authorized NSF to enact a sweeping, one-size-fits-all command that will upend research at America's universities. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994).

Second, the Rate Cap Policy violates the indirect cost regulations that the Office of Management and Budget ("OMB") promulgated precisely to provide stability for funding recipients, protect reliance interests, and ensure that recipients can cover the *actual costs* of conducting the research the government has asked them to undertake. Those regulations provide that once rates are carefully negotiated on an institution-specific basis, the "[n]egotiated indirect cost rates must be accepted by all Federal agencies." 2 C.F.R. § 200.414(c)(1). NSF's reading of that mandate's narrow exceptions would nullify that command, effectively replace the word "must" with "may," and allow any agency to reject those negotiated rates simply by announcing a different across-the-board policy. That is not a sensible reading of the regulation. Moreover, Plaintiffs collectively have thousands of proposals pending before NSF that were prepared in reliance on their individually negotiated rates. To the extent the new rate will apply to awards that did not include notice of the 15% rate, the Policy violates the requirement that any departure appear in the notice of funding opportunity at the beginning of the grant-making process.

Third, the Rate Cap Policy's conclusory explanation violates the reasoned-decisionmaking requirements of the Administrative Procedure Act ("APA")—that agencies must "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Policy ignores that the process of approximating indirect costs

is inherently individualized and is—at its core—incompatible with a one-size-fits-all approach. The Policy ignores the immense harms from jettisoning an approach dating from 1965—harms that Congress itself recognized in rejecting a cap proposal in 2017. The Policy ignores the reliance interests of the universities that carry out federally sponsored research, which have structured their budgets and investment decisions on the durable approach to indirect cost rates that Congress has embedded in statute and that the Executive Branch has protected in regulation. Meanwhile, the Policy inexplicably singles out universities, while allowing other recipients to recover actual costs.

The harms from NSF's unlawful actions will be swift and devastating. And even though the Policy applies to new grants, these irreparable harms are accruing now and proliferating rapidly. If Plaintiffs stick to their negotiated rates in their thousands of pending applications, NSF may rely on the Policy to reject applications out of hand. If Plaintiffs accept the 15% rate, many of those applications will result in awards that are financially unsustainable either standing on their own or in the aggregate. And once an application is gone, it is gone forever. Moreover, absent judicial intervention, Plaintiffs must plan on the assumption that all their NSF grants will soon have 15% indirect cost rates. Because universities cannot sustain NSF-funded programs at a 15% indirect cost rate, the Rate Cap Policy will have significant impacts on critical projects. Meanwhile, the human cost will be immense, as universities will have to reduce staff and training programs— irreversibly damaging their academic communities, the careers of young researchers, and the national interest in training the next generation of scientists. Nor can the consequences of grinding vital scientific work to a halt, and stifling critical, specialized training, be unwound. Progress on critical issues—biomedical research, cybersecurity, quantum computing, domestic mineral extraction, and much more—will grind to a halt.

Because of these imminent harms, Plaintiffs are seeking both expedited summary judgment

and a preliminary injunction. This memorandum supports both requests. Plaintiffs believe the merits can be decided on an expedited basis and on the existing record—as occurred with the *NIH* case, where the parties stipulated to entry of final judgment based on the preliminary injunction record. If the court sets expedited merits briefing and decides the merits quickly, it may moot the need for a separate preliminary injunction. But if the Court needs more time for final judgment, a preliminary injunction should issue to prevent proliferating irreparable harms.

## STATEMENT OF FACTS

### A.  NSF's Grants and Funding for Indirect Costs

For decades, NSF-funded research at universities has made the United States a world leader in basic science. NSF was born in the wake of World War II to fund scientific progress that would allow the United States to build upon the advances that had supported Allied victory. NSF, *History*, https://www.nsf.gov/about/history#why-was-nsf-formed-bf0 (last visited May 4, 2025). One of NSF's goals was to grow the government's role in funding scientific research. *Id.*; *see also* NSF, *About Us*, https://www.nsf.gov/about (last visited May 8, 2025). And NSF grants have led to innumerable breakthroughs.[2]

Most NSF-funded research occurs at outside institutions, and about 80% occurs at universities[3]—also known in government grantmaking parlance as institutions of higher

---

[2] *E.g.*, ASU Decl., Doc. No. 40-4 at ¶¶ 12-13 (energy sources and understanding of seismic activity); BU Decl., Doc. No. 40-6 at ¶ 6 (drug screening and AI safety); Caltech Decl., Doc. No. 40-8 at ¶ 5 (molecular synthesis supporting pharmaceutical discoveries); CU Boulder Decl., Doc. No. 40-12 at ¶ 5 (wireless communications, power grid control, advanced sensing systems, and medical diagnostics); UW-Madison Decl., Doc. No. 40-40 at ¶ 5 (high-energy and multi-messenger astrophysics).

[3] Nat'l Ctr. for Sci. & Eng'g Statistics, *Survey of Federal Funds for Research and Development* (2023-2024), https://ncses.nsf.gov/surveys/federal-funds-research-development/2023-2024#tableCtr13393.

education ("IHEs"). NSF's approach allows it to fund a wide array of institutions, promote competition, and help train the next generation of researchers.

Recipients generally do not receive lump-sum funding. They use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research. *See* 2 C.F.R. pt. 200, app. III ("Indirect (F & A) Costs Identification and Assignment, and Rate Determination For Institutions Of Higher Education (IHEs)") ("Appendix III to Part 200"); 2 C.F.R. §§ 200.1, 200.414, 200.501(b), 200.504, 200.514. Recoverable costs come in two types. "[D]irect costs" are costs that can be attributed to a specific research project. 2 C.F.R. § 200.413(a). "Indirect costs" are necessary for multiple research projects but cannot be attributed to any one specific research project. 2 C.F.R. § 200.1.

"[I]ndirect costs" have two components: "[f]acilities" and "[a]dministration." 2 C.F.R. § 200.414(a). The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." 2 C.F.R. § 200.414(a). Those costs are indirect because a single building might house numerous research groups engaged in multiple distinct projects. The "[a]dministration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" *Id*. Together, these indirect cost categories, known as "F&A costs," pay for critical research infrastructure, without which the vast majority of research projects could not proceed.

The computation and determination of indirect costs are subject to extensive regulation— and then fixed for a specified period of time in recognition of the institutions' and government's needs for predictability. Appendix III to Part 200; *see* 2 C.F.R. §§ 200.414, 200.501. The

methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs. Appendix III to Part 200. As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs. Suppose, too, that the laboratory's sole indirect cost is electricity, which costs $10,000 per year. Because the cost of electricity ($10,000) is 10% of the total overhead-bearing direct costs ($100,000), the indirect cost rate would be 10%. Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 to the second.

Federal regulations prescribe a detailed methodology and set of procedures for negotiating indirect cost rates. *See* Appendix III to Part 200. Typically, a single agency negotiates an indirect cost rate with an institution. For universities, rates are generally negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." Appendix III(C)(11)(a)(1) to Part 200.

Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs. If an institution seeks to recover the cost of building maintenance, it must document those costs and then allocate those maintenance costs across research and non-research programs. The agency then reviews and verifies these proposals and determines the institution's indirect cost rate. By regulation, the rate must reflect actual costs incurred. "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402. The regulations establish

7

detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs. *See generally* 2 C.F.R. § 200.414; Appendix III to Part 200; *accord* Appendix III(A) to Part 200.

Once the agency agrees to an indirect cost rate for a particular institution, it binds the entire federal government for a specified period—typically from two to four years. Appendix III to Part 200; 2 C.F.R. §§ 200.414, 200.501; *see* CU Boulder Decl., Doc. No. 40-12 at ¶¶ 11-12 (two-year negotiated indirect cost rate period); Yale Decl., Doc. No. 40-41 at ¶ 12 (four-year period); *see also* Dartmouth Decl., Doc. No. 40-15 at ¶¶ 15-16 (seven-year period). After the costs are incurred, agencies conduct audits to ensure that the payments to the institution at the indirect cost rate conform to the actual indirect costs that were incurred. 2 C.F.R. §§ 200.1, 200.501(b), 200.504, 200.514. The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs. Appendix III to Part 200.

