# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-11231-IT |
| NATIONAL SCIENCE FOUNDATION, *et al*., | ) ) | Leave to File Granted May 23, 2025 |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT [DOC NO. 40] AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT [DOC NO. 60]

# Table of Contents

Introduction ................................................................................................................................ 1

Background ................................................................................................................................. 3

Legal Standard ......................................................................................................................... 10

Argument ................................................................................................................................. 12

    I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims. ................................................. 12

        A.    Plaintiffs have not established standing to sue. ........................................... 12

        B.    The APA does not waive sovereign immunity for actions committed to agency discretion. .................................................................................................... 14

    II.    The Policy Is Lawful. ................................................................................................. 17

        A.    The Policy is authorized by the NSF Act and 41 U.S.C. § 4708. ................. 17

        B.    The Policy follows 2 C.F.R. § 200.414(c). .................................................. 20

        C.    Plaintiffs' regulatory scheme argument fails ............................................... 24

        D.    The Policy is reasonable and reasonably explained ..................................... 26

    III.    Any Remedy Should Be Limited To Remand. ........................................................... 33

    IV.    Plaintiffs Have Not Satisfied the High Burden for Injunctive Relief. ......................... 34

        A.    Plaintiffs have not shown irreparable harm. ............................................... 34

        B.    Injunctive relief is not in the public interest. .............................................. 41

    V.    Any Injunction Should Be Narrowly Tailored to Plaintiffs—And, More Specifically, Apply Only To IHEs That Are Plaintiffs or Represented by Plaintiffs and that Have Shown Irreparable Harm. ............................................................................................ 42

    VI.    The Court Should Order That Plaintiffs Post A Bond As A Condition Of Preliminary Relief. ........................................................................................................................ 43

Conclusion ............................................................................................................................... 45

Table of Authorities

Page(s)

**Cases**

*Acosta-Ramirez v. Banco Popular de P.R.*,
712 F.3d 14 (1st Cir. 2013) ........................................................................... 12

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ........................................................................... 35

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ..................................................................................... 32

*ALPO Petfoods v. Ralston Purina Co.*,
913 F.2d 958 (D.C. Cir. 1990) ....................................................................... 42

*Amazon Web Servs., Inc. v. United States*,
147 Fed. Cl. 146 (2020) ........................................................................... 44, 45

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) ..................................................................................... 12

*Assoc. of Amer. Univs. v. Dep't of Energy*,
No. 1:25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025) ........................... 36

*Axia Net-Media Corp. v. Mass. Tech. Park Corp.*,
889 F.3d 1 (1st Cir. 2018) ............................................................................. 11

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ..................................................................................... 13

*Bennett v. Murphy*,
166 F. Supp. 3d 128 (D. Mass. 2016) ........................................................... 10, 11

*Bona Fide Conglomerate, Inc. v. United States*,
96 Fed. Cl. 233 (2010) .................................................................................. 45

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ..................................................................................... 32

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................... 23, 35, 42

*Carcieri v. Salazar*,
    555 U.S. 379 (2009) ............................................................................................. 19

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004) ........................................................ 34, 36, 37, 39

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................. 13

*Cmty. Rels.-Soc. Dev. Comm'n v. United States*,
    8 Cl. Ct. 723 (1985) ............................................................................................. 25

*Concerned Citizens on I-190 v. Sec'y of Transp.*,
    641 F.2d 1 (1st Cir. 1981) .................................................................................. 31

*Craker v. DEA*,
    44 F.4th 48 (1st Cir. 2022) ................................................................................ 29

*Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*,
    679 F.2d 978 (1st Cir. 1982) ............................................................................. 44

*Department of Education v. California*,
    604 U.S. ----, 145 S. Ct. 966 (2025) ............................................................... 41

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ................................................................................................ 30

*Doble Seis Sport TV, Inc. v. Puerto Rico*,
    No. 18-cv-1432, 2019 WL 1153432 (D.P.R. Mar. 12, 2019) ...................... 34

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996) ........................................................................... 12

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ............................................................................................. 44

*EEOC v. Astra USA, Inc.*,
    94 F.3d 738 (1st Cir. 1996) ................................................................................ 34

*Env't Def. Fund v. EPA*,
    922 F.3d 446 (D.C. Cir. 2019) .......................................................................... 32

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ...................................................................................... 27, 31

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ........................................................................................ 27

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ........................................................................................ 14

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................................ 33

*Forsyth Cnty. v. Army Corp. of Eng'rs*,
   633 F.3d 1032 (11th Cir. 2011) ...................................................................... 15

*Free Speech Coal., Inc. v. Att'y Gen. U.S.*,
   974 F.3d 408 (3d Cir. 2020) ........................................................................... 43

*Glob. Naps, Inc. v. Verizon New Eng., Inc.*,
   489 F.3d 13 (1st Cir. 2007) ............................................................................ 44

*Gonzalez-Droz v. Gonzalez-Colon*,
   573 F.3d 75 (1st Cir. 2009) ............................................................................ 11

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................. 14, 15

*Heckler v. Turner*,
   468 U.S. 1305 (1984) ...................................................................................... 41

*Holbrook v. Tenn. Valley Auth.*,
   48 F.4th 282 (4th Cir. 2022) ..................................................................... 15, 16

*Hollingsworth v. Perry*,
   570 U.S. 693 (2013) ........................................................................................ 13

*In re TelexFree Sec. Litig.*,
   No. 4:14-MD-02566, 2021 WL 11604879 (D. Mass. Apr. 21, 2021) ............ 34

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
   589 U.S. 178 (2020) ........................................................................................ 20

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines Inc.*,
   925 F.2d 6 (1st Cir. 1991) .............................................................................. 44

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,
   802 F.3d 99 (1st Cir. 2015) ............................................................................ 10

*iQuartic, Inc. v. Simms*,
  No. 15-13015, 2015 WL 5156558 (D. Mass. Sept. 2, 2015)....................................................43

*K-Mart Corp. v. Oriental Plaza, Inc.*,
  875 F.2d 907 (1st Cir. 1989).........................................................................................................11

*Lance v. Coffman*,
  549 U.S. 437 (2007)......................................................................................................................39

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)......................................................................................................................14

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)......................................................................................................................12

*Maine v. U.S. Dep't of Agric.*,
  -- F. Supp. 3d ---, 2025 WL 1088946 (D. Maine Apr. 11, 2025)..............................................44

*Massachusetts v. Nat'l Insts. of Health*,
  -- F. Supp. 3d --, 2025 WL 702163 (D. Mass. 2025) ................................................................36

*Md. Dep't of Hum. Res. v. U.S. Dep't of Agric.*,
  976 F.2d 1462 (4th Cir. 1992).....................................................................................................44

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002).....................................................................................................14

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)......................................................................................................................33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)........................................................................................................................26

*Murthy v. Missouri*,
  603 U.S. 43 (2024)........................................................................................................................12

*Myriddian, LLC v. United States*,
  165 Fed. Cl. 650 (2023)...............................................................................................................44

*NACM-New Eng., Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*,
  927 F.3d 1 (1st Cir. 2019)............................................................................................................42

*Narragansett Indian Tribe v. Guilbert*,
  934 F.2d 4 (1st Cir. 1991)............................................................................................................39

*Nat. Res. Def. Council, Inc. v. Winter*,
    508 F.3d 885 (9th Cir. 2007) ............................................................................... 42

*Nat'l Consumer Info. Ctr. v. Gallegos*,
    549 F.2d 822 (D.C. Cir. 1977) .............................................................................. 13

*Nat'l Kidney Patients Ass'n v. Sullivan*,
    958 F.2d 1127 (D.C. Cir. 1992) ............................................................................ 45

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................. 11

*Off. of Commc'n of United Church of Christ v. FCC*,
    707 F.2d 1413 (D.C. Cir. 1983) ............................................................................ 29

*Palantir USG, Inc. v. United States*,
    129 Fed. Cl. 218 (Fed. Cl. 2016) ......................................................................... 27

*Peoples Fed. Sav. Bank v. People's United Bank*,
    672 F.3d 1 (1st Cir. 2012) .................................................................................... 11

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ....................................................................... 14

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
    835 F.2d 380 (1st Cir. 1987) .......................................................................... 34, 41

*Roberts v. Progressive Preferred Ins. Co.*,
    No. 1:23 CV 1597, 2024 WL 2295482 (E.D. Ohio May 21, 2024) ........................ 13

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) .................................................................................. 38

*Savantage Fin. Servs., Inc. v. United States*,
    595 F.3d 1282 (Fed. Cir. 2010) ...................................................................... 27, 28

*Sierra Club v. Larson*,
    769 F. Supp. 420 (D. Mass. 1991) ....................................................................... 34

*Sorreda Transp., LLC v. U.S. Dep't of Transp.*,
    980 F.3d 1 (1st Cir. 2020) .............................................................................. 26, 28

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*,
    282 F.3d 23 (1st Cir. 2002) ...................................................................... 23, 35, 42

*TikTok Inc. v. Trump*,
  507 F. Supp. 3d 92 (D.D.C. 2020) ................................................................. 38

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ....................................................................................... 12

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ........................................................................... 28, 29, 43

*U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.*,
  844 F.2d 1087 (4th Cir. 1988) ....................................................................... 24

*U.S. Telecom Ass'n v. FCC*,
  359 F.3d 554 (D.C. Cir. 2004) ....................................................................... 32

*United States v. Aguirre-Gonzalez*,
  597 F.3d 46 (1st Cir. 2010) ............................................................................ 23

*United States v. Michigan*,
  230 F.R.D. 492 (E.D. Mich. 2005) ................................................................ 37

*United States v. N.Y. Rayon Importing Co.*,
  329 U.S. 654 (1947) ....................................................................................... 16

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
  645 F.3d 26 (1st Cir. 2011) ..................................................................... 11, 36

*Webster v. Doe*,
  486 U.S. 592 (1988) ....................................................................................... 15

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ....................................................................................... 13

*WildEarth Guardians v. EPA*,
  751 F.3d 649 (D.C. Cir. 2014) ....................................................................... 32

*Winter v. Nat. Res. Def. Counsel, Inc.*,
  555 U.S. 7 (2008) ............................................................................ 11, 29, 38, 39

**Statutes**

5 U.S.C. § 701(a)(1) ............................................................................................ 14

5 U.S.C. § 706(2)(A) .................................................................................... 11, 26

41 U.S.C. § 4708 ......................................................................................... passim

42 U.S.C. § 1862(a)(1) ................................................................................................... 3

42 U.S.C. § 1870(c) .......................................................................................... 3, 15, 17

42 U.S.C. § 1873(e) ..................................................................................... 2, 3, 15, 17

National Science Foundation Act of 1950, Pub. L. No. 81-507, 64 Stat. 149 ................. 3

Independent Offices Appropriation Act, 1963 § 303, Pub. L. No. 87-741 ..................... 8

Independent Offices Appropriation Act, 1966 § 303, Pub. L. No. 89-128 ..................... 8

**Regulations**

2 C.F.R. § 200.1 ........................................................................................... 8, 22, 26

2 C.F.R. § 200.100(c) ............................................................................................. 25

2 C.F.R. § 200.402 ................................................................................................. 25

2 C.F.R. § 200.412 .................................................................................................. 4

2 C.F.R. § 200.414(a) ........................................................................................... 4, 5

2 C.F.R. § 200.414(c) ..................................................................................... passim

2 C.F.R. § 200.414(f) ................................................................................... 18, 19, 21

2 C.F.R. § 200.501(b) ............................................................................................ 26

2 C.F.R. § 200.504 ................................................................................................ 26

2 C.F.R. § 200.514 ............................................................................................... 26\

2 C.F.R. § 2500.100 ................................................................................................ 5

16 Fed. Reg. 12835 (Dec. 21, 1951) ................................................................... 8, 17

56 Fed. Reg. 50224 (Oct. 3, 1991) ...................................................................... 10

58 Fed. Reg. 39996 (July 26, 1993) ..................................................................... 10

## INTRODUCTION

The National Science Foundation ("NSF") is an independent federal agency that supports science and engineering in all 50 states and United States territories.  Congress established NSF in 1950 to promote the progress of science, advance the national health, prosperity and welfare, and secure the national defense.  NSF accomplishes these objectives primarily through grant agreements, accounting for approximately 24 percent of federal support to America's Institutions of Higher Education ("IHEs") for basic research.