The "[n]egotiated indirect cost rates must be accepted by all Federal agencies," including NSF. 2 C.F.R. § 200.414(c)(1); *see* 2 C.F.R. § 2500.100 (adopting OMB guidance in 2 C.F.R. pt. 200). The only exception is if a "deviation[]" from these rates "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation" or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414](c)(3)." 2 C.F.R. § 200.414(c)(1), (3). A deviation from a negotiated indirect cost rate, pursuant to 2 C.F.R. § 200.414(c)(3), requires that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3). Any such deviation can only apply prospectively. Under 2 C.F.R. § 200.414(c)(4), the "agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate

reimbursement." Moreover, the "agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity." *Id.*

Rates differ significantly across universities primarily because different institutions conduct different kinds of research, often in different kinds of facilities. Certain facilities, like specialized laboratories, are more expensive. For example, NSF funds research into how best to broaden access to STEM (*i.e.*, identifying and addressing barriers to opportunities and innovations in STEM, including studying evidence-based approaches to education) and also funds research in quantum physics. NSF, *Our Focus Areas*, https://www.nsf.gov/focus-areas (last visited May 4, 2025). The indirect cost rates for institutions undertaking the latter—which involve labs with specialized instruments—are likely to be higher.

### B. Congress's Refinements of the Indirect Cost Structure and NSF's Response

Congress has been active in determining what proportion of research costs universities should bear and when agencies may use institution-wide fixed rates to approximate indirect costs. In 1962, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708. This authorization was essential because, in 1956, the Comptroller General deemed unlawful "payment of overhead based on a stipulated percentage of direct labor or other costs … in lieu of reimbursement of the actual costs of overhead." 35 Comp. Gen. 434 (1956) (capitalization omitted). In 1965, Congress imposed a 20% cap on the indirect costs that agencies could reimburse. Independent Offices Appropriation Act, 1965, Pub. L. No. 88-507, § 303, 78 Stat. 640, 666 (1964); *see* Independent Offices Appropriation Act, 1963, Pub. L. No. 87-741, § 304, 76 Stat. 716, 740 (1962).

But just a few years later, in 1965, Congress decisively rejected that cap and replaced it with more general language indicating that "[n]one of the funds provided herein shall be used to pay any recipient of a grant for the conduct of a research project an amount equal to as much as the entire cost of the project"—in short, requiring at least *some* cost-sharing. Independent Offices Appropriation Act, 1966, Pub. L. No. 89-128, § 303, 79 Stat. 520, 543 (1965). Congress eliminated the cap based on concerns it was not "equitable." H.R. Rep. No. 89-320, at 16 (1965).

In 2005, Congress eliminated even the more general cost-sharing requirement. And NSF until now created policies that sought to carefully follow the lead that Congress by statute had set. For example, NSF's *Proposal and Award Policies and Procedures Guide*—cross-referenced in NSF's regulations implementing OMB's uniform guidance, 2 C.F.R. § 2500.100—specifies that "it is NSF policy that recipients are entitled to reimbursement from award funds for indirect costs" pursuant to recipients' "current Federally negotiated indirect cost rate agreement." NSF, *Proposal and Award Policies and Procedures Guide* X-5 (effective May 20, 2024), https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf ("*Award Guide*"); *see* NSF, *NSF Grant Administration Manual* 34 (1973), https://babel.hathitrust.org/cgi/pt?id=osu.32435001754233&seq=1 ("Universities and colleges … may charge NSF grants for the NSF share of the indirect costs associated with a grant-supported project … . [I]t is the intent of NSF to provide full reimbursement for the Federal share of indirect costs … .").

The *Award Guide* also limits "mandatory cost sharing," *i.e.*, situations in which a recipient must cover part of the cost of the research. *Award Guide* at II-21. "Mandatory cost sharing will only be required … when explicitly authorized by the NSF Director, the NSB, or legislation." *Id.* The *Award Guide* states that "[e]xcept where specifically identified in an NSF program solicitation, the applicable U.S. Federally negotiated indirect cost rate(s) must be used in

computing indirect costs (F&A) for a proposal. Use of an indirect cost rate lower than the organization's current negotiated indirect cost rate is considered a violation of NSF's cost sharing policy." *Id.* at II-20.

The cost-sharing policy, which recently disappeared from NSF's website, states that "[m]andatory programmatic cost sharing will rarely be approved," and that any cost-sharing proposal "must develop a compelling justification regarding why non-Federal financial support and commitment is … foundational to programmatic success." NSF, *Implementation of the 2nd NSB Cost Sharing Report: NSF Revised Cost Sharing Policy Statement*, https://web.archive.org/web/20250307184941/https://www.nsf.gov/bfa/dias/policy/csdocs/princi ples.pdf ("*Revised Cost Sharing Policy Statement*").

### C.  Prior Executive Branch Attempts to Limit Indirect Cost Rates.

In 2017, the Executive Branch proposed slashing the indirect cost rate to 10% for all NIH grants. The proposal caused widespread criticism and alarm; Congress saw immediately that the proposal would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965"; noted that Congress had "not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray," S. Rep. 115-150, at 109; and concluded that this proposal was "misguided and would have a devastating impact," H.R. Rep. 115-244, at 50.

To avert disaster, Congress enacted an appropriations rider providing that regulatory "provisions relat[ed] to indirect costs … including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017," and

specifying that no funds "made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. Congress has repeatedly reenacted the rider, and it remains in effect. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

Flouting Congress's directive, NIH in February 2025 "impos[ed] a standard indirect cost rate on all grants of 15%." NIH, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html ("NIH Rate Change Notice"). Three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in this case—filed complaints and motions for temporary restraining orders. *See NIH*, 2025 WL 702163, at *1.

A federal district court quickly enjoined that policy, issuing first a nationwide temporary restraining order and then a nationwide preliminary injunction. *See id.* at *1. The Court held that the dispute was justiciable; that the plaintiffs were likely to succeed on their arguments that the NIH Rate Change Notice violated the applicable regulations, the appropriations rider, and the APA; that the plaintiffs demonstrated irreparable harm; and that the balance of the equities and public interest favored an injunction. Thereafter, the parties jointly moved to convert the preliminary injunction to a permanent injunction. *See* Motion for Consent, *NIH*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), Doc. No. 108. An injunction remains in place pending appeal.

Despite the injunction, DOE on April 11, 2025, announced a near-identical policy, declaring that DOE "will no longer use the negotiated indirect cost rate" for universities, instead "setting a standardized 15 percent indirect cost rate for all grant awards." DOE, *Policy Flash:*

*Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025). A temporary restraining order was granted on April 16, 2025. *DOE*, 2025 WL 1119791, at *1.[4]

### D. NSF's Rate Cap Policy.

NSF on May 2, 2025, issued its own Rate Cap Policy. Compl. Ex. A. The Rate Cap Policy announces that, beginning May 5, 2025, the "NSF will apply a standard indirect cost rate not to exceed 15% to all grants and cooperative agreements awarded to IHEs." *Id.* The Policy applies this supposedly necessary limit on indirect cost rates only with respect to "Institutions of Higher Education," *i.e.* universities. *Id.* Other institutions can continue to use negotiated indirect cost rates above 15%—even when they compete for the same grants as universities, and even though studies have shown that other types of recipients actually have higher indirect cost rates than IHEs. *See* Ass'n of Am. Univs., *Frequently Asked Questions About Facilities and Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs.

### E. Plaintiffs and Member Universities' Federally Funded Research Programs

Plaintiffs are several associations—the Association of American Universities ("AAU"), the Association of Public and Land-Grant Universities ("APLU"), and the American Council on Education ("ACE; collectively, "Organizational Plaintiffs")—and individual universities.

---

[4] The court requested continued briefing on the motion for the temporary restraining order and set a hearing, which was held on April 28, 2025. The court determined that it would treat plaintiffs' motion as seeking a preliminary injunction ("PI"), and would keep the temporary restraining order in place until it ruled on the PI. *See* Order, *AAU v. DOE*, No. 25-cv-10912 (D. Mass. Apr. 29, 2025), Doc. No. 55 (order extending TRO "until a further order is issued resolving the request for a preliminary injunction").

AAU is an association composed of 69 leading research universities with the goal of transforming lives through education, research, and innovation. AAU Decl., Doc. No. 40-1 at ¶ 3. Its members receive significant research funding from NSF grants. *Id.* For instance, in fiscal year 2023, AAU members received approximately $3.7 billion in NSF research and development funds stretching across various fields, from nanotechnology and semiconductors to biomedical engineering to advance drug delivery systems. *Id.* ¶ 4. Many of AAU's member universities have negotiated an indirect cost rate that is significantly higher than 15%, often in the 50%-65% range. *Id.* ¶ 12.

APLU is a membership organization that seeks to "foster[] a community of university leaders collectively working to advance the mission of public research universities," including "more than 230 public research universities, land-grant institutions, state university systems, and affiliated organizations spanning across all 50 U.S. states, the District of Columbia, and six U.S. territories." APLU Decl., Doc. No. 40-3 at ¶ 3. Members conduct "a wide variety of vital research on behalf of American citizens," including based on grant funding from NSF, with $4.6 billion in NSF grant funding in fiscal year 2023. *Id.* ¶ 5.