In May 2025, NSF issued a forward-looking policy to achieve a longstanding goal across Administrations: to establish new grant terms that rein in spending on administrative overhead, which has increasingly displaced NSF's ability to fund direct scientific research.  *See* Nat'l Sci. Found., NSF 25-034, *Policy Notice: Implementation of Standard 15% Indirect Cost Rate* (2025) (the "Policy"), Decl. of Janis Coughlin-Piester, ("NSF Decl."), Exh. 1, Doc. No. 61-1.[1]  By limiting such overhead, known as "facilities and administrative" or "indirect" costs, NSF will "streamline funding practices, increase transparency, and ensure that more resources are directed toward direct scientific and engineering research activities."  *Id.*

Plaintiffs—IHEs and IHE associations—ask this Court to award a declaratory judgment that the Policy is unlawful, Mot. for Prelim. Inj. & for Summ. J., Doc. No. 40 (the "Motion"), analogizing NSF's policy to other agencies' indirect cost rate policies that courts have recently set aside.[2]  Yet Plaintiffs ignore the significant differences between those cases and both NSF's policy and its organic statute.  Unlike the National Institutes of Health ("NIH") and Department of Energy ("DOE") policies referenced by Plaintiffs, the NSF Policy only applies to newly issued awards and

---

[1] The Policy is publicly available at https://www.nsf.gov/policies/document/indirect-cost-rate.
[2] Defendants respectfully maintain that those policies are valid and are challenging the district courts' conclusions to the contrary.

does not require IHEs to amend budgets for existing awards.  Moreover, this Policy is authorized

by the National Science Foundation Act, which directs NSF to use "its discretion" to spend federal

money to "best realize" its mission of promoting scientific research.  42 U.S.C. § 1873(e).  In other

words, NSF is not trying the "same thing" as DOE and NIH, and the "same result" should not

follow.  *See* Mem. in Supp. of Mot. for Prelim. Inj. & Summ. J., Doc. No. 41 at 8.  Plaintiffs

additionally ask the Court to issue a broad injunction that would constrict NSF's statutory

discretion and prevent NSF from funding research on terms that NSF has determined best serve

the public interest and its programmatic objectives.  Doc. No. 40 at 2; Doc. No. 40-43.  Plaintiffs

seek this extraordinary remedy even though the only "harm" they can identify is speculation that

their own budgetary constraints may lead them to turn down funding if they are offered grant

awards at the indirect cost rate set forth in NSF's Policy.

This Court should deny Plaintiffs' Motion in full for two reasons.  *First*, the Court does not

have jurisdiction to decide Plaintiffs' claims, both because Plaintiffs have not shown they have

standing and because NSF's grant-related decisions are committed to discretion by law under the

Administrative Procedure Act ("APA").  *Second*, even if Plaintiffs' claims are justiciable, they fail

on their merits.  The Policy is authorized by NSF's organic statute, is additionally authorized by

41 U.S.C. § 4708, and is reasonable and provides a reasoned explanation.  The Court therefore

should either dismiss this lawsuit or enter judgment for Defendants.

Even if the Court determines it has jurisdiction and finds the claims meritorious, the Court

should deny Plaintiffs' request for injunctive relief.  The proper remedy for action found unlawful

under the APA at the summary judgment stage is vacatur and remand to the agency.  Further,

Plaintiffs have failed to show injunctive relief is warranted because they have not shown

irreparable harm or that injunctive relief is in the public interest.  Finally, if the Court grants

Plaintiffs' request for preliminary injunctive relief, the Court should require a bond pursuant to Rule 65(c).

## BACKGROUND

The National Science Foundation Act of 1950 (the "Act" or "NSF Act"), Pub. L. No. 81-507, 64 Stat. 149, established NSF as an independent agency "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes." To that end, the Act gave NSF broad grant-making authority. The Act "authorized and directed" NSF to "initiate and support basic scientific research" in a range of scientific and mathematical fields through "contracts or other arrangements (including grants, loans, and other forms of assistance)." *Id.* § 3(a)(2). The Act gave NSF latitude to fund any research NSF "deem[ed] necessary to carry out" its mission. *Id.* § 11(c). And the Act authorized NSF to use "its discretion" to use appropriations in whatever way would "best realize" four objectives: (1) having qualified persons perform the research; (2) "strengthening the research staff of organizations" in the United States; (3) "aiding institutions, agencies, or organizations which, if aided, will advance basic research"; and (4) "encouraging independent basic research by individuals." *Id.* § 14(g). The Act otherwise provided no limitations on how to make or fund grants. The Act's original grant-making authorities continue in effect substantially unchanged today. *See* 42 U.S.C. §§ 1862(a)(1), 1870(c), 1873(e).

### A.    NSF Grants: Direct and Indirect Costs

In an average year, NSF awards approximately 12,000 grants.[3] In doing so, it provides funding to more than 2,000 academic and other private and public institutions, accounting for 24 percent of all federally funded research at academic institutions.[4] NSF's funding reaches roughly

---

[3] Nat'l Sci. Found., NSF 2022-2026, 2022-2026 Strategic Plan 11.
[4] *Id.*

350,000 researchers, entrepreneurs, students and teachers across all 50 states.[5] NSF is "responsible to Congress and taxpayers for carrying out its mission in a manner that not only facilitates research but does so cost-effectively." Doc. No. 61 at 4 ¶ 14.

NSF grant funds are generally disbursed in installments. A grantee draws down its grants on a periodic, as-needed basis, based on costs it incurred or expects to incur during the relevant period. *Id.* at 3 ¶ 10. These grants generally cover two types of expenses: direct costs and indirect costs. *See* 2 C.F.R. § 200.412. "Direct costs" are costs "identified specifically with" a particular research project or activity—*i.e.*, the specific research that NSF intends to support with the grant. *Id.* § 200.413(a). Direct costs include, for example, the "proportion of employee compensation" expended on the research, related "fringe benefits," and the costs of "supplies needed to achieve the award's objectives." *Id.* § 200.413(b). They may also include more general costs that are "directly related to a specific award," such as "extraordinary utility consumption," "integrated data systems," or certain "cost of materials." *Id.*

NSF grants may also cover certain "indirect costs," also known as "F&A" costs. 2 C.F.R. § 200.414(a). These costs support "more than one" research project or activity and are "not readily assignable" to specific research "without effort disproportionate to the results achieved." *Id.* § 200.1. Indirect costs are "classified within two broad categories: 'Facilities' and 'Administration.'" *Id.* § 200.414(a). "Facilities" costs include "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.* "Administration" costs, in turn, include "general administration and general expenses such as the director's office, accounting, personnel and all other types of expenditures not listed" elsewhere. *Id.* Indirect costs

---

[5] *Id.*

generally are paid based on an "indirect cost rate." The higher the indirect cost rate, the more NSF will reimburse. For example, at Harvard University, which has an indirect-cost rate of 69 percent for on-campus research, NSF may pay up to $169,000 for a $100,000 grant: $100,000 in direct costs plus $69,000 in indirect costs.[6]

For determining the indirect cost rate that will apply to a particular grant, NSF has adopted the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Guidance"). *See* 2 C.F.R. § 2500.100. As a default, section 200.414(c)(1) of the Guidance generally requires NSF to pay indirect costs based on a rate periodically negotiated with each grantee institution, which is memorialized in a negotiated indirect cost rate agreement ("NICRA"). *Id.* § 200.414(c)(1); *see id.* pt. 200, subpart E & app. III. But the Guidance also provides a path for NSF to depart from those rates. The next sentence of section 200.414(c)(1) states that a "Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award" in two instances: first, "when required by Federal statute or regulation," and second, "when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section." *Id.*

This case involves the latter provision, allowing NSF to "use a rate different from the negotiated rate . . . when approved by the awarding Federal agency . . . in accordance with paragraph (c)(3)." 2 C.F.R. § 200.414(c)(1). Paragraph (c)(3), in turn, provides that the "Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." *Id.* § 200.414(c)(3). Aside from that procedural requirement, the Guidance

---

[6] *See* Harvard Univ., FAS Office of Research Admin., Indirect Costs, https://perma.cc/NU2R-N6XB.

imposes no substantive constraint on the ability of NSF to deviate from negotiated indirect cost rates, whether "for a class of Federal awards or a single Federal award." *Id.* § 200.414(c)(1).

In addition to providing the path to depart from NICRA rates, the Guidance provides for a default "de minimis rate of up to 15 percent" for institutions that have not negotiated rates. *Id.* § 200.414(f). In those circumstances, the grant recipient "is authorized to determine the appropriate rate up to this limit" and need not provide "documentation to justify its use." *Id.*

### B.    NSF Grants Policy

NSF routinely issues a Grants Policy Statement that collects policy requirements that serve as the terms and conditions of NSF grant awards. *See* Nat'l Sci. Found., NSF 24-1, Proposals & Award Pol'ys & Procs. Guide (2024) ("PAPPG"). "Each NSF award notice specifically identifies certain conditions that are applicable to, and become part of, that award. . . . When these conditions reference a particular PAPPG section, that section becomes part of the award requirements through incorporation by reference." *Id.* at VI-2. In addition, throughout the year, NSF publishes policy notices to its website. *See, e.g.*, Doc. No. 61-1. These policy notices can "take[] precedence over inconsistent policies and procedures set forth in the [PAPPG]." *See, e.g.*, *id.* at 3. NSF typically issues dozens of such policy updates over the course of each fiscal year. Doc. No. 61 at 4 ¶ 15.

### C.    The May 2025 Policy

These cases concern the Policy issued by NSF on May 2, 2025, addressing indirect-cost rates. Doc. No. 61-1. NSF issued the Policy to notify the public "of the policies, procedures and general decision-making criteria that NSF has used to justify deviation from negotiated rates for all awards in accordance with 2 CFR 200.414(c) for the class of NSF financial assistance awarded to IHEs." *Id.* As the name suggests, the Policy applies a standard, predetermined indirect cost rate capped at 15 percent to grant awards issued by NSF after May 5, 2025. *Id.* It applies "to all

grants and cooperative agreements awarded to IHEs [after May 5, 2025] for which indirect costs are allowable." *Id.* The Policy's allowance of a standard rate up to 15 percent is equivalent to the default rate that already applies by regulation in the absence of individually negotiated rates.