ACE is a membership organization composed of more than 1,600 colleges and universities, related associations, and other organizations in America and around the world. ACE Decl., Doc. No. 40-2 at ¶ 3. Its members "conduct a wide variety of vital research on behalf of United States citizens, funded in part by agency awards from across the federal government, including the National Science Foundation." *Id.* ¶ 7. ACE members received over six billion dollars in research and development funding from NSF in fiscal year 2023. *Id.* "ACE member universities rely on these funds to advance fundamental research and accelerate technology and innovation that ensure national security." *Id.*

14

Plaintiffs Arizona Board of Regents on behalf of Arizona State University ("ASU"), Brown University ("Brown"), California Institute of Technology ("Caltech"), The Regents of the University of California ("UC"), Carnegie Mellon University ("CMU"), University of Chicago ("UChicago"), Cornell University ("Cornell"), the Board of Trustees of the University of Illinois ("UIUC"), Massachusetts Institute of Technology ("MIT"), Regents of the University of Michigan ("Michigan"), Regents of the University of Minnesota ("Minnesota"), the Trustees of the University of Pennsylvania ("Penn"), and the Trustees of Princeton University ("Princeton") are research universities that house significant scientific study and innovation supported by NSF grants. They collectively receive hundreds of millions of dollars to support thousands of projects. *See, e.g.*, ASU Decl., Doc. No. 40-4 at ¶ 4; UC Decl., Doc. No. 40-7 at ¶ 2; Caltech Decl., Doc. No. 40-8 at ¶ 3; CMU Decl., Doc. No. 40-9 at ¶ 3; Cornell Decl., Doc. No. 40-14 at ¶ 4; UIUC Decl., Doc. No. 40-17 at ¶ 4; Michigan Decl., Doc. No. 40-20 at ¶ 3; Minnesota Decl., Doc. No. 40-21 at ¶ 3.

## LEGAL STANDARD

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious" or otherwise unlawful. *Bos. Redevl. Auth. v. Nat'l Park Serv*., 838 F.3d 42, 47 (1st Cir. 2016).

The Court evaluates four factors in determining whether a preliminary injunction is appropriate: "1) a likelihood of success on the merits, 2) irreparable harm to the plaintiff should preliminary relief not be granted, 3) whether the harm to the defendant from granting the preliminary relief exceeds the harm to the plaintiff from denying it, and 4) the effect of the

preliminary injunction on the public interest." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 75 (1st Cir. 2005). When defendants are government entities or officials, the balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

**I.    This Court Has Jurisdiction To Grant The Relief Requested.**

This suit seeks prospective relief to enjoin an across-the-board policy that applies to new grants on the ground that it violates the governing statutes and regulations. That falls squarely within a district court's jurisdiction under 28 U.S.C. § 1331 and the APA's waiver of sovereign immunity. In some grant-related cases, the government has argued that suits must be brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. The *NIH* court rejected that argument. *See NIH*, 2025 WL 702163, at *4. And its conclusion applies with even greater force here: Because the Rate Cap Policy applies only to future grants, and because Plaintiffs seek relief only as to future grants, Plaintiffs could not sue for damages in the Court of Federal Claims. The *sine qua non* of that court's jurisdiction is a "money-mandating" contract that establishes an entitlement to "actual, presently due money damages from the United States," *Taylor v. United States*, 73 Fed. Cl. 532, 545 (2006) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)). Absent a specific contract from which what is "essentially a contract dispute" can arise, *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 60-61 (1st Cir. 1978), the Tucker Act is irrelevant. Nor could "the doubtful and limited relief available in the Claims Court" be "an adequate substitute for review in the District Court" for this matter, *Bowen v. Massachusetts*, 487 U.S. 897, 901 (1988)—because the Court of Federal Claims cannot set aside or enjoin unlawful agency action. *See Nat'l Air Traffic*

*Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998).[5]

Nor does it matter that this case will have an effect on future grants that might be issued pursuant to notices of funding opportunity. Courts routinely "reject[] the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quotation omitted). That settled rule applies with particular force where, as here, there is no contract to refer to because plaintiffs challenge a policy that applies only to future contracts.

## II.  The Organizational Plaintiffs Have Standing.

The organizational Plaintiffs—AAU, APLU, and ACE—have standing to sue on behalf of their members. An "association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "Actions for declaratory, injunctive and other forms of prospective relief," like this one, are "particularly suited to group representation." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).

First, AAU, APLU, and ACE's members have Article III standing to sue in their own right. *See Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023). The university members face severe consequences should the Rate Cap Policy take effect. *See Plazzi v. FedEx*

---

[5] For the same reason, the Supreme Court's decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), is irrelevant. There, the challenged agency action was the breach of existing contracts, and the desired remedy was an order forcing the government to continue paying money under the contract.

*Ground Package Sys., Inc.*, 52 F.4th 1, 4 (1st Cir. 2022). The declarations attached to Plaintiffs'

motion demonstrate the injuries member schools will suffer. *See infra* Part IV. Those injuries are

directly traceable to the Policy. And declaratory and injunctive relief against the Policy will redress

that injury. *See Housatonic River Initiative*, 75 F.4th at 265.[6]

Second, the interests at stake are not only "germane" to AAU, APLU, and ACE's purposes,

but are intrinsically tied to their missions. *Id.* at 264-66. AAU's "primary goal is to provide a forum

for the development and implementation of institutional and national policies promoting strong

programs of academic research and scholarship and undergraduate, graduate, and professional

education"; APLU advocates for "public impact research" with a positive impact on society; and

ACE's mission is to advocate for public policy that supports the interests of its members, including

in obtaining support for academic research. AAU Decl., Doc. No. 40-1 at ¶ 3; ACE Decl., Doc.

No. 40-2 at ¶ 4; APLU Decl., Doc. No. 40-3 at ¶ 4.

Finally, participation by AAU, APLU, and ACE's members is not required for the claims

asserted or relief requested. Plaintiffs seek forward-looking injunctive and declaratory relief that

the Policy is unlawful, not damages or any remedy requiring individual participation. In such cases,

individual participation is not typically necessary, as "the remedy, if granted, will inure to the

benefit" of all members. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*

*v. Brock*, 477 U.S. 274, 287-88 (1986) (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *Pharm.*

*Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005) (Boudin, J. & Dyk, J. concurring).

### III.  Plaintiffs Are Entitled To Judgment On Their Claims.

Courts must hold unlawful and set aside final agency action that is "arbitrary, capricious,

---

[6] For these reasons, the individual school plaintiffs have standing in their own right. *See*
*Housatonic River Initiative*, 75 F.4th at 265.

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the

Rate Cap Policy violates those standards in myriad respects.

### A. The Rate Cap Policy Is Contrary To The Statutes Authorizing NSF To Make Grants.

An "agency literally has no power to act … unless and until Congress confers power upon

it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The only statute that authorizes

NSF to use a fixed rate for indirect cost reimbursements is 41 U.S.C. § 4708; Congress, as noted,

enacted that statute after the Comptroller General had deemed such rates unlawful. *Supra* at 9. And

Section 4708 does not authorize NSF to enact a categorical cap unmoored from any estimate of

actual "reimbursable indirect costs."

Section 4708's text, read with a view toward history and context, authorizes agencies to

estimate actual "reimbursable indirect costs" and then use that "pre-determined fixed-percentage

rate[]" to reimburse grant recipients. The text authorizes agencies to "provide for payment of

reimbursable indirect costs on the basis of predetermined fixed-percentage rates." 41 U.S.C.

§ 4708. The phrase "reimbursable indirect costs" means the indirect costs—costs "not directly

attributable to the performance of a particular contract but which nevertheless benefit the contract,"

S. Rep. No. 87-1826, at 3 (1962)—that the government must reimburse under governing law. And

Section 4708 authorizes agencies to "provide for payment" of these costs "on the basis of" "pre-

determined rates." To "provide for" means "to supply something needed." *Provide*, *American

Heritage Dictionary of the English Language* 1418 (5th ed. 2011). Nothing in the statute authorizes

agencies to pick a random number that does not even try to estimate a grant recipient's actual

reimbursable indirect costs. To the contrary, the agency is authorized to first determine a rate that

reasonably measures actual reimbursable indirect costs and then use that pre-determined rate to

make payments covering those reimbursable indirect costs.