The Policy's objective is "to streamline funding practices, increase transparency, and ensure that more resources are directed toward direct scientific and engineering research activities." *Id.* The Policy observes that the use of a standard rate "allows NSF and its awardees to focus more on scientific progress and less on administrative overhead by aligning with common federal benchmarks." Further, the Policy "improves government efficiency by eliminating the need for individualized indirect cost negotiations." *Id.* The Policy only applies to new awards made to IHEs on or after May 5, 2025. *Id.* It does not apply to existing awards, including award supplements granted through amendments to existing awards. *Id*.

NSF adopted the Policy pursuant to express authority. Although, as noted (*supra* at 5), section 200.414(c)(1) presumptively requires the use of NICRA rates, that provision also allows NSF to "use a rate different from the negotiated rate"—whether for "a single Federal award" or for "a class of Federal awards"—"when approved by [NSF]" based on "the policies, procedures and general decision-making criteria that [NSF] programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(1), (3). The Policy thus makes public the policies, procedures, and general decision-making criteria justifying NSF's deviations from the NICRA rates for a class of federal awards it administers.

### D.    Prior Efforts to Contain Indirect Costs

The Policy is the latest volley in a long line of government-wide efforts to contain indirect costs.[7]  Joining the fray at its inception, NSF limited reimbursement of indirect costs for its first fifteen years.  In 1951, NSF first capped reimbursement of indirect costs at 15 percent of direct costs.  16 Fed. Reg. 12835 §§ 620.3, 620.9(h)(6) (Dec. 21, 1951).  Nine years later, in 1960, NSF raised its rate ceiling to 20 percent.[8]  And from 1963 to 1965, Congress limited NSF's indirect costs reimbursement to 25 percent through appropriations riders.[9]

In fiscal year 1966, Congress lifted the cap on indirect costs and required cost sharing, instead—*i.e.*, requiring grant recipients to fund an unspecified portion of direct or indirect research costs.[10]  This change continued Congress's prior mandate of limiting reimbursement of indirect costs while accommodating differing accounting methods used by varying IHEs.[11]  The NSF Director predicted at the time that "the average university might not receive more reimbursement" from the change.[12]  Over the following decades, IHEs worked "to eliminate statutory cost sharing

---

[7] *See* Marcy E. Gallo & Laurie Harris, Cong. Rsch. Serv., R48540, Univs. & Indirect Costs for Federally Funded Rsch. 9 (2025) (hereinafter CRS Report); *see also, e.g.*, Nat'l Sci. Bd., NSB-09-20, Investing in the Future: NSF Cost Sharing Pol'ys for a Robust Fed. Rsch. Enter. 7 (2009) (hereinafter 2009 NSB Report) ("cost sharing has been the subject of debate" throughout NSF's 75-year history).

[8] *Limitation on Indirect Costs in Rsch. Grants: Hearing Before the H. Comm. on Sci. & Astronautics*, 87th Cong. 35 (1962) (statement of Aaron Rosenthal, Comptroller, NSF) (hereinafter 1962 Hearing).

[9] *See, e.g.*, Independent Offices Appropriation Act, 1963 § 304, Pub. L. No. 87-741.

[10] Independent Offices Appropriation Act, 1966 § 303, Pub. L. No. 89-128.  Cost sharing is "the portion of project costs not paid by Federal funds or contributions (unless authorized by Federal statute)."  2 C.F.R. § 200.1.  It may include but is not limited to unreimbursed indirect costs.

[11] *Independent Offices Appropriations for 1966: Hearings Before the Subcomm. On Independent Offices of the H. Comm. on Appropriations Part 2*, 89th Cong. 625 (1965) (statement of Dr. Leland J. Haworth, Director, NSF) (hereinafter 1965 Hearing).

[12] *Id.*

requirements."[13]   Yet Congress continued to require cost sharing in NSF grants through appropriations riders for the next 40 years, until 2007.[14]

Contrary to the NSF Director's 1965 speculation, in the two decades after Congress removed the indirect costs ceiling in 1966, indirect cost rates "steadily increased," with the average indirect cost rate more than 50 percent by the end of the 1980s.[15]  As a result, containing indirect costs received renewed government-wide attention in the 1980s and 1990s, with "Congress, OMB, and other federal agencies extensively discuss[ing] proposals to cap the administrative portions of indirect cost reimbursements"[16] and applying "consistent pressure to keep indirect cost rates lower, or to at least slow down the rate at which they increase."[17]  In 1986, OMB made the first of three notable changes to Circular A-21 ("Cost Principles for Educational Institutions") during that period to rein in costs, fixing reimbursement of faculty administrative costs at 3.6 percent.[18]

Disclosures in the early 1990s revealed that the government had been charged hundreds of millions of dollars in "unallowable, questionable, or improperly allocated indirect costs," leading the U.S. General Accounting Office ("GAO") to conclude "fundamental changes to the existing reimbursement system" were needed to address the "depth and persistence of the problems."[19]

---

[13] Robert B. Hardy, *Cost Sharing - Past, Present - and Future?*, Rsch. Mgmt. Rev., Spring/Summer 2000, at 11.

[14] *See* 2009 NSB Report, *supra* note 7, at 29.

[15] GAO, GAO/RCED-92-203, Fed. Rsch.: Sys. for Reimbursing Univs.' Indirect Costs Should Be Reevaluated 10, 13 (1992) (hereinafter 1992 GAO Report).

[16] CRS Report, *supra* note 7, at 8; *see also* 1992 GAO Report, *supra* note 15, at 13 (discussing limits on indirect cost reimbursement enacted by Congress in the early 1990s).

[17] Richard P. Seligman, *An Introduction to Cost Sharing: Why Good Deeds Do Not Go Unpunished*, Rsch. Mgmt. Rev., Spring/Summer 2000, at 4.

[18] CRS Report, *supra* note 7, at 8.  OMB Circular A-21 underwent a number of revisions over the five decades following its first issuance in 1958.  In 2005, OMB relocated Circular A-21 to Title 2 of the Code of Federal Regulations.  Administration-wide grant policies that previously would have been set out in Circular A-21 are now incorporated into the Guidance.

[19] 1992 GAO Report, *supra* note 15, at 3, 16.  GAO later became the Government Accountability Office.

Among possible solutions, GAO proposed caps on indirect cost rates or uniform flat indirect cost rates. GAO concluded the use of rate ceilings would be beneficial because it was "not new" and would result in "savings in government funds [that] might then be used to fund more research projects," whereas uniform flat rates would significantly ease the administrative burden of indirect costs for the government and IHEs, including "eliminat[ing] the extensive rate negotiation and determination process."[20] As a result of the unallowable, questionable, or improperly allocated indirect costs GAO uncovered, OMB revised Circular A-21 in 1991 to cap all administrative indirect costs at 26 percent,[21] and then again in 1993 to clarify that administrative costs include all non-facilities costs and to give universities a fixed flat-rate reimbursement option.[22]

OMB's 26-percent cap on administrative indirect costs is still in effect today. *See* 2 C.F.R. Pt. 200, App. III § C.8. Despite this 34-year cap on the administrative portion of F&A costs, a 2017 GAO study found that the proportion of NSF awards going to indirect costs continued to increase over time.[23]

## LEGAL STANDARD

"[T]he traditional Rule 56 standard does not apply" to summary judgment on actions brought under the APA "due to the limited role of a court in reviewing the administrative record." *Bennett v. Murphy*, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (citing *Int'l Junior Coll. of Bus. &*

---

[20] *Id.* at 31, 34. These benefits have been widely recognized in debates over indirect costs and cost sharing over the last 75 years. *See, e.g.*, GAO, GAO-17-576T 1, Nat'l Sci. Found.: Prelim. Observations on Indirect Costs for Rsch. 6, 17 (2017) (hereinafter 2017 GAO Report) (favoring flat indirect cost rates because the "Circular A-21 cost accounting procedures are too expensive to implement and susceptible to abuse"); CRS Report, *supra* note 7, at 9 (quoting President Clinton's 1994 proposal "to shift national spending from overhead to funding research" by limiting indirect costs); 1962 Hearing, *supra* note 8, at 34–35 (proposing use of "a fixed percentage" for indirect costs to "simplify greatly the administration of grants").

[21] 56 Fed. Reg. 50224, 50228 (Oct. 3, 1991).

[22] 58 Fed. Reg. 39996, 39998–99 (July 26, 1993).

[23] 2017 GAO Report, *supra* note 20, at 5.

*Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015)).  Rather, the Court's review "is narrow because the APA standard affords great deference to agency decisionmaking and the [agency's] action is presumed valid." *Id.* (quotation omitted).  The Court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

Injunctive relief—whether preliminary or permanent—"is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012).  A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008).  To establish entitlement, Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits (or actual success, in the case of a permanent injunction), (2) irreparable harm in the absence of relief, (3) the balance of the equities favor the movant, and (4) an injunction is in the public interest. *Axia Net-Media Corp. v. Mass. Tech. Park Corp.,* 889 F.3d 1, 6 (1st Cir. 2018); *see also K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (noting that for permanent injunctive relief, "the movant must show 'actual success' on the merits of the claim, rather than a mere likelihood of such success.").  The last two factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm is "a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims.

Before considering the merits of Plaintiffs' motion, the Court must assess whether it has jurisdiction over this dispute in the first instance.  *See Acosta-Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (recognizing that complaint must be dismissed in its entirety absent subject matter jurisdiction). Plaintiffs bear the burden of demonstrating subject-matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Here, the Court lacks jurisdiction over Plaintiffs' claims for two independent reasons: Plaintiffs have not shown they have standing to sue, and the APA does not waive sovereign immunity to these claims.

### A.    Plaintiffs have not established standing to sue.

The Court first lacks jurisdiction over this matter because Plaintiffs have not established standing.  To establish Article III standing, a plaintiff must demonstrate (1) that it suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *See Lujan* 504 U.S. at 560–61.  Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281–82 (1st Cir. 1996).  And "standing is not dispensed in gross": each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks.  *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez.* 594 U.S. 413, 431 (2021)).

Hear, Plaintiffs have not established an injury in fact.  First, no plaintiff has alleged that NSF has altered the terms of an existing grant by applying the 15 percent indirect cost rate. Plaintiffs cannot make such an allegation because the NSF Policy applies "only to new awards

12

made to IHEs on or after May 5, 2025."[24]  Second, no plaintiff has alleged that it has received a

new grant award at the 15 percent indirect cost rate.  Third, no plaintiff has alleged that it is

guaranteed or entitled to receive a new grant after May 5, 2025.  Nor could it: in fiscal year 2024,

less than one-third of grant proposals submitted were chosen for awards.  Doc. No. 61 at 3 ¶ 9.

Thus, the only "injury" a plaintiff can identify would stem from *potentially* being offered a grant

award with a lower indirect cost rate than that plaintiff's NICRA—an award that the plaintiff would

then have discretion to accept or reject—or having to submit (or decide not to submit) grant

proposals using the new 15 percent indirect cost rate.  An *opportunity* to accept or reject federal

funding for research on any terms offered by NSF is not an *injury*.  Regardless, claims concerning

"hypothetical, future grants—that Plaintiffs may or may not be eligible for" are "nothing more

than a generalized grievance about Defendants' programs."  *Roberts v. Progressive Preferred Ins.