This is how both Congress and the Executive Branch have always understood Section 4708. The Executive has never simply used a single across-the-board rate that bears no relationship to actual reimbursable costs, and the first time it even suggested that possibility, Congress rejected the plan with swift and bipartisan action. *Supra* at 11. Indeed, when Congress first enacted Section 4708, it did so only after virtually every affected agency wrote that they supported it *only because* they understood that the pre-determined rates would approximate actual costs.[7] The Executive Branch's implementing guidance, too, has always understood "predetermined" rates as based on an "estimate of the costs to be incurred during the period."[8] As of this writing, NSF's own website continues to memorialize that same understanding: "[a] predetermined indirect cost rate is a fixed rate established for a future fiscal period, based on the actual costs from a representative prior period."[9] Even in a post-*Chevron* world, when the Executive Branch from the start has understood and applied a statute a particular way, and that interpretation has "remained consistent over time," that construction properly "inform[s] [a court's] determination of 'what the

---

[7] S. Rep. 87-1826, at 3 (1962) (comms. of Gen. Counsel, Dep't of Def.) ("[I]ndirect costs must be reimbursed in fair degree when the government agrees to pay the costs of the contract and cost-sharing is not contemplated"); *id.* at 5-6 (comms. of Asst. Dir. for Legis. Ref., Bur. of Budget) ("[I]t is important that the predetermined rate closely approximate the actual rates, and that provision be made for frequent reviews—say annually—of each institution's rate to assure that this objective is met."); *id.* at 8 (comms. of Gen. Counsel, Dep't of Treasury) ("The Department perceives no objection to the proposed legislation if some procedures are established, under which the rates can be kept in reasonably close conformity with actual overhead costs.").

[8] OMB Circular A-122, *Cost Principles for Nonprofit Organizations*, 45 Fed. Reg. 46,022, 46,026 (July 8, 1980); *see* 2 C.F.R. Part 200 Appendix IV(C)(1)(b) (same); accord *Principles for Determining Costs Applicable to Research and Development Under Grants and Contract With Educational Institutions*, 30 Fed. Reg. 9676, 9681 (Aug. 4, 1965) (directing agencies to use predetermined rate procedure "where the cost experience and other pertinent facts available are deemed sufficient to enable the contracting parties to reach an informed judgment as to the probable level of indirect costs during the ensuing accounting period" (emphasis added)).

[9] NSF, *Indirect Cost Rate Policies*, https://www.nsf.gov/funding/proposal-budget/indirect-costs (last visited May 3, 2025) (Doc. No. 39-42).

law is.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

The subsequent statutory history reinforces the conclusion the text compels. When Congress wanted to impose a categorical cap that denies reimbursement of actual costs, it did so expressly, as in 1962 when it briefly experimented with such a cap. *Supra* at 9-10. But because that approach quickly proved unworkable and not "equitable," Congress rejected it just a few years later in 1965. Independent Offices Appropriation Act, 1966, Pub. L. 89-128, § 303, 79 Stat. 520, 543 (1965); *see* H.R. Rep. 89-320, at 16. In 2005, Congress did away with even the modest cost-sharing requirement it imposed in 1965. And in 2017, Congress could not have been clearer in explaining that a draconian cap would "radically change the nature of the Federal Government's relationship with the research community" and would "throw[] research programs across the country into disarray." S. Rep. 115-150, at 109. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 180 (2020). Yet NSF's Rate Cap Policy attempts to impose (in more severe form, no less) the kind of rate cap that Congress *specifically repealed* and has, ever since, *specifically declined* to reenact.

Indeed, the Supreme Court has made clear that courts must look with skepticism on claims by the Executive that it has newly discovered authority in broadly worded statutes to abandon a longstanding understanding that a more specific approach is necessary. *See MCI Telecomms. Corp.*, 512 U.S. at 229. Just as the prior Administration violated that principle when it used a tailored waiver authority to wipe out student loans wholesale and thereby "unilaterally alter large sections of the American economy," *Biden v. Nebraska*, 600 U.S. 477, 507 (2023), NSF may not rewrite Congress's tailored approach to indirect costs with a one-size-fits-all rate that will upend research across higher education and that is inconsistent with NSF's mission as a grantmaking

agency whose purpose is to fund scientific research. *Supra* at 5; *West Virginia v. EPA*, 597 U.S. 697, 721 (2000) (reasoning that the "history and breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion" counsel in favor of "hesitat[ing] before concluding that Congress meant to confer such authority" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000))).

### B.  The Rate Cap Policy Violates 2 C.F.R. § 200.414.

The Rate Cap Policy also violates the regulations promulgated to implement the tailored approach Congress created by statute. "An agency may not … simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The relevant regulation, 2 C.F.R. § 200.414(c)(1), states that negotiated rates "must be accepted by all Federal agencies," unless narrow exceptions apply. An "agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award *only* when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." 2 C.F.R. § 200.414(c)(1) (emphasis added). In turn, 2 C.F.R. § 200.414(c)(3) states: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." Here, as in *NIH*, the Rate Cap Policy conflicts with the plain text of 2 C.F.R. § 200.414 in numerous ways. *See NIH*, 2025 WL 702163, at *10.

First, the regulations authorize deviations only for "a class of Federal awards or a single Federal award." 2 C.F.R. § 200.414(c)(1). The Rate Cap Policy, however, does not set a new rate for either a class of awards or a single award. It sets a new rate for a class of *recipients*— universities. This distinction is not mere semantics: Under the Policy, the indirect cost rate for a particular class of awards or a particular award will vary depending on *who receives it*. The

regulations do not authorize deviations to yield that result. They instead recognize that in some cases particular awards may merit their own indirect cost rate, separate from institution-wide negotiated rates. Where the regulations establish a detailed system for setting institution-wide negotiated rates, typically via HHS or DOD, it makes no sense to read those regulations as allowing other agencies to toss out those rates at will. Moreover, even if the regulations permitted deviations for a "class of Federal award[] [recipients]," the Rate Cap Policy would violate this limit because it applies to universities that account for over 80% of NSF's total R&D obligations. That is not a "class" in any meaningful sense.

Second, the regulations at most authorize agencies to announce policies or procedures governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate, not to announce by fiat a different rate. That is clear from the text: The regulation requires agencies to implement and publicize "the *policies*, *procedures and general decision-making criteria*" that they "*will* follow to *seek and justify* deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3) (emphasis added). The first italicized phrase connotes *a process* that applies *standards*. A "procedure" is a "series of steps followed in a regular orderly definite way." *Procedure*, *Webster's Third New International Dictionary* 1807 (1986). Criteria are "standard[s] on which a decision or judgment may be based." *Criterion*, *Webster's Third New International Dictionary* 538 (1986). A categorical dictate of a 15% rate applicable to every university is not a "procedure" and does not set forth "general decision-making criteria." Nor can issuing a blanket diktat be said to "seek and justify" a departure. That phrase again connotes a weighing of a particular rate against the agency's general standards.

Moreover, the phrase "will follow" makes clear that the agency must publish its procedures first and then apply them to particular facts. NSF skipped the first step—it never

enacted any policies, procedures, or criteria—and attempted to accomplish these distinct and mandatory regulatory requirements in one fell swoop. Indeed, NSF in the Rate Cap Policy admits as much, stating that the Policy sets forth rules that "NSF *has used* to justify deviation[s]." (emphasis added). That is not the process the regulations require. As in *NIH*, NSF "ignore[d] the separate requirements" and failed to "comply with the step-by-step process mandated by the language of the regulation." 2025 WL 702163, at *10.

Third, the Rate Cap Policy's elimination of the negotiated-rate regime is not a mere "deviation[]," which is all that Section 200.414(c)(3) authorizes. 2 C.F.R. § 200.414(c)(3). As the Supreme Court has repeatedly made clear, agencies cannot stretch similar authorities to enact "fundamental changes" to the regulatory regime, like the wholesale elimination of negotiated rates for all universities. *Cf. MCI Telecomms. Corp.*, 512 U.S. at 228-29 (holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Biden*, 600 U.S. at 494-95 (similar). As the *NIH* court observed in a similar context, a "single [indirect cost rate] capped at 15% is certainly a different approach than" the approach contemplated by the regulations—"negotiating [indirect cost rates] institution by institution with deviations allowed in limited, justified circumstances." 2025 WL 702163, at *13. So too here: Far from deviating from negotiated rates, the Policy states that "[a]pplying a standard indirect cost rate also improves government efficiency by *eliminating* the need for individualized indirect cost negotiations." Rate Cap Policy (emphasis added). It would be downright bizarre to say that NSF is "deviating" from negotiated rates when it is really eliminating them.

Finally, the Rate Cap Policy contravenes Section 200.414(c)(4), which requires federal agencies to include in any "notice of funding opportunity[] the policies relating to indirect cost rate reimbursement." 2 C.F.R. § 200.414(c)(4). The Federal Register notice promulgating this

provision makes clear that any attempt to depart from negotiated rates must first be "established" and then "inclu[ded] … in the announcement of funding opportunity." *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). To the extent NSF's Policy applies to grants for which the notice of funding opportunity has issued but the grant has not yet been awarded, it violates this clear requirement. Plaintiffs have thousands of such proposals pending.