Co.*, No. 1:23 CV 1597, 2024 WL 2295482 at *8 (E.D. Ohio May 21, 2024).  "The Supreme Court

has 'repeatedly held that such a "generalized grievance," no matter how sincere, is insufficient to

confer standing.'"  *Id.* (citing *Hollingsworth v. Perry,* 570 U.S. 693, 706 (2013)); *see also, e.g.*,

*Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("possible future injury" does not suffice for

standing); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (conjectural future injuries or

alleged fear of such injuries do not establish standing); *Nat'l Consumer Info. Ctr. v. Gallegos,* 549

F.2d 822, 828 (D.C. Cir. 1977) (year-to-year grants "cannot create more than a 'unilateral

expectation' . . . which is not entitled to constitutional protection" (citing *Bd. of Regents v. Roth*,

408 U.S. 564 (1972)).

---

[24] Unlike the recent policies issued by the NIH and DOE, the NSF Policy applies "only to new awards made to IHEs on or after May 5, 2025."

**B.      The APA does not waive sovereign immunity for actions committed to agency discretion.**

The Court additionally lacks jurisdiction to entertain this lawsuit because Plaintiffs have not identified an applicable waiver of sovereign immunity.  Without a waiver, "sovereign immunity shields the Federal Government and its agencies from suit," depriving the court of jurisdiction over the matter.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Plaintiffs ground their claims in the APA, but their reliance on the APA's waiver of sovereign immunity is misplaced: that waiver does not apply to agency action that "is committed to agency discretion by law."  5 U.S.C. § 701(a)(1).  An action is committed to agency discretion when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  In other words, agency action is not subject to APA review if the governing statute gives courts no "law to apply."  *Id.*  That is the case here.

Plaintiffs challenge the Policy, arguing it unlawfully "cap[s] indirect cost rates for universities at 15% across the board no matter the actual indirect costs."  Doc. No. 41 at 8.  But the "allocation of funds" is an "administrative decision traditionally regarded as committed to agency discretion."  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  Courts have made clear that *Lincoln*'s logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute.  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).  Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  *Id.* at 752 (quotation omitted); *see also Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018).

As described above, the Act authorizes NSF to issue grants NSF "deems necessary to carry out" its mission. 42 U.S.C. § 1870(c). To that end, NSF is given "discretion" to "utilize appropriations" however will "best realize" four congressional objectives, none of which concern any funding mechanism or direct or indirect costs. *Id.* § 1873(e). Statutory language that empowers action the agency head "'shall *deem* . . . necessary or advisable'" commits the action to agency discretion as it "fairly exudes deference to the" agency head. *Webster v. Doe*, 486 U.S. 592, 600 (1988) (quoting section 102(c) of the National Security Act with added emphasis). And statutory language giving an agency "discretion" to act creates no law to apply. *See Forsyth Cnty. v. Army Corp. of Eng'rs*, 633 F.3d 1032, 1041 (11th Cir. 2011). Thus, nothing in the Act provides the "law to apply" to an analysis of any particular percentage of indirect costs selected by NSF – or, indeed, whether grants need to fund indirect costs at all. The APA therefore does not authorize review of the Policy.

Plaintiffs cannot overcome the discretion conferred to NSF by Congress under the Act. Where a decision is presumptively non-reviewable, as with funding allocations, "Congress may overcome the presumption against review by providing 'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 293 (4th Cir. 2022) (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)). Plaintiffs argue two sources of law—both found outside the statutory scheme specific to NSF—curb NSF's discretion to issue the Policy: 41 U.S.C. § 4708 and the Guidance. However, these authorities fail to show that Congress intended through the APA to waive sovereign immunity for this case.

*First*, 41 U.S.C. § 4708 is additional authority for the Policy that simply aligns with NSF's broad discretion in structuring grants; it does not circumscribe NSF's discretion to offer grants

with predetermined indirect cost rates.  *See* B-157584, 1965 WL 1919 (Comp. Gen. Nov. 26, 1965)

(confirming NSF's broad "di[scre]tionary administrative authority" permits use of predetermined,

fixed indirect cost rates beyond what is authorized in § 4708).  Section 4708 states in full:

> A cost-type research and development contract (including a grant)
> with a university, college, or other educational institution may
> provide for payment of reimbursable indirect costs on the basis of
> predetermined fixed-percentage rates applied to the total of the
> reimbursable direct costs incurred or to an element of the total of the
> reimbursable direct costs incurred.

NSF's policy is consistent with that statutory authority.  Section 4708 does not cabin an agency's

discretion to make funding decisions.  Instead, as is plain on its face, the statute sets out that a

"cost-type research and development" grant issued to an IHE "may provide for payment of

reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to . . .

reimbursable direct costs incurred."  41 U.S.C. § 4708.  It is thus entirely discretionary, providing

only that agencies "may" use standard fixed-percentage rates.

Moreover, when agencies choose to exercise that authority, the statute provides no

"guidelines for the agency" to apply when setting the rates, *Holbrook*, 48 F.4th at 293, and therefore

no law for the Court to apply when assessing the rates.  The statute confirms the agency's discretion

and precludes the Court's exercise of jurisdiction to constrain that discretion.

*Second*, the Guidance cannot show that Congress intended through the APA to waive

sovereign immunity for this case.  The Guidance was promulgated by the Office of Management

and Budget and implemented by NSF.  It sets out agency guidelines, not congressional guidelines.

As such, it cannot act to waive sovereign immunity.  *See United States v. N.Y. Rayon Importing

Co.*, 329 U.S. 654, 660 (1947) ("It has long been settled that officers of the United States possess

no power through their actions to waive an immunity of the United States or to confer jurisdiction

on a court in the absence of some express provision by Congress.").

16

Because the Act commits the determination of whether grants should reimburse indirect costs and at what rate to NSF's discretion as a matter of law, the APA's waiver of sovereign immunity does not apply to the Policy, and Plaintiffs' claims must be dismissed.

## II.    The Policy Is Lawful.

Even if the Court finds it has jurisdiction and Plaintiffs have established standing, the Policy is lawful.  Plaintiffs argue that the Policy is contrary to authorizing statute, violates the Guidance expressly allowing NSF to set class indirect cost rates, is inconsistent with the Executive's indirect costs scheme as a whole, and is arbitrary and capricious.  However, none of Plaintiffs' arguments hold water.  Plaintiffs' Motion therefore should be denied in full, and summary judgment should be granted to Defendants.

### A.    The Policy is authorized by the NSF Act and 41 U.S.C. § 4708.

The Policy properly exercises NSF's statutory authority over grants.  The Act gives NSF broad authority to issue grants funding research NSF "deems necessary to carry out" its mission of promoting science, health, prosperity, and welfare, and securing national defense.  42 U.S.C. § 1870(c).  And the Act gives NSF "discretion" to use appropriations in whatever way will "best realize" four objectives geared toward strengthening and encouraging research capacity within the United States.  *Id.* § 1873(e).  NSF thus has broad authority to set the terms of its grants, including by requiring predetermined indirect cost rates that do not exceed 15 percent.

This understanding accords with NSF's first guidance implementing its grant-making authority, which capped indirect cost rates at 15 percent.  *See* 16 Fed. Reg. 12835, 12835 § 620.3 (1951).  And the Comptroller General reached this same conclusion in 1965, when it confirmed NSF's authority to use predetermined indirect cost rates extends beyond what is permitted in 41 U.S.C. § 4708.  *See* B-157584, 1965 WL 1919 (Comp. Gen. No. 26, 1965).  As that office explained, § 4708 was enacted to overcome statutes prohibiting a cost-plus-a-percentage-of-cost

17

system of contracting, which did not apply to NSF. *See id.* The Comptroller General held the use of predetermined indirect cost rates is authorized outside of the context of § 4708 "where [discretionary] administrative authority is so broad as to permit grants or gifts[,] as in the grant program conducted by NSF." *Id.* The Comptroller General concluded that, if NSF determined it was "in the best interest of the government," NSF's use of predetermined indirect cost rates "would seem appropriate." *Id.*

There should be no question that the Act affords NSF discretion to issue grants with fixed indirect cost rates not exceeding 15 percent. Indeed, NSF recently adopted the Guidance, which permits grantees that do not have a NICRA to choose a predetermined rate of up to 15 percent. 2 C.F.R. § 200.414(f). That provision is not limited to IHEs. *See id.* Plaintiffs are thus plainly incorrect that 41 U.S.C. § 4708 is "[t]he only statute that authorizes NSF to use a fixed rate for indirect cost reimbursements." Doc. No. 41 at 26. NSF has had long-standing authority to issue the Policy under the Act, and it is not contrary to law.

Although not necessary, 41 U.S.C. § 4708 provides a second source of authority for using standard indirect cost rates where, as here, grants are issued to IHEs. As discussed above, § 4708 straightforwardly provides that a "cost-type research and development" grant issued to an IHE "may provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to . . . reimbursable direct costs incurred." 41 U.S.C. § 4708. That is exactly what the Policy does: grants issued to IHEs moving forward will provide for the payment of reimbursable indirect costs at predetermined fixed-percentage rates up to 15 percent. The statute provides no guidance on which predetermined fixed-percentage rates may be used, compelling the conclusion that any predetermined rates, including 15 percent, are authorized.

18

Finding no support in the statute's plain text, Plaintiffs grasp at various straws to try to delegitimize NSF's policy but come up empty-handed. Plaintiffs first attempt to import into the statute a requirement that NSF "first determine a rate that reasonably measures actual reimbursable indirect costs and then use that pre-determined rate to make payments covering those reimbursable costs." Doc. No. 41 at 26. No such requirement exists on the statute's face, making the argument plainly wrong. And Plaintiffs' insistence that the statute does not specifically state that agencies may use standard fixed rates without first approximating actual indirect costs is a red herring: the statute broadly authorizes the use of predetermined rates *without foreclosing* the use of standard rates. This argument therefore fails.

Next, Plaintiffs attempt to sidestep the statute's acknowledgement of broad authority through legislative and executive history. This effort fails for several reasons. First, the cited history is relevant only to § 4708; it has no bearing on NSF's independent, preexisting authority under the NSF Act. Second, such history is immaterial where, as here, the statute is clear on its face. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) ("[S]ettled principles of statutory construction" require the court to "apply the statute according to its terms" when "the statutory text is plain and unambiguous."). And third, Plaintiffs' argument that the Executive "has never simply used a single across-the-board rate that bears no relationship to actual reimbursable costs" is wrong. Doc. No. 41 at 27. OMB has capped the administrative portion of indirect costs at 26 percent for the past 34 years. *See supra* at 10. And the Guidance has for several years permitted a standard rate of up to 15 percent without documented justification, 2 C.F.R. § 200.414(f), evincing the Executive's long-standing position that flat-rate indirect costs are statutorily authorized. *See also, e.g.*, 35 Comp. Gen. 590 (1956) ("[I]n some instances [the volume of government work may be so small that] computation of the actual indirect costs . . . may not be

justified [and] it may be administratively desirable to adopt some alternative but legally acceptable procedure such as a flat amount for indirect costs.").