### C. The Rate Cap Policy Violates Regulatory Requirements For Indirect Cost Recovery.

The Rate Cap Policy is also inconsistent with the larger regulatory framework governing recovery of indirect costs. As the *NIH* Court again observed, the deviation provision "operates within a larger regulatory structure"—a structure that "expound[s] upon the identification, negotiation, and administration of indirect costs" and requires agencies and recipients to follow detailed substantive and procedural guidelines aimed at identifying *actual* indirect costs. *NIH*, 2025 WL 702163, at *9. The Rate Cap Policy upends that detailed system.

As explained, the regulations create a reticulated scheme for setting indirect cost rates— one ensuring that grantees can recover their actual indirect costs that are reasonable and attributable to federal projects. The bedrock principle is that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402. The regulations establish detailed guidelines to ensure that grantees recover those costs via a detailed documentation and recovery system. *See* 2 C.F.R. § 200.414; Appendix III to Part 200 ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity"); Appendix III to Part 200(A)(2)(e)(1) ("Indirect (F&A) costs are the broad categories of costs discussed in Section B.1."). By slashing

indirect cost rates for universities across the board to 15%, NSF will prevent grantees from recovering their indirect costs—a portion of their actual research costs—in direct contravention of this regulatory framework.

The Rate Cap Policy also departs from the existing, complex process for negotiating an indirect cost recovery rate. Under existing law, institutions must document and submit costs in great detail to support recovery. Subpart E of part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards." 2 C.F.R. § 200.100(c). 2 C.F.R. § 200.414(e) stipulates that appendices will detail "[r]equirements for development and submission of indirect cost rate proposals and cost allocation plans." Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal"). Appendix III to those regulations establishes the criteria for identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs). *Id.* § 200.414(e)(1); Appendix III to Part 200. The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among projects. The Policy dispenses with every bit of this procedure for documentation and calculation.

The Policy further displaces the regulatory process to review and validate indirect cost allocation. By existing law, NSF must employ annual audits to determine what is charged to a federal award and ensure that accounting is correct. 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it "elects to have a program-specific audit." *Id*. This audit is performed annually, and it must be conducted in accordance with articulated standards. 2 C.F.R. §§ 200.504, 200.514. An auditor may identify

26

any "[q]uestioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment:" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award"; (2) "[a]t the time of the audit, lacked adequate documentation to support compliance; or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results are factored into negotiation of indirect cost rates. *See* Appendix III to Part 200. Again, the Rate Cap Policy ignores and is inconsistent with this comprehensive and demanding regulatory scheme.

### D.  The Rate Cap Policy Is Arbitrary And Capricious.

The Rate Cap Policy's change—taking the inherently individualized process of approximating indirect costs that vary widely, and replacing it with a one-size-fits-all number—is arbitrary at its core. No surprise, then, that the Policy violates the APA several times over, as the *NIH* court found in enjoining a similar policy. 5 U.S.C. § 706(2)(A); *see NIH*, 2025 WL 702163, at *16-21. Under the APA, agencies must provide a reasoned basis for their actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983). This standard requires a "rational connection between the facts found and the choice made." *Id*. at 43 (quotations omitted). And agencies cannot fail to consider "important aspect[s] of the problem." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). In two broad ways, and in numerous more specific ways, NSF has violated these bedrock requirements.

*First*, the Policy's three justifications are conclusory and, to the extent any reasoning can be discerned, nonsensical. The first justification, "Efficiency," posits that the Policy "[r]educe[s] administrative burdens for awardee institutions" and "improves government efficiency by

eliminating the need for individualized indirect cost negotiations." But the Policy will not *avoid* these burdens: Universities must still negotiate rates with other agencies, other agencies must still negotiate rates with universities, and NSF itself must still negotiate rates with non-university recipients. Indeed, NSF negotiates rates only "for ~100 organizations," not all universities. NSF, *NSF's Indirect Cost Rate Policies*, https://www.nsf.gov/funding/proposal-budget/indirect-costs (last visited May 6, 2025). More fundamentally, it is simply bizarre to pitch a massive cut in research funding as a *benefit* to universities or, by extension, the research work that they perform for the federal government. Nor does the Policy genuinely improve efficiency: "Efficiency" is "capacity to produce desired results with a minimum expenditure of energy, time, money, or materials." *Efficiency*, *Webster's Third New International Dictionary* 725 (1986). There is nothing "effective" about picking an arbitrary number that damages the very outputs that Congress directed NSF to "produc[e]"—properly funded research.

Next, NSF avers that the Rate Cap Policy "[e]nsur[es] consistent treatment of all IHE financial assistance recipients." But treating institutions with *different* costs *the same* is not consistency. It is inconsistency. And the Policy also treats universities and non-universities inconsistently, exempting from its cap non-university recipients that can compete for the same awards as universities but that can receive reimbursement of all of their research costs. Indeed, similar inconsistencies are precisely what Congress sought to avoid when it rejected a fixed cap in 1965 as not "equitable," H.R. Rep. 89-320 at 16, and those inequities are only greater today. *Cf. Independent Offices Appropriations, 1966: Hearings on H.R. 7997 Before the Subcomm. of the S. Comm. on Appropriations*, 89th Cong. at 578-79 (1965) (Statements of Dr. Haworth and Dr. Thieme) (noting that cap yielded different results based on "accounting systems" and imposed an "arbitrary limitation" on grants that did not apply to other agreements).

Finally, the Policy says it "[i]ncreas[es] the proportion of federal funds allocated to direct research costs" and "ensure[s] that more resources are directed toward direct scientific and engineering research activities." But to start, these sentences just describe what the policy does; they do not explain why NSF has made its choice. And given that the Policy does not announce some other means of providing funding, this statement is simply not true; it just yields less research.  Nor does the Policy justify its implied view that direct costs are more worthy than indirect. As explained, indirect costs are necessary for research and often differ from direct costs only in that they fund multiple projects. For example, if a cutting-edge computer supports three NSF grants, one NIH grant, and one private grant, its cost might be indirect—but it would be essential for the NSF work. Moreover, indirect costs are often highest in facility-intensive cutting-edge research. If NSF believes that it should more fully fund the research of institutions whose research skews toward (say) social science over (say) advanced AI, it must at minimum say why.

***Second***, the Rate Cap Policy is arbitrary and capricious because it ignores "important aspect[s] of the problem," *Regents of Univ. of Cal.*, 591 U.S. at 30 (citation omitted), including how its cap will thwart the goals that NSF by statute must promote. Congress directed NSF to promote basic science research, especially at universities. 42 U.S.C. § 1862(a)(1). A categorical 15% cap will badly undermine and diminish that research, as the declarations submitted with Plaintiffs' motion amply confirm. *Infra* Part IV. And as explained, that cap will hit the most advanced research the hardest and amounts simply to a decision to fund less research of particular types—including cutting edge scientific research that relies heavily on unique, expensive facilities. Congress itself has called attention to these consequences, observing that a draconian cap would "radically change the nature of the Federal Government's relationship with the research community" by changing an indirect rate methodology that "has been in place since

1965," and that it is not clear how such a "proposal … could be accomplished without throwing research programs across the country into disarray," S. Rep. 115-150, at 109; *accord* H.R. Rep. 115-244, at 50. NSF said not *one word* about these obvious problems, which is the very essence of administrative arbitrariness.

   ***Finally***, in myriad more specific ways, the Policy violates the settled rule that administrative decisions must be reasonable and reasonably explained.

   One, the Rate Cap Policy "fails in its entirety to recognize or consider the substantial reliance interests at issue." *NIH*, 2025 WL 702163, at *19; *see Regents of Univ. of Cal.*, 591 U.S. at 30-31. The average rate of indirect costs incurred by Plaintiffs is well more than 30% and often more than 50%. *E.g.*, CMU Decl., Doc. No. 40-9 at ¶ 13 (roughly 52%); Cornell Decl., Doc. No. 40-14 at ¶ 17 (up to 64%). The Policy thus purports to slash indirect cost recovery by around two thirds or more. That badly damages the reliance interests of universities, which have structured their budgets and their planning—about what buildings to contract, what employees to hire, and much more—in reliance on the Executive Branch's decades-old practice of sticking to negotiated indirect cost rates with narrow and limited exceptions, as the statutes and regulations require. *Infra* at 35-36 (describing how the Policy undermines long-term budgeting).

   Nor can NSF excuse its failure to consider these reliance interests on the theory that the Rate Cap Policy applies only to new grants. In *Regents*, the Supreme Court rejected the government's argument that it "did not need to" consider reliance interests because the challengers supposedly lacked "legally cognizable … interests" or "substantive rights." 591 U.S. at 30-31. Such features, the Court explained, do not "automatically preclude reliance interests," and they do not excuse agencies of their duty to "consider[]" reliance interests "in the first instance." *Id.* Here, as in *NIH*, NSF's Rate Cap Policy "fails to contemplate the budgets of these

institutions, formulated months and years before this Notice's sudden implementation … . It fails to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed." *NIH*, 2025 WL 702163, at *20. *See also infra* Part IV.