Last, Plaintiffs attempt to obfuscate the statute's broad authority—and the Act's even broader authority—by reading too much into the appropriations riders limiting cost reimbursement from 1963 to 2005. Doc. No. 41 at 28. By their nature, appropriations riders overlay statutory authority that already exists. As described above, the riders limited cost reimbursement in grants, highlighting a longstanding focus on grant cost containment. *See supra* at 8–9. But Plaintiffs fail to recognize that when those riders were discontinued, the underlying authority given NSF by the Act and § 4708 remained unaffected. Plaintiffs similarly read too much into the appropriations rider Congress began enacting in 2017 concerning NIH's use of predetermined indirect cost rates. If Congress wanted to make that rider applicable to NSF, it could have easily done so, and it did not. While Plaintiffs correctly observe that "[w]hen Congress acts to amend a statute, . . . it intends its amendment to have real and substantial effect," Doc. No. 41 at 28 (quoting *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 180 (2020)), Plaintiffs have identified no amendment that impacts the authority granted NSF by the Act or § 4708. And Plaintiffs wrongly argue that the Policy relies on "newly discovered authority," Doc. No. 41 at 28 – as discussed above, NSF's authority to issue grants using capped, fixed indirect cost rates has been recognized by the Executive for the better part of a century. The Policy thus properly falls within NSF's statutory authority.

### B.    The Policy follows 2 C.F.R. § 200.414(c).

The Policy is consistent with, and indeed was promulgated expressly pursuant to, the Guidance on indirect costs. That Guidance provides that agencies generally will adhere to "negotiated rate[s]" for indirect costs. 2 C.F.R. § 200.414(c)(1). But it also provides an express path for NSF to depart from that approach. *See* 2 C.F.R. § 200.414(c)(1). As relevant here, "[a]

Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award . . . when approved by the awarding Federal agency [*i.e.*, NSF] in accordance with paragraph (c)(3) of this section." 2 C.F.R. § 200.414(c)(1).  Paragraph (c)(3), in turn, requires only that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." *Id.* § 200.414(c)(3).  Thus, the Guidance expressly contemplates that NSF may deviate from negotiated indirect-cost rates for a "class of Federal awards" provided that NSF "make[s] publicly available[]" the "policies, procedures and general decision-making criteria" that "justify deviations from negotiated rates." *Id.* § 200.414(c)(1), (3).  Aside from that procedural requirement, the Guidance imposes no substantive constraint on the ability of NSF to depart from negotiated rates.

NSF followed that path.  The Policy specifies that it is deviating from negotiated indirect-cost rates for the class of awards issued to IHEs.  Doc. No. 61-1 at 3.  It publicly sets out "the policies, procedures and general decision-making criteria" that NSF will follow.  *Id.*  And it sets forth a "documented justification" for adopting that updated policy—including that the updated policy would "[r]educ[e] administrative burdens for awardee institutions"; "[e]nsur[e] consistent treatment of all IHE financial assistance recipients"; "[i]ncreas[e] the proportion of federal funds allocated to direct research costs"; and "improv[e] government efficiency by eliminating the need for individualized indirect cost negotiations." *Id.* at 3.

Plaintiffs' attempts to distinguish between a class of awards and class of recipients and to re-characterize this class deviation as an unauthorized "wholesale elimination of negotiated rates for all universities," Doc. No. 41 at 29–31, are untenable.  The Guidance expressly states that an "awarding agency" may deviate from negotiated rates for "a single Federal award" or, at its option,

for "a class of Federal awards." 2 C.F.R. § 200.414(c)(1). That phrasing readily encompasses the grants addressed by the Policy. A "[c]lass of Federal [a]wards," as defined in the Guidance, includes "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1. Here, the Policy applies to a "group of Federal awards" for a "specific type of recipient"—specifically, to NSF research grants made to IHEs. And nothing in the Guidance limits the size of the group of awards that may be adjusted. But even accepting Plaintiffs' theory that a "class" must be a subset of NSF awards, that is true here: the Policy applies only to research grants made to IHEs.

Moreover, despite Plaintiffs' assertion to the contrary, nothing in the text of subsections 200.414(c)(1) and (3) expressly calls for a multi-stage adjudicative process. The focus is instead on making publicly available NSF's explanation for any departure from negotiated rates. Section 200.414(c)(1) authorizes a deviation when approved by NSF, and section 200.414(c)(3) requires that the deviation's policy be implemented and made public. Although NSF could certainly choose to provide for a step-by-step rate redetermination process, nothing in the Guidance guarantees recipients any opportunity to litigate individual deviations.

On the contrary, the Guidance's text actively contemplates that NSF may announce generally applicable "polic[y]." 2 C.F.R. § 200.414(c)(3). And the Policy need not set forth further "procedures and decision-making criteria" for applying its policy because the Policy does not contemplate any individualized redetermination of indirect cost rates. Rather, as the Policy states, "NSF will apply a standard indirect cost rate not to exceed 15% to all grants" to IHEs, with the awardee "authorized to determine the appropriate rate up to this limit." Doc. No. 61-1 at 2. No

further procedures or criteria—beyond the IHE recipient's selection of a rate within the new range and application of that rate to the particular award—are necessary to implement that policy.

Finally, section 200.414(c)(4) does not help Plaintiffs. That provision provides that "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." The new Policy expressly provides that it will be included in notices of funding opportunity moving forward. For any grants awarded after May 5 for which funding opportunities were announced prior to May 5—at most a small subset of grants—subsection (c)(4) is not mandatory because it says nothing about what should happen in the event of noncompliance.[25] *See United States v. Aguirre-Gonzalez*, 597 F.3d 46, 55 (1st Cir. 2010) (holding language directing that action "shall" be taken within a set time was "precatory, rather than mandatory" because the statute "impos[ed] no consequence" for non-compliance). Moreover, subsection (c)(4) does not displace what subsections (c)(1) and (c)(3) expressly authorize: an agency can "use a rate different from the negotiated rate," without temporal limitation, so long as the agency "make[s] publicly available[]" the "policies, procedures and general decision-making criteria" that "justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(1), (3); *see also* 2 C.F.R., Pt. 200, App. III § C(7)(a) (noting that an agency may decline to "use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award" so long as it complies with 2 C.F.R. § 200.414(c)(1)). NSF has done so here.

---

[25] At most, any impact on these in-progress grants supports enjoining or vacating the Policy with respect to those grants. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co.,* 282 F.3d 23, 40 (1st Cir. 2002) ("Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs.") (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

### C.    Plaintiffs' regulatory scheme argument fails.

Plaintiffs next attempt a more wide-ranging argument that the NSF's planned deviation from negotiated rates violates "the larger regulatory framework governing recovery of indirect costs."[26] Doc. No. 41 at 32. As a preliminary matter, the Guidance "framework" cannot prohibit what it expressly permits: deviations expressly allowed by section 200.414(c). Plaintiffs rest their argument on a mistaken assertion that the law imposes a requirement that grantees recover in full some objective, knowable amount of "*actual* indirect costs." *Id.* The law imposes no such requirement—and in fact confirms that there is no such requirement. For example, 41 U.S.C. § 4708 expressly allows "payment of reimbursable indirect costs on the basis of predetermined fixed percentage rates applied to the total of the reimbursable direct costs incurred." That is a blunt measure: application of a predetermined fixed rate to the reimbursable direct costs will yield a number, but that number will not reflect—and certainly will not necessarily reflect—the actual amount of indirect costs that are associated with any specific federal award (a concept that is itself fuzzy and leaves ample room for disagreement). The Guidance has capped recovery of the administrative portion of F&A costs for more than three decades. *See* 2 C.F.R. Pt. 200, App. III § C.8; *supra* at 10. And the default negotiated rate method underscores the point: a rate arrived at through negotiation will not guarantee recovery of "*actual* indirect costs." *Id.* And even if it would, the fact remains that subsection (c)(3) explicitly allows for "deviation[s]" from the negotiated rate. In any event, the Guidance itself directly provides that the provisions setting out "cost principles . . . do not address the circumstances nor dictate the extent of Federal Government

---

[26] Plaintiffs' repeated references to the Guidance as "regulations" are imprecise. The Guidance is not regulatory as it does not regulate any non-government entity. Instead, as noted above, the guidance sets forth Executive-wide policies for grant awards that historically were issued through OMB circulars. *See supra* note 18; *see also U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.*, 844 F.2d 1087, 1096 (4th Cir. 1988) (explaining OMB is "the President's principal arm for the exercise of his managerial functions") (citation omitted).

funding of a particular program or project."  2 C.F.R. § 200.100(c).  Plaintiffs thus have no right to recover some knowable amount of actual indirect costs.

The provisions cited by Plaintiffs are not to the contrary.  Plaintiffs rely primarily on 2 C.F.R. § 200.402—itself one of the "cost principles" that expressly does not dictate the extent of funding—which, provides that "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits."  Section 200.402 speaks only to the "total cost," making clear that allocable indirect costs are part of the "total costs" that generally may be charged against a grant (up to the amount of the grant), without purporting to set an indirect cost rate to be used in setting the amount of the grant—much less requiring the Government to pay for the entirety of a recipient's costs. *See Cmty. Rels.-Soc. Dev. Comm'n v. United States*, 8 Cl. Ct. 723, 726 (1985) (explaining in similar context that a "fixed percentage of direct cost rates," as opposed to "actual allocations" or "lump sums," is simply one method of "determining allocable indirect costs" under a grant).  Were it otherwise, section 200.402 would be at war with not only sections 200.100 and 414(c)(1) and (3), but also the default use of negotiated rates under the regulations.

The Policy likewise does not contravene Appendix III to Part 200.  That Appendix "provides criteria for identifying and computing indirect . . . rates at IHEs (institutions)."  2 C.F.R. Pt. 200, App. III § A.  As noted above, it caps recovery of the administrative portion of F&A costs, undermining Plaintiffs' premise that the Guidance requires recovery of actual costs.  *See* 2 C.F.R. Pt. 200, App. III § C.8; *supra* at 10.  Moreover, the Appendix simply (i) defines categories of indirect costs, such as "Depreciation," "Interest," and "Operation and Maintenance Expenses," 2 C.F.R. Pt. 200, App. III §§ B.2–B.4; (ii) requires those costs to be "distributed to the major functions of the institution," *id.* § A.2; and (iii) further defines each of the "major functions of the

institution," *id.* § A.1.  It does not purport to require an agency to pay for all of a grantee's costs, or even to adhere to the "negotiated rate" for indirect costs.  In fact, it expressly notes that the grantor may deviate from the negotiated rate under Subsection (c)(1)—precisely as NSF proposes in the Policy.  *Id.* § C.7.