Two, the Rate Cap Policy departs without acknowledgment or explanation from NSF's policy on mandatory cost-sharing. That policy states that "[m]andatory programmatic cost sharing will rarely be approved for an NSF program," and that "[a]ny program that would like to request consideration of mandatory programmatic cost sharing requirement in an NSF solicitation must develop a compelling justification regarding why non-Federal financial support and commitment is considered foundational to programmatic success." *Revised Cost Sharing Policy Statement*; *accord Award Guide* at II-21. As NSF has acknowledged, an arbitrary cap on indirect costs is, in substance, mandatory cost-sharing: It requires applicants to pay otherwise reimbursable costs, and says that if they do not, they will not receive the work. *Award Guide* at II-20 ("Use of an indirect cost rate lower than the organization's current negotiated indirect cost rate is considered a violation of NSF's cost sharing policy."). And such a cap creates all the problems that has led NSF to disfavor mandatory cost sharing: It fails to fund the full costs of the research NSF sponsors in a manner that NSF has acknowledged is rarely appropriate. And it favors certain applicants over others for reasons unrelated to their ability to effectively carry out the research. Yet the Rate Cap Policy does not even acknowledge that it conflicts with NSF's cost-sharing policy. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (an agency "must at least display awareness that it is changing position" and "show that there are good reasons for the new policy" (internal quotation marks and citations omitted)).

Three, the Rate Cap Policy is arbitrary and capricious because it rests upon factual findings that contradict those that underlay NSF's prior policy, but that NSF does not explain.

The "existing [indirect cost rate] negotiation process contemplates the need for an individualized analysis at the institution level, as well as the dramatically different needs of those varying institutions." *NIH*, 2025 WL 702163, at *19. The prior policy rested on the fact that different institutions are differently situated, and that indirect cost rates must be individualized to reflect that. This Policy, though, "failed to acknowledge those circumstances, nor provides any justification for that disregard." *Id.*; *cf. Fox Television Stations*, 556 U.S. at 515 (if a "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," failure to consider such factors "would be arbitrary or capricious").

Four, NSF fails to explain why audits of indirect costs would not "improve government efficiency." Because audits look at specific costs, they can accomplish what NSF's indiscriminate policy cannot—identifying specific costs that can be appropriately curtailed. NSF regulations provide for a robust audit procedure to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred, and to adjust the indirect cost rate if it does not. *See* 2 C.F.R. §§ 200.1, 200.501(b), 200.504, 200.514; Appendix III to Part 200. NSF "fails to explain the inadequacy of the existing audit system or how the auditing system differs from the tracing of direct costs." *NIH*, 2025 WL 702163, at *18. "At the very least," NSF should have addressed "this alternative way of achieving" the Policy's stated objectives and provided "adequate reasons … for its abandonment." *State Farm*, 463 U.S. at 48.

Five, the Rate Cap Policy is arbitrary and capricious because it singles out universities without explanation. If (counterfactually) a 15% cap were sound policy, NSF does not explain why it imposed that policy on only one class of recipients. And this inequitable treatment is

especially pernicious because, as explained, universities regularly compete with non-universities for the same awards—disadvantaging IHEs seeking the same funds from the same programs.

Nor does the Policy even attempt to explain why it set its university-specific rate at 15%. Cryptically referring to "aligning with common federal benchmarks," the Policy appears to have borrowed the "de minimis" rate from 2 C.F.R. § 200.414(f). But this rate applies when institutions have not offered "documentation to justify" a particular rate. And NSF has not even attempted to explain why it treats universities that have documented substantially higher indirect costs the same as other recipients that have documented no indirect costs.

## IV.    Plaintiffs Are Entitled To A Preliminary Injunction.

Plaintiffs meet all the requirements for a preliminary injunction: The Rate Cap Policy is inflicting enormous irreparable harm, and the balance of hardships and the public interest emphatically favor enjoining patently unlawful Executive actions.

### A.    The Rate Cap Policy Is Inflicting Irreparable Harm.

If the Rate Cap Policy is allowed to remain in effect, Plaintiffs and their members will suffer immediate and irreparable harm to their educational missions, core infrastructures and facilities, research agendas and programs, critical personnel, and operating budgets. That harm is substantial, manifest, and not ascertainable or compensable by money damages. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000); *see NIH*, 2025 WL 702163, at *28 ("suspension of ongoing research" would constitute "irreparable harm"); *New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025) (same re "disruptions to research projects by state universities"). Harms from the Policy will be severe, causing immediate and ongoing irreparable damage to Plaintiffs' and hundreds of universities' educational and research missions.

*First*, Plaintiffs and declarants collectively have—right now—thousands of proposals pending before NSF that were prepared in reliance on their individually negotiated indirect cost rates, and researchers and staff at these institutions are in the process of preparing and submitting more every day.[10] Most of these projects could not proceed at a 15% indirect cost rate.[11] For Plaintiffs and declarants, then, the 15% rate cap has immediately placed them in an untenable position. Relying on negotiated indirect cost rates in new proposals creates a substantial risk that those proposals will be rejected out of hand, thus putting at risk Plaintiffs' ability to conduct critical research. But they also cannot accept the 15% rate—because that rate is financially unsustainable. *See, e.g.*, Cornell Decl., Doc. No. 40-14 at ¶ 14; Dartmouth Decl., Doc. No. 40-15 at ¶ 30; Florida Decl., Doc. No. 40-16 at ¶ 23; KU Decl., Doc. No. 40-18 at ¶ 22; Rice Decl., Doc. No. 40-30 at ¶ 19. Losing out on the ability to submit research proposals means losing out on research, full stop. And the First Circuit has said the loss of similarly "unique or fleeting" opportunities is sufficient to show irreparable harm. *See Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997).

---

[10] *See, e.g.*, CU Boulder ¶ 15 ($18.5 million worth of research anticipated from proposals due in the next two months); MIT Decl., Doc. No. 40-19 at ¶ 10 (decisions expected on dozens of proposals currently pending with NSF over the next two months); *see also* ASU Decl., Doc. No. 40-4 at ¶ 10 (400 proposals totaling almost $275 million); Cornell Decl., Doc. No. 40-14 at ¶¶ 5, 14-15 (over 260 current proposals); Dartmouth Decl., Doc. No. 40-15 at ¶¶ 19-20 (nearly 100 proposals); UIUC Decl., Doc. No. 40-17 at ¶ 7 (two pending, multi-institutional proposals); KU Decl., Doc. No. 40-18 at ¶ 4 (123 pending proposals); Minnesota Decl., Doc. No. 40-21 at ¶ 15 (over 300 proposals); OSU Decl., Doc. No. 40-25 at ¶ 5 (169 proposals totaling almost $198 million).

[11] Brown Decl., Doc. No. 40-5 at ¶¶ 7-8 (describing six projects currently funded by NSF that would be seriously jeopardized or forced to end if funded at the 15% cap); *see also, e.g.*, Cornell Decl., Doc. No. 40-14 at ¶¶ 13-15; Dartmouth Decl., Doc. No. 40-15 at ¶ 21; Florida Decl., Doc. No. 40-16 at ¶ 16; UIUC Decl., Doc. No. 40-17 at ¶ 8; KU Decl., Doc. No. 40-18 at ¶ 19; MIT Decl., Doc. No. 40-19 at ¶¶ 11-12; Minnesota Decl., Doc. No. 40-21 at ¶ 15; UNR Decl., Doc. No. 40-22 at ¶¶ 5-6; OSU Decl., Doc. No. 40-25 at ¶ 16; Yale Decl., Doc. No. 40-41 at ¶¶ 6-7.

For example, the University of New Hampshire has *already* been notified of a proposal that it can no longer submit because its partner institutions could not continue the project at a 15% indirect cost rate. UNH Decl., Doc. No. 40-23 at ¶ 15; *see also, e.g.*, CU Boulder ¶ 15 (dozens of NSF proposals currently in process or pending review that, if subject to the 15% cap, will "significantly constrain[]" the University's ability to drive "critical scientific and technological advances" in "quantum science, materials innovation, and national infrastructure resilience"); Vermont Decl., Doc. No. 40-38 at ¶ 15(a) (twelve NSF-funded researchers who will run out of funding in 2025 have pending proposals to continue their work, but under the Policy, they "will be forced to wind down research activities and terminate their long-time lab managers and technicians").