Nor does the Policy somehow contravene the guidelines relating to audits and the negotiation of indirect cost rates.  Nothing about a change in indirect cost rates precludes an agency from auditing a grant recipient to ensure that the recipient is properly using federal funds.  *See* 2 C.F.R. §§ 200.501(b), 200.504, 200.514.  And to invalidate the Policy's "deviation from negotiated rates" on the ground that it is inconsistent with the provisions governing negotiations of indirect cost rates would be to read Section 200.414(c) into nonexistence.  *See* 2 C.F.R § 200.1 (defining "Indirect cost rate proposal"), § 200.100(c) (noting that "Subpart E establishes principles for determining allowable costs incurred by recipients . . . under Federal awards," but that they "do not address the circumstances nor dictate the extent of Federal Government funding of a particular program or project"), § 200.414(e) (listing Appendices "for development and submission of indirect (F&A) cost rate proposals and cost allocation plans").  Those provisions will continue to apply whenever an agency uses negotiated indirect cost rates—but under the plain terms of section 200.414(c) an agency is not bound to do so.

### D.    The Policy is reasonable and reasonably explained.

The Policy also survives arbitrary-and-capricious review.  The APA allows courts to "hold unlawful" agency actions when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Sorreda Transp., LLC v. U.S. Dep't of Transp.*, 980 F.3d 1, 3 (1st Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Indeed, a court

must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted). At bottom, the APA requires only that agency action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Those deferential principles apply even where, as here and as is frequently the case, the agency action reflects a change in policy. An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Fox Television Stations*, 556 U.S. at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* To the extent that the agency's change in course unsettles any "serious reliance interests," the agency need only acknowledge and address those interests and explain why it is nonetheless pursuing its chosen policy. *Id.*

Further, the judiciary affords a particularly lenient standard of review to agency action in the contracting context. "Effective contracting demands broad discretion." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260 (Fed. Cl. 2016). As such, contracting decisions are subject to a "highly deferential rational basis review," *id.* at 261, because, at bottom, "competitors do not dictate an agency's minimum needs, the agency does," *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). "Determining an agency's minimum needs is a matter within the broad discretion of agency officials ... and is not for the court to second guess." *Id.*

Measured against these standards, the Policy is clearly reasonable. The Policy acknowledges it is an "updat[e]" and "change" to NSF's preexisting policy. Doc. No. 61-1 at 2. It sets out the reasons for the change: to improve "efficiency" by "[r]educing administrative burdens on awardee institutions" and "eliminating the need for individualized indirect cost

27

negotiations," "consistency" by "[e]nsuring consistent treatment of all IHE financial assistance recipients," and "effectiveness" by "[i]increasing the proportion of federal funds allocated to direct research costs." *Id.* at 3. The Policy explains the change will "allow[] NSF and its awardees to focus more on scientific progress and less on administrative overhead by aligning with common federal benchmarks." *Id.* The Policy accounts for reliance interests by only applying to new awards. *Id.* And the Policy does all of this to address an important problem. The "administrative overhead" and other indirect costs targeted by the Policy have come to consume more than a quarter of NSF's annual grantmaking budget for IHEs ($1.07 billion out of $4.22 billion). Doc. No. 61 at 5 ¶ 18. NSF "is responsible to Congress and taxpayers for carrying out its mission in a manner that not only facilitates research but does so cost-effectively" but "indirect costs, by definition, constitute Federal expenditures that do not directly support researchers." *Id.* at 4 ¶ 14.

Assailing the reasoned nature of the Policy, Plaintiffs raise a flurry of objections. None succeeds. They first posit that the Policy's three justifications are "conclusory" and "nonsensical." Doc. No. 41 at 34. But these protestations amount to mere disagreement with NSF's decision, insufficient to satisfy the arbitrary and capricious standard. *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018). Specifically, Plaintiffs' argument that the Policy does not increase efficiency because IHEs must still negotiate rates with other agencies and NSF must negotiate rates with non-university recipients, Doc. No. 41 at 35, misses the point. The Policy alleviates the burden of tracking indirect costs with respect to NSF grants, even if not with respect to other sources of funding.

Similarly, Plaintiffs' assertion that "treating institutions with *different* costs *the same* is not consistency," Doc. No. 41 at 35 (emphasis in original), is semantics. Giving all IHEs the opportunity to use the same standard indirect costs rate treats them consistently in the most

straightforward sense.  The Policy treats "like cases alike." *Craker v. DEA*, 44 F.4th 48, 64 (1st Cir. 2022).  Plaintiffs' "consistency" argument amounts to no more than disagreement with NSF's policy choice, which is not sufficient under arbitrary-and-capricious review.  Finally, contrary to Plaintiffs' assertions otherwise, NSF's policy will cause more resources to flow towards direct scientific and engineering research activities.  Decreasing the indirect cost rate will force IHEs to fund greater shares of research themselves or from other sources—just as they did during earlier periods in which flat rates or cost-sharing were used.  *See supra* at 8–10.  Simple math demonstrates this.  Assume NSF awards $100 in direct costs at a 30 percent indirect cost rate for a total award of $130.  Under the Policy, with the same $100 award for direct costs, NSF provides only $15 in indirect costs, saving $15 which it can use to fund direct scientific and engineering research.

Next, the Policy does not "ignore[] 'important aspect[s] of the problem'" as the Plaintiffs allege.  Doc. No. 41 at 36.  Plaintiffs claim that the Policy will "thwart the goals" of NSF, but NSF plainly concluded that the Policy will advance "scientific progress."  Doc. No. 61-1 at 3.  Plaintiffs' argument is an improper attempt to substitute their judgment for that of the agency.  *See Hawaii*, 585 U.S. at 708 (The judiciary "cannot substitute [its] own assessment for the Executive's predictive judgments … all of which 'are delicate, complex, and involve large elements of prophecy." (citation omitted)); *see also Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference").  NSF continues to promote basic scientific research, and the Policy furthers that goal by allocating more of NSF's budget toward research instead of expenses that can and should be borne by

29

Plaintiffs, such as "tenured faculty salaries" and other costs.  *See, e.g.*, Doc. No. 40-9 at 11 ¶ 17;

Doc. No. 40-16 at 8 ¶ 17; Doc. No. 40-37 at 8 ¶ 16.

Nor does the Policy ignore reliance interests.  The Policy plainly considers reliance

interest—first, through its limited reach, applying only to "funding opportunities issued after May

5, 2025," and not "to existing rewards."  Doc. No. 61-1 at 3.  The Policy specifically stressed that

IHEs therefore "are **not required to amend budgets** for awards issued before the effective date,

nor will they be required to return previously reimbursed indirect costs."  *Id.* (emphasis in original).

In other words, unlike in *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), where

the agency failed to consider important reliance interests, here NSF considered the IHE's reliance

interest on existing grants by making the rate change forward-facing.

NSF also properly considered the IHE's reliance interest on "continuing grant awards" by

excepting those grants from the Policy.  Doc. No. 61-1 at 3.  The Policy does not apply to existing

grants, or to continuing grant awards.  *Id.*  Plaintiffs' ostensible reliance interest is their reliance

on the chance that they might receive a new grant in the coming months subject to the new policy.

Given that only 27 percent of grant applications are successful, this reliance is patently

unreasonable.  *See* Doc. No. 61 at 3 ¶ 9.  To the extent that Plaintiffs *rely* on receiving grant awards

that have not been made, and then *rely* on forever receiving reimbursement for indirect costs at

their NICRA rates, those speculative interests are not protected by law.  At bottom, to the extent

that Plaintiffs have any reliance interest in the receipt of future grants, (they do not), the Policy

reflects the considered policy judgment that it is preferable to "[i]ncreas[e] the proportion of

federal funds allocated to direct research costs" even at the cost of disrupting those private reliance

interests.  Doc. No. 61-1 at 3.

Moreover, Plaintiffs' argument that the Policy "departs without acknowledgment or explanation from NSF's policy on mandatory cost-sharing," Doc. No. 41 at 38, is misdirection. The Policy does not necessarily depart from NSF's preexisting cost-sharing policy. NSF's indirect costs policy already allowed deviations "identified in an NSF program solicitation," the mandatory cost sharing policy allowed cost sharing when authorized by the NSF Director or Board, and the voluntary cost sharing policy only prohibited "voluntary committed" cost sharing – *i.e.*, binding, auditable cost sharing – not "voluntary uncommitted" cost sharing – *i.e.*, non-binding contributions of awardee resources that are not subject to audit. PAPPG at II-20–21. Regardless, the Policy expressly "updat[es] [NSF's] policy regarding the reimbursement of indirect costs," making a "change." Doc. No. 61-1 at 2. The Policy additionally recognizes that "inconsistent policies and procedures" exist in the PAPPG, that the Policy notice "takes precedence" over them, and that "NSF will update relevant grant policy documents and FAQs to reflect" the updated policy. *Id.* at 3. The Policy thus expressly recognizes that it is a shift from preexisting policy and that inconsistent policies and procedures will be updated. And the Policy provides the reasons for that shift. The Policy is therefore sufficiently reasoned. *See Fox Television Stations*, 556 U.S. at 515.

Review of prior policies reveals only that the present dispute is nothing new. *See supra* at 8–10. Indeed, "[u]niversity officials [have] often claim[ed] that the government, by requiring cost sharing, has breached a promise to universities to provide full cost reimbursement for sponsored research," whereas NSF "always has viewed research as a normal function of universities and their faculty which is further stimulated or encouraged by NSF funding," making it "reasonable for the government to pay only its 'fair share' of costs."[27] Plaintiffs' "disagreement" with the "merits of the [Policy's] conclusion" on this longstanding debate does not make the Policy arbitrary and

---

[27] Hardy, *supra* note 13, at 10.

capricious.  *Concerned Citizens on I-190 v. Sec'y of Transp.*, 641 F.2d 1, 7 (1st Cir. 1981) (summary judgment for agency was proper where plaintiffs' "evidence suggesting that" lands "were recreationally significant" offered nothing more than "a possible disagreement" with the agency's conclusion that they were not).

Plaintiffs next accuse NSF of failing to "explain why audits of indirect costs would not 'improve government efficiency.'" Doc. No. 41 at 39.  That is a non-sequitur.  Audits of whether the NICRA rates conform to the actual indirect costs incurred are irrelevant.  NSF does not assert that any Plaintiff has an indirect cost rate that misaligns with the actual indirect costs incurred. Instead, NSF has decided that a uniform indirect cost rate of 15 percent reflects an appropriate amount of the IHEs' expenses that should be borne by the taxpayers, in light of its policy of promoting efficiency, consistency, and "increasing the proportion of federal funds allocated to direct research costs"—none of which are addressed by audits.  The 15 percent cap on indirect costs is a path that "may reasonably be discerned" of achieving the goal of efficiency, consistency, and effectiveness as stated in the Policy and should be upheld.  *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Last, Plaintiffs' arguments that the Policy "does not explain why it" only applies to "one class of recipients" or applies a 15 percent rate are unpersuasive.  Doc. No. 41 at 39–40.  Even where regulatory obligations are involved, agencies need not address every potential issue "in one fell swoop." *Env't Def. Fund v. EPA*, 922 F.3d 446, 457 (D.C. Cir. 2019) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004)).  "It is not for [the court] to 'second-guess'" what the agency chooses to prioritize. *Id.* (quoting *WildEarth Guardians v. EPA*, 751 F.3d 649, 656 (D.C. Cir. 2014)).  Moreover, as Plaintiffs recognize, about 80 percent of NSF-funded research

is done at IHEs, Doc. No. 41 at 12, so deviations focused on other classes would not as effectively accomplish the Policy's goals. And as Plaintiffs recognize, the Guidance already recognizes 15 percent as an appropriate flat rate—making it perfectly reasonable for NSF to rely on that "common federal benchmark[ ]." Doc. No. 41 at 40; Doc. No. 61-1 at 3.