*Second*, due to the realities of budgeting and cost allocation for research programs, the myriad harms from slashing the indirect cost rate to 15%—described below—begin to accrue immediately, for programs supported by both new and existing grants. A 15% rate cap imposes a massive budget shortfall, growing over time.[12] To see why those cuts hit so hard and so fast, consider a simplified example: A university with a 50% negotiated indirect cost rate and 100 grants, each with $1 million in authorized costs, each lasting five years, and with 20 grants turning over each year (and with the university reasonably expecting to receive new grants for each grant that turns over). In Year 1, a cut to 15% will reduce indirect cost reimbursement across the 20

---

[12] *See, e.g.*, CMU Decl., Doc. No. 40-9 at ¶¶ 13-15 (anticipated annual loss of roughly $12.8 million); Cornell Decl., Doc. No. 40-14 at ¶ 20 (annual loss of $25 million); Michigan Decl., Doc. No. 40-20 at ¶ 14 (annual loss of $36 million); UPenn Decl., Doc. No. 40-26 at ¶¶ 13-15 (annual loss of roughly $10 million); Rutgers Decl., Doc. No. 40-31 at ¶ 14 (annual loss of $26.3 million); Vanderbilt Decl., Doc. No. 40-37 at ¶¶ 12-14 (annual loss of $6 million); Washington Decl., Doc. No. 40-39 at ¶ 14 (annual loss of $27 million); UW-Madison Decl., Doc. No. 40-40 at ¶¶ 13-14 (anticipated annual loss of $25 million); Yale Decl., Doc. No. 40-41 at ¶¶ 11-13 (annual loss of $9 million).

turning-over grants by $7 million (from $10 million at a 50% rate to $3 million at a 15% rate). Because money is fungible, the university must account for the loss across all of its programs. Absent judicial intervention, the loss will grow to $14 million in Year 2, $21 million in Year 3, and so on until it reaches $35 million. That is why, as Dartmouth explains, a 15% rate cap for new awards would "need to be factored into our institutional projections *now* in terms of investments, hiring, etc., and would result in a dramatic restructuring and realignment away from doing research." Dartmouth Decl., Doc. No. 40-15 at ¶ 20 (emphasis added); *see also* UC Decl., Doc. No. 40-7 at ¶ 14; Cornell Decl., Doc. No. 40-14 at ¶ 22; UIUC Decl., Doc. No. 40-17 at ¶ 18; Michigan Decl., Doc. No. 40-20 at ¶ 16; Rice Decl., Doc. No. 40-30 at ¶ 14; SUNY Decl., Doc. No. 40-32 at ¶ 21; *Bos. Celtics Ltd. P'ship v. Shaw*, 908 F.2d 1041, 1048 (1st Cir. 1990) (finding that a "difficult[y] to plan intelligently" contributes to a showing of irreparable harm).

NSF's policy will lead to staffing reductions across the board, at some institutions within "a matter of weeks."[13] Moreover, even if funding is later restored, it is exceedingly hard to recruit staff and researchers who have the knowledge and experience to work on such projects. *See Nat'l Council of Nonprofits v. OMB*, No. 25-239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (inability to recruit replacements following layoffs is irreparable harm).[14]

---

[13] Cleveland State Decl., Doc. No. 40-11 at ¶ 15; *see also* UNR Decl., Doc. No. 40-22 at ¶ 15 (required to "lay off an estimated 20-30 grant support and technical personnel within a matter of weeks"); URI Decl., Doc. No. 40-29 at ¶ 14 ("If NSF F&A rates were capped at 15% we would have to start laying off staff within a matter of weeks."); UC Decl., Doc. No. 40-7 at ¶ 18; CMU Decl., Doc. No. 40-9 at ¶ 16; CU Boulder ¶ 14; Florida Decl., Doc. No. 40-16 at ¶ 15; UIUC Decl., Doc. No. 40-17 at ¶ 25; Rutgers Decl., Doc. No. 40-31 at ¶ 15; Stony Brook Decl., Doc. No. 40-33 at ¶ 14; Tufts Decl., Doc. No. 40-35 at ¶ 14; Utah Decl., Doc. No. 40-36 at ¶ 15; Washington Decl., Doc. No. 40-39 at ¶ 15.

[14] *Accord* Michigan Decl., Doc. No. 40-20 at ¶ 15 ("A sudden loss of support would prompt specialized researchers, technicians, and graduate students to leave for better-funded programs."); *see, e.g.*, Dartmouth Decl., Doc. No. 40-15 at ¶¶ 23-24 (possibility of significant layoffs and

NSF's policy will make it "impossible" to equip and maintain state-of-the art facilities that house and support various high-tech and cutting-edge research fields.[15] For instance, a rate reduction to 15% would "severely impact … laboratories and operations" at UNR, "with potential closures of critical facilities such as the Earthquake Engineering Laboratory, the Nevada Terawatt Facility, or specialized labs within the Mackay Mines Complex." UNR Decl., Doc. No. 40-22 at ¶ 9. At the University of Florida, crucial research into nanotechnology and semiconductors similarly requires maintenance of 7 "cleanrooms for chip and device assembly" that could not continue to operate without sufficient reimbursement of indirect costs on future NSF grants. Florida Decl., Doc. No. 40-16 at ¶¶ 8-9, 15. At the University of Wisconsin-Madison, the Centers for Nanoscale Technology (WCNT), a critical shared instrument facility that supports the Materials Research Science and Engineering Center as well as seven other universities and 32 companies in the past year, depends on indirect funding support and, with the 15% rate cap, would need to seek alternative funding sources, which will either "reduce the funding available for scientific advancement or result in proposals for significantly higher direct costs," threatening a "critical resource" whose closure would have negative impact throughout "the upper Midwest." UW-Madison Decl., Doc. No. 40-40 at ¶ 8.

---

necessary reduction in new faculty "start-up" packages for junior investigators to open laboratories); MIT Decl., Doc. No. 40-19 at ¶ 13 (describing "increased outreach from colleagues at institutions in Europe and other nations" to MIT's top researchers, seeking to take advantage of reductions in and uncertainty about researching funding from NSF and other agencies); *see also* Caltech Decl., Doc. No. 40-8 at ¶ 15; CMU Decl., Doc. No. 40-9 at ¶ 18; URI Decl., Doc. No. 40-29 at ¶ 14.

[15] Caltech Decl., Doc. No. 40-8 at ¶¶ 8-9; *see also, e.g.*, CMU Decl., Doc. No. 40-9 at ¶ 10; CU Boulder Decl., Doc. No. 40-12 at ¶ 8; UIUC Decl., Doc. No. 40-17 at ¶ 25; Michigan Decl., Doc. No. 40-20 at ¶¶ 8-9; UNR Decl., Doc. No. 40-22 at ¶ 9; OSU Decl., Doc. No. 40-25 at ¶ 14; Penn State Decl., Doc. No. 40-27 at ¶ 15; Rutgers Decl., Doc. No. 40-31 at ¶¶ 8-9; SUNY Decl., Doc. No. 40-32 at ¶ 10; Stony Brook Decl., Doc. No. 40-33 at ¶¶ 7-8; Utah Decl., Doc. No. 40-36 at ¶¶ 15-16.

The rate cut will also result in critical research programs being disrupted or stopped altogether. *See, e.g.*, UChicago Decl., Doc. No. 40-10 at ¶ 19; Cleveland State Decl., Doc. No. 40-11 at ¶¶ 7, 15; Michigan Decl., Doc. No. 40-20 at ¶¶ 5-6; UNR Decl., Doc. No. 40-22 at ¶¶ 5-6; UNM Decl., Doc. No. 40-24 at ¶¶ 4-6; Penn State Decl., Doc. No. 40-27 at ¶¶ 5-6, 15. At Caltech, for instance, the rate cut will severely disrupt or stop altogether research into new methods of molecular synthesis that are essential to drug development, advances in battery technology central to America's energy future, and progress in developing quantum devices necessary for quantum computing. Caltech Decl., Doc. No. 40-8 at ¶ 5. At Cleveland State University, the Policy would jeopardize tissue engineering that holds the promise of restoring sensation in engineered skin, significantly improving the recovery of servicemembers and civilians who experience traumatic injuries. Cleveland State Decl., Doc. No. 40-11 at ¶ 5.