*    *    *

As explained above, this Court lacks jurisdiction and, even if that were not true, the Policy complies with all relevant statutes and regulations and is reasonable and reasonably explained. The Court therefore should deny Plaintiffs' Motion and either dismiss this lawsuit or grant summary judgment to Defendants.

## III.    Any Remedy Should Be Limited To Remand.

Even if the Court concludes otherwise, it should deny Plaintiffs' request for an injunction and instead remand to NSF. Upon determination that an agency has violated the APA, "the proper course, except in rare circumstances, is to remand to the agency." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). In contrast, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). As such, a permanent injunction in the APA context should not issue unless it would "have [a] meaningful practical effect independent of [the policy's] vacatur." *Id.* An injunction has that effect when the remedy of vacatur is insufficient to redress respondents' injury. *Id.* at 165–66.

Plaintiffs blow past the proper remedy of remand and request a permanent injunction of staggering scope. Doc. No. 41 at 49. Their requested injunction could be read as prohibiting NSF from ever promulgating a rule setting the indirect cost rate at 15 percent, even if it later provides a reasoned explanation that satisfies the APA's requirements (though, again, NSF has already provided that reasoned explanation here). *See* Doc. No. 41 at 49. Injunctive relief would be even

33

more improper because Plaintiffs make no showing that the harms they highlight cannot be adequately redressed by vacatur and remand.  Nor could they.  All of Plaintiffs' harms flow from the Policy.  Once the Policy is vacated, the harms dissipate.

## IV.    Plaintiffs Have Not Satisfied the High Burden for Injunctive Relief.

For the reasons already discussed, Plaintiffs' claims fail on the merits, precluding both injunctive relief and summary judgment in their favor.  However, even if the Court concludes that Plaintiffs' claims have merit, the Court should deny Plaintiffs' requests for injunctive relief for the independently sufficient reason that Plaintiffs have not carried their high burden of demonstrating irreparable harm or showing injunctive relief is in the public interest.  *See EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996); *In re TelexFree Sec. Litig.*, No. 4:14-MD-02566, 2021 WL 11604879, at *7–8 (D. Mass. Apr. 21, 2021) (finding likelihood of success on the merits but denying emergency relief for failure to show irreparable harm); *Doble Seis Sport TV, Inc. v. Puerto Rico*, No. 18-cv-1432, 2019 WL 1153432, at *5 (D.P.R. Mar. 12, 2019) ("Plaintiffs face a high burden of showing that irreparable harm will result from a denial of the requested preliminary injunction.").

### A.    Plaintiffs have not shown irreparable harm.

"A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  The irreparable harm must be "actual and imminent," not remote or speculative.  *See Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991).  And, for a preliminary injunction, it must occur before the Court can adjudicate the merits.  *See Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382–83 (1st Cir. 1987) (affirming denial of preliminary injunction in the absence of indication that the merits of the case would not be decided before harms occurred).

In considering whether Plaintiffs have met the "exceedingly high burden" of demonstrating that, absent the injunctive relief they seek, they are likely to suffer irreparable harm, the Court should not consider Plaintiffs in the collective. Instead, each Plaintiff—and each institution represented by a plaintiff—must, on its own, make a clear showing of irreparable harm. *See, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485–86 (3d Cir. 2000) (partially vacating a preliminary injunction because "[i]nstead of making a case-by-case determination that each plaintiff demonstrated irreparable harm, . . . the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy that prong of the preliminary injunction test"). Plaintiffs' (and their member institutions') circumstances vary significantly, and the Court should require each Plaintiff (and member institution) to meet this burden. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs[.]") (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Moreover, even as a collective, Plaintiffs cannot show irreparable harm from a Policy that does not alter any existing grant award.

Plaintiffs' primary claimed injury—the alleged direct consequence of the Policy—is that they will receive less indirect cost reimbursements from NSF than they would have under negotiated indirect cost rates. But the Policy explicitly provides that the that the 15 percent rate cap applies "only to new awards made to IHEs on or after May 5, 2025." Doc. No. 61-1 at 3. The Policy "does not apply retroactively to existing awards" and IHEs "are not required to amend budgets for awards issued before this effective date, nor will they be required to return previously

reimbursed indirect costs."[28]  *Id.*  Award supplements and continuing grant increments under awards existing prior to May 5, 2025 are not subject to the 15 percent indirect cost rate cap.  Grants that have yet to be issued by NSF cannot be the basis of irreparable harm, otherwise the element of irreparable harm would lose all meaning.  That is not the law: irreparable harm must be proved. *See Arab World, Inc.,* 645 F.3d at 32.

Plaintiffs' alleged harms are speculative because they concern proposals that are still under review by NSF, proposals being prepared by Plaintiffs, and funding opportunities that NSF has yet to issue.  Such alleged harms are nothing more than "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store" and cannot justify injunctive relief. *Blinds To Go, Inc.*, 370 F.3d at 162.  For example, the Motion discusses "a proposal that [the University of New Hampshire] can no longer submit" as one of Plaintiffs' alleged harms.  Doc. No. 41 at 42.  The alleged "harm" arises from an *unsubmitted proposal*.  In FY 2024, the average approval rate for grant proposals from IHEs was 27 percent.  Doc. No. 61 at 3 ¶ 9.  Whether Plaintiffs submit proposals to NSF is outside NSF's control, but, in any event, Plaintiffs have no entitlement to NSF funding merely because NSF called for proposals.  In the above example, the University of New Hampshire would not be guaranteed funding even if it submitted a proposal, but the declaration conclusorily states that due to its decision to not submit a proposal, the University "would stand to lose approximately $3M in indirect costs over the lifetime of the grant."

---

[28] The recent decisions in this district finding irreparable harm from changes to indirect cost rates implemented by federal agencies are therefore inapposite.  *See Assoc. of Amer. Univs. v. Dep't of Energy*, No. 1:25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025); *Massachusetts v. Nat'l Insts. of Health*, -- F. Supp. 3d --, 2025 WL 702163 (D. Mass. 2025), *appeal docketed*, Nos. 5-1343, 25-1344, 25-1345 (1st Cir.).  While the policies at issue in those cases similarly were not retroactive, plaintiffs in those cases claimed that the relevant policies applied to existing grants. NSF's policy is different in kind, as the rate change applies only to grants accepted by recipients after May 5.

Doc. No. 40-23 at 7 ¶ 15. A decision not to seek funding is insufficient to warrant injunctive relief. Plaintiffs otherwise assert *anticipated* annual losses resulting from the policy, once again treating future NSF grants as money already in the bank. *See* Doc. No. 41 at 35 n.12 (noting annual losses based on *anticipated* reimbursements). Plaintiffs' alleged harms are also not imminent for the same reasons.

Even if an inability to recover indirect costs above 15 percent from NSF on *future* awards is not deemed speculative, injunctive relief is still not warranted because additional reimbursements can redress the injury if Plaintiffs succeed in this litigation. *See Blinds To Go, Inc.*, 370 F.3d at 162 (stating no irreparable harm where monetary award will make plaintiff whole). Once again, the Policy only affects new grants, and any effects from a lowered cap of indirect cost reimbursement will only accumulate gradually. As Plaintiffs' "simplified example" demonstrates, the effect of the policy cap is gradual and will only reach its full extent "[a]bsent judicial intervention." *See* Doc. No. 41 at 42–43 (noting that only 20 percent of the full extent of the reduction would accumulate within the first year of a five-year grant). Plaintiffs' reluctance to do so aside, at least some Plaintiffs recognize their ability to cover lost funding for at least some time. For example, Yale asserts that using its endowment to "make up for the budget shortfall" that might result from the Policy would not be a "responsible option"—implicitly recognizing that it could use its endowment for that purpose (and certainly during the duration of this litigation). Doc. No. 40-41 at 11 ¶ 26; *see also* Doc. No. 40-20 at 15 ¶ 19 ("The University of Michigan cannot *indefinitely* 'float' all of the indirect costs it would likely lose coverage for . . .") (emphasis added). And even if Plaintiffs could not cover costs in the interim, injunctive relief is still unwarranted. *See United States v. Michigan*, 230 F.R.D. 492, 494 n.1 (E.D. Mich. 2005) ("[Movant] argues that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.' The rule that

equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it.") (citations omitted).

Finally, Plaintiffs rely on a variety of alleged harms that *could* happen if there are deviations from indirect cost rates resulting in reduced payment of money under grants they have not even received. But *potential* downstream consequences of *speculative* harms cannot support injunctive relief. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."). In any event, Plaintiffs' claimed downstream harms fail on their own terms.

*First*, many of Plaintiffs' claimed harms categorically do not qualify as irreparable harm. For example, Plaintiffs assert the policy "will allow competitor nations that are maintaining their investments in research to surpass the United States on [scientific breakthroughs], threatening our nation's national security and its economic dominance." Doc. No. 40-1 at 8 ¶ 16. The declarations are replete with rote recitations of these concerns over the United States' national security and economic dominance—which are not harms *to Plaintiffs* but rather alleged harms to the United States' interests. *See, e.g.*, Doc. No. 40-7 at 8 ¶ 16; Doc. No. 40-9 at 12 ¶ 20; Doc. No. 40-12 at 14 ¶ 19; Doc. No. 40-15 at 11 ¶ 25; Doc. No. 40-24 at 14 ¶ 17; Doc. No. 40-31 at 8 ¶ 18; Doc. No. 40-33 at 9 ¶ 17. Setting aside the multiple speculations contained in these assertions, considerations regarding the United States' "national security" and "economic dominance" properly belong to the democratically elected President and his Administration, not Plaintiffs seeking more money from the public fisc. *See, e.g.*, *Winter*, 555 U.S. at 26 (looking to what "the President—the Commander in Chief—has determined" is in national security interests when evaluating injunctive relief); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 114 (D.D.C. 2020) ("courts

typically defer to the President's judgment" when parties dispute "that a preliminary injunction would displace and frustrate the President's decision on how to best address a national security threat"). Indeed, in the context of standing these sorts of harms are deemed nonjusticiable generalized grievances. *See Lance v. Coffman*, 549 U.S. 437, 439–40 (2007) (explaining that "[t]o have standing, a plaintiff must have more than a general interest common to all members of the public") (quotations and citation omitted). In any event, the Policy reflects the Administration's choice on how to best use taxpayer money to enhance public interest and is entitled to deference by the Court.