These projects, once stopped, cannot simply be restarted: The loss of human capital, and sometimes the degradation of physical infrastructure, is too great. APLU Decl., Doc. No. 40-3 at ¶ 12; Vermont Decl., Doc. No. 40-38 at ¶ 17; Washington Decl., Doc. No. 40-39 at ¶ 15. For example, at the University of Michigan, maintenance schedules would be interrupted in critical facilities, causing shutdowns and damage that could take years to remedy. Michigan Decl., Doc. No. 40-20 at ¶ 15; *see* UC Decl., Doc. No. 40-7 at ¶ 7; UIUC Decl., Doc. No. 40-17 at ¶ 10; SUNY Decl., Doc. No. 40-32 at ¶ 11. Even those projects that may be restarted down the line, when additional funding is secured, will suffer setbacks and delays, maybe even permanent closures. Caltech Decl., Doc. No. 40-8 at ¶ 23 ("draconian cost-cutting measures would need to be adopted" "immediately," and "layoffs, closures, and research pauses or contractions would follow soon thereafter"); *see* Utah Decl., Doc. No. 40-36 at ¶ 15; Vermont Decl., Doc. No. 40-38 at ¶ 23.

Moreover, universities will have to cut graduate and post-graduate trainees—irreversibly damaging their academic communities, their talent pipelines, the careers of these young researchers, and the national interest in training the next generation of scientists.[16] And these costs will be felt not just at the Plaintiff universities, but in the surrounding communities that rely on the jobs and spending these programs provide.

Some of the losses will occur in rapidly evolving and highly competitive fields, such as energy technology, quantum computing, and artificial intelligence. *See, e.g.*, UC Decl., Doc. No. 40-7 at ¶ 18; Caltech Decl., Doc. No. 40-8 at ¶ 23; UIUC Decl., Doc. No. 40-17 at ¶ 25; Rice Decl., Doc. No. 40-30 at ¶¶ 4, 7; UW-Madison Decl., Doc. No. 40-40 at ¶ 5. At the University of Michigan, the development of new materials for batteries and other materials safeguards the strategic interest of the United States against competition from Russia and China and reduces our reliance on imported rare earth metals, making supply chains more resilient. Michigan Decl., Doc. No. 40-20 at ¶ 5. Loss of dominance in these fields will cause "existential injuries" that undeniably rise to the level of irreparable harm, *National Council of Nonprofits*, 2025 WL 368852, at *12-13; there is no "possibility [of] adequate compensatory or other corrective relief … at a later date." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (quotation omitted).

Hence, as the *NIH* court explained, the "ripples" of the Rate Cap Policy "are profound and have the potential to reverberate around the world." 2025 WL 702163, at *31. "It is impossible to

---

[16] Caltech Decl., Doc. No. 40-8 at ¶ 15 ("We would immediately begin a process of reducing the number of graduate student researchers at Caltech," totaling "250 positions over the first year, with no prospect of new appointments"); CU Boulder Decl., Doc. No. 40-12 at ¶ 17 ("CU Boulder has long-term obligations" including "433 PhD students funded on NSF awards" and "relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments."); ACE Decl., Doc. No. 40-2 at ¶¶ 10-11; APLU Decl., Doc. No. 40-3 at ¶ 15.

measure the value of discovery from scientists who choose to leave, or of the potential students who now never become scientists at all. Even for those harms tha[t] can be measured in dollars and cents, the losses are compounding and will result in even greater disruption to ongoing research … ." *Id.*

Universities have undertaken NSF-funded research to support the national interest and development of key scientific technologies, such as in semiconductors, artificial intelligence, quantum computing, and drug therapies, AAU Decl., Doc. No. 40-1 at ¶ 4, and they can only sustain these programs because their costs are supported by NSF. *See, e.g.*, *id.* ¶¶ 9-11; UC Decl., Doc. No. 40-7 at ¶ 18; Caltech Decl., Doc. No. 40-8 at ¶¶ 7-8; Cornell Decl., Doc. No. 40-14 at ¶¶ 7-13; Florida Decl., Doc. No. 40-16 at ¶¶ 5-9; UIUC Decl., Doc. No. 40-17 at ¶ 25; Rice Decl., Doc. No. 40-30 at ¶¶ 4-5; Stony Brook Decl., Doc. No. 40-33 at ¶ 14. Even if universities might prefer to continue conducting particular research or training programs without NSF support, the costs of such work are very often too great; hence, most universities cannot simply make up for the loss in funding on their own. *See, e.g.*, Caltech Decl., Doc. No. 40-8 at ¶ 22; CMU Decl., Doc. No. 40-9 at ¶ 22; Cleveland State Decl., Doc. No. 40-11 at ¶¶ 21-22; UNM Decl., Doc. No. 40-24 at ¶¶ 17-18; UPenn Decl., Doc. No. 40-26 at ¶¶ 20-21; Utah Decl., Doc. No. 40-36 at ¶¶ 22-23; Vanderbilt Decl., Doc. No. 40-37 at ¶¶ 20, 22; Washington Decl., Doc. No. 40-39 at ¶ 22. It is not feasible or sustainable for universities to use endowment funds—for those institutions that have such funds—or other revenue sources to offset these substantial shortfalls. *See, e.g.*, APLU Decl., Doc. No. 40-3 at ¶ 16; BU Decl., Doc. No. 40-6 at ¶ 17; UC Decl., Doc. No. 40-7 at ¶ 18; Caltech Decl., Doc. No. 40-8 at ¶ 21; CMU Decl., Doc. No. 40-9 at ¶ 21; CSU Decl., Doc. No. 40-13 at ¶¶ 20, 22; UIUC Decl., Doc. No. 40-17 at ¶¶ 23, 25; KU Decl., Doc. No. 40-18 at ¶¶ 22-23; UNR Decl., Doc. No. 40-22 at ¶¶ 21-22; Pitt Decl., Doc. No. 40-28 at ¶ 18; Toledo Decl., Doc.

No. 40-34 at ¶¶ 18-19; Utah Decl., Doc. No. 40-36 at ¶¶ 22-23; Vanderbilt Decl., Doc. No. 40-37 at ¶¶ 20-21; Vermont Decl., Doc. No. 40-38 at ¶¶ 20, 22; Washington Decl., Doc. No. 40-39 at ¶¶ 21-22.

### B.  The Balance of the Equities and Public Interest Overwhelmingly Favor Relief.

The balance of the equities and public interest favor an injunction; these factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the Rate Cap Policy has and will continue to burden Plaintiffs and impair the public interest. That is because the irreparable harm that the Policy inflicts on Plaintiffs' members and Plaintiffs' research programs also harms the public. The very purpose of these federal research partnerships is to advance energy, economic, and national security, as the declarations in this case amply reflect. Curtailing this research due to unexpected budget deficits will undermine the very aims promoted by NSF grants, and federal research funding more broadly.

By contrast, "the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Moreover, the government incurs no cognizable harm from the continuation of the approach to indirect costs that has endured for decades to the benefit of universities, the government, and the public.

### CONCLUSION

Plaintiffs respectfully urge this Court to expedite resolution of this action; vacate the Rate

Cap Policy; enter a declaratory judgment finding the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law; and enter a preliminary and permanent injunction prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form, including in rejecting or treating adversely proposals for NSF funding submitted at universities' negotiated rates rather than the 15% rate; and from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB.

<div style="display:flex; justify-content:space-between;">

Dated: May 8, 2025

JENNER & BLOCK LLP

By: */s/ Shoba Pillay*

Shoba Pillay, BBO No. 659739
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice granted*)
Lindsay C. Harrison (*pro hac vice granted*)
Lauren J. Hartz (*pro hac vice granted*)
Elizabeth Henthorne (*pro hac vice granted*)
Anjali Motgi (*pro hac vice granted*)
Zachary C. Schauf (*pro hac vice granted*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
AMotgi@jenner.com
ZSchauf@jenner.com
*Attorneys for All Plaintiffs*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice granted*)
James Y. Xi (*pro hac vice granted*)
Kyle R. Eiswald (*pro hac vice granted*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com
*Attorneys for Association of American Universities,*
*Association of Public and Land-grant Universities,*
*and American Council on Education*

</div>

42

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ *Paul D. Clement*
Paul D. Clement (*pro hac vice*)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com

Dated: May 8, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(a) and Federal Rule of Civil Procedure 65(a)(1), counsel for

Plaintiffs certify that they have provided this memorandum to the following individuals at the U.S.

Department of Justice by electronic mail:

Brian Lea
Deputy Associate Attorney General
brian.lea@usdoj.gov

Nicole O'Connor
Assistant United States Attorney, U.S. District of Massachusetts
Nicole.O'Connor@USDOJ.GOV

Eric J. Hamilton
Deputy Assistant Attorney General, Federal Programs Branch
eric.hamilton@usdoj.gov

Alex Haas
Co-Director, Federal Programs Branch
alex.haas@usdoj.gov

Diane Kelleher
Co-Director, Federal Programs Branch
diane.kelleher@usdoj.gov

John Griffiths
Co-Director, Federal Programs Branch
john.griffiths@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

<div style="text-align: right;">

/s/ *Paul D. Clement*
Paul D. Clement (*pro hac vice*)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com

</div>

Dated: May 8, 2025