*Second*, Plaintiffs describe numerous potential harms that might materialize if NSF were to reduce their indirect cost funding, but the asserted harms are nothing more than conjecture. A plaintiff seeking injunctive relief must demonstrate that irreparable injury is *likely* in the absence of an injunction. *See Blinds To Go, Inc.*, 370 F.3d at 162; *see also Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"). But the declarations are littered with unsubstantiated fears that cannot justify an injunction. For example, one declarant asserts that "[n]ot winning this race [in quantum networking] will mean the US will be in a far weaker position in the future and will not enjoy the advantages of technological superiority of our military." Doc. No. 40-33 at 9 ¶ 17. This catastrophizing assumes irreparable harm but does not demonstrate it. *See Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) ("[I]rreparable harm is not assumed; it must be demonstrated."). And Plaintiffs' repeated speculations on the long-term effects of NSF's action on the local economy or national security only further demonstrate that their alleged harms are speculative and not imminent. *See, e.g.*, Doc. No. 40-19 at 14 ¶ 28 (MIT asserting that loss of federal funding would

"undermine economic growth across both Massachusetts and the country"); Doc. No. 40-15 at 11 ¶ 23 ("In the longer term . . . decisions [to curtail investments] would be devastating not only to the Dartmouth community but also to the local economy."); Doc. No. 40-16 at 11 ¶ 23 ("Cutting back on the University of Florida's research . . . will also have long-term implications on national security and the American economy."); Doc. No. 40-23 at 10 ¶ 23 (same statement from the University of New Hampshire); Doc. No. 40-41 at 12–13 ¶ 29 (same statement from Yale).

Other speculations in the declarations similarly undermine Plaintiffs' request for an injunction. A significant portion of the claimed harms would only arise if Plaintiffs declined NSF funding or declined to apply for NSF funding altogether. Numerous declarants assert that "*[i]f* [an IHE] can no longer apply for NSF grants because it is unable to accept the new indirect cost rate cap," the alleged harms would be "exacerbated." *See, e.g.*, Doc. No. 40-5 at 12 ¶ 26; Doc. No. 40-12 at 15 ¶ 22, Doc. No. 40-18 at 13 ¶ 24; Doc. No. 40-26 at 17 ¶ 22. But whether Plaintiffs will apply for future NSF grants is purely conjectural at this stage. *See, e.g.*, Doc. No. 40-41 at 12 ¶ 29 ("If Yale ultimately *concludes* that it can no longer apply for NSF grants . . .") (emphasis added); Doc. No. 40-17 at 13 ¶ 25 ("If the University [of Illinois Urbana-Champaign] *elects* to not apply for NSF grants . . .") (emphasis added). Whether Plaintiffs will in fact refuse to apply for NSF grants that cover direct costs and up to 15 percent of indirect cost remains to be seen, but alleged harm from future decisions not to seek funding are uncertain, speculative, and at this stage nothing more than threatened harm within Plaintiffs' control.[29]

---

[29] IHEs' concerns that they would not be able to accept federal funding due to cost issues are not new, but "despite all the complaints and concerns universities raise about cost sharing, invariably universities appear to take the federal research money, regardless of the cost sharing 'strings' attached." Hardy, *supra* note 13, at 18.

*Third*, where declarants assert that reducing funding is likely to harm research, innovation, or retention, they generally do not assert that those harms are *imminent* as opposed to eventual reductions in their capacity that would occur from sustained diminished funding after a ruling on the merits. *See Pub. Serv. Co. of N.H.*, 835 F.2d at 382 (affirming denial of preliminary injunction in the absence of indication that the merits of the case would not be decided before harms occurred); *see also, e.g.*, Doc. No. 40-12 at 13 ¶ 16 ("Over time, [the policy] would erode the development of the scientific workforce, diminish innovation output, and reduce the nation's ability to compete globally in science and technology for decades to come."); Doc. No. 40-40 at 18 ¶ 16 ("This would also significantly hinder UW-Madison's ability to train the next generation of researchers and educate students."); Doc. No. 40-9 at 11 ¶ 18 ("Ultimately, top scientists will not move to (or stay at) the University if we cannot provide the facilities and staff necessary to conduct world-class research."). Likewise, Plaintiffs assert that even if they could absorb the cost of a lower indirect cost rate, doing so would create "long-term budget pressures." *See, e.g.*, Doc. No. 40-21 at 11 ¶ 23; Doc. No. 40-25 at 16 ¶ 20; Doc. No. 40-26 at 17 ¶ 21; Doc. No. 40-35 at 8 ¶ 19; Doc. No. 40-37 at 10 ¶ 21. But even if budget "pressures" can be considered a harm, they are "long-term" by Plaintiffs' own admissions and are not imminent.

**B.    Injunctive relief is not in the public interest.**

As Plaintiffs acknowledge, the "public interest" element generally merges with the likelihood of success on the merits in cases where the Government is a party. *See* Doc. No. 41 at 48. Because Plaintiffs have not shown a likelihood of success on the merits, they likewise have failed to show that an injunction would be in the public interest.

Moreover, as the Supreme Court recently held in *Department of Education v. California*, 604 U.S. ----, 145 S. Ct. 966, 968–69 (2025), the public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. An injunction thus would harm the

public interest. *See Heckler v. Turner*, 468 U.S. 1305, 1307–08 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay of injunction).

Lastly, Plaintiffs' argument on irreparable harm largely seeks to impose their assessment of what is in the public interest in place of the views of the President and the Administration. The Court should not substitute Plaintiffs' views concerning what would best serve the public interest for the views of the Executive Branch.[30]

## V.    Any Injunction Should Be Narrowly Tailored to Plaintiffs—And, More Specifically, Apply Only To IHEs That Are Plaintiffs or Represented by Plaintiffs and that Have Shown Irreparable Harm.

For the reasons explained above, Plaintiffs are not entitled to injunctive relief. But in the event the Court concludes otherwise, the Court should ensure any injunction is properly tailored.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *Tamko Roofing Prods.*, 282 F.3d at 40 (quoting *Califano*, 442 U.S. at 702); *see also NACM-New Eng., Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 7 (1st Cir. 2019). Thus, "courts must 'closely tailor injunctions to the harm that they address.'" *Tamko Roofing Prods.*, 282 F.3d at 40 (quoting *ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990)); *see also Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) ("Injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion.").

---

[30] For the reasons explained, no injunction should be entered and Plaintiffs' complaint should be dismissed. In response to the Court's May 19, 2025 minute order (Doc. No. 52), NSF is prepared to continue the current voluntary stay of implementation of the Policy for an additional seven days after the June 13 hearing while the Court considers summary judgment. Thereafter, the Court must recognize that this delay in implementation imposes burdens on NSF, and Defendants respectfully decline to voluntarily extend the stay beyond June 20, 2025.

Here, Plaintiffs seek a universal injunction.  Doc. Nos. 1, 40, 41.  Defendants contend that universal injunctive relief is an improper exercise of judicial authority: universal injunctions violate Article III, stretch traditional principles of equity (including those just discussed) past the breaking point, and "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see also Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 974 F.3d 408, 431 (3d Cir. 2020) (vacating nationwide injunction and remanding for entry of relief limited to successful as-applied plaintiffs).[31]

Here, the Court should limit any remedy to those plaintiff institutions, or institutions represented by plaintiff associations, that the Court concludes have shown irreparable harm warranting injunctive relief.  As noted, universal injunctive relief is improper.  And Plaintiffs in any event have not offered any argument purporting to justify their request for universal relief. The Court therefore should tailor any injunction to the irreparable harms proved (and the Plaintiffs that proved it).

## VI.    The Court Should Order That Plaintiffs Post A Bond As A Condition Of Preliminary Relief.

If the Court issues a preliminary injunction, Defendants respectfully request that the Court order Plaintiffs to post a bond or other security in the amount of $3 million to cover the amount of indirect costs that NSF is likely to reimburse beyond the Policy's 15 percent indirect cost rate on awards issued after May 5 during the first month under a preliminary injunction.  Under Federal Rule of Civil Procedure 65(c), the Court may issue preliminary relief "only if the movant gives

---

[31] A challenge to the appropriateness of universal injunctive relief is currently pending at the Supreme Court. *Trump v. State of Washington*, 24A885 (S. Ct., filed March 13, 2025).

security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  *See also iQuartic, Inc. v. Simms*, No. 15-13015, 2015 WL 5156558, at *6 (D. Mass. Sept. 2, 2015) ("A movant for injunctive relief must give security in an amount that the Court considers proper to pay costs and damages sustained by any party found to have been improvidently enjoined.").  "The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction," and the amount of the bond therefore must be "sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully." *Glob. Naps, Inc. v. Verizon New Eng., Inc.*, 489 F.3d 13, 21 (1st Cir. 2007) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring in part and concurring in the judgment)).

The text of Rule 65(c) makes a bond mandatory.  Moreover, a bond is appropriate under First Circuit authority because this case "involve[s] commercial or financial transactions," "both parties are individuals or institutions," and this case does not involve "comprehensive federal health and welfare statutes" or "indigent plaintiffs."  *Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984).[32]  Indeed, courts routinely require security where, as here, one or more organizations challenge government funding or procurement decisions.  *See Md. Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992) (failing to require bond was error where injunction required the food stamp program to pay more benefits than it otherwise would have, exposing the program "to substantial financial losses");

---

[32] Although reversed on other grounds, the bond analysis in *Crowley* continues to be authoritative. *See, e.g.*, *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines Inc.*, 925 F.2d 6, 9 (1st Cir. 1991); *Maine v. U.S. Dep't of Agric.*, -- F. Supp. 3d ---, 2025 WL 1088946, at *30 (D. Maine Apr. 11, 2025).

*Myriddian, LLC v. United States*, 165 Fed. Cl. 650, 659 (2023) (requiring security for preliminary injunction in bid protest challenging contract award); *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 160 (2020) (same); *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 243 (2010) (same).

Based on information provided in NSF's declaration, $3 million reflects a reasonable estimate of the amount of damages that Defendants will sustain in the first month of a preliminary injunction.[33]  Courts have not hesitated to require much larger bonds in similar circumstances, when needed to protect the public fisc.  *See Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1129 (D.C. Cir. 1992) (rejecting trial court's $1000 bond requirement where "Medicare had already paid over $18 million to vendors under the injunction, an amount for which the $1000 bond was 'clearly inadequate to ensure repayment'"); *Amazon Web Services*, 147 Fed. Cl. at 160 (requiring bid protester to post $42 million in security to cover costs of potential six-month delay in awarding government contract).  Accordingly, the Court should require a bond in the amount of $3 million for a one-month injunction.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction and for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

---

[33] A 15 percent rate cap would have reduced budgeted indirect cost by $432 million in FY 2024. Doc. No. 61 at 5 ¶ 18.  Assuming that new NSF awards are spread out evenly in the year and are each for 12-month terms, a 15 percent cap would have saved $3 million in indirect costs in its first month.

Dated: May 27, 2025                    Respectfully submitted:

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        LEAH B. FOLEY
                                        United States Attorney

                                        BRIAN C. LEA
                                        Deputy Associate Attorney General

                                        KIRK T. MANHARDT
                                        Director

                                        MARC S. SACKS
                                        Deputy Director

                                        By: /s/ *Bethany R. Theriot*
                                        BETHANY R. THERIOT (D.C. Bar 1022065)
                                        I-HENG HSU (NY No. 4904033)
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division
                                        Corporate/Financial Litigation Section
                                        P.O. Box 875
                                        Ben Franklin Station
                                        Washington, D.C. 20044-0875
                                        (202) 307-0244
                                        bethany.theriot@usdoj.gov
                                        i-heng.hsu@usdoj.gov

                                        *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: May 27, 2025                              /s/ *Bethany R. Theriot*
                                                 BETHANY R. THERIOT
                                                 Trial Attorney