**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-11231-IT |
| NATIONAL SCIENCE FOUNDATION, *et al.*, | **(Leave to File Granted May 14, 2025)** |
| *Defendants*. | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION AND EXPEDITED SUMMARY JUDGMENT
[DOC. NO. 40] AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [DOC. NO. 60]**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................1

I.   The Government's Threshold Arguments Fail. ...................................................1

   A.  Plaintiffs Have Standing. ...........................................................................1

   B.  Plaintiffs' Claims Are Justiciable Under The APA. ..................................3

II.  The Rate Cap Policy Is Unlawful. .....................................................................4

   A.  Congress Never Authorized NSF To Enact An Arbitrary Cap Unmoored
       From Actual Indirect Costs. .......................................................................4

   B.  The Rate Cap Policy Violates The Regulations Governing Indirect Cost
       Rates. ..........................................................................................................8

   C.  The Rate Cap Policy Is Arbitrary And Capricious. .................................11

III. The Government's Remedial Arguments Fail. ..................................................15

   A.  Plaintiffs Have Established Irreparable Harm. ........................................15

   B.  Other Factors Warrant Injunctive Relief. ................................................18

   C.  The Government's Miscellaneous Remedial Arguments Fail. .................18

CONCLUSION..............................................................................................................20

i

# TABLE OF AUTHORITIES

CASES

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) ....................................................15

*American First Legal Found. v. Becerra*, No. 24-CV-1092, 2024 WL 3741402
(D.D.C. Aug. 9, 2024)........................................................................................................20

*Association of American Universities v. Department of Energy*, No. 25-CV-10912,
2025 WL 1414135 (D. Mass May 15, 2025).........................................3, 9, 10, 15, 16, 17, 18

*Bailey v. Federal Bureau of Prisons*, No. 24-CV-1219, 2024 WL 3219207 (D.D.C.
June 28, 2024).....................................................................................................................20

*Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041 (1st Cir. 1990)....................................16

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020).....................................................................18

*Celsis ln Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) ....................................16

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ...................................2

*Climate United Fund v. Citibank, NA.*, No. 25-CV-698, __ F. Supp. 3d __, 2025
WL 842360 (D.D.C. Mar. 18, 2025)...................................................................................20

*Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers,
Helpers, Warehousemen, & Packers*, 679 F.2d 978 (1st Cir. 1982), *rev'd on
other grounds*, 467 U.S. 526 (1984) ..................................................................................20

*Department of Commerce v. New York*, 588 U.S. 752 (2019)...................................................3, 4

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ...............................11, 12, 13

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ...........................................................20

*Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998) ..........................................................................4

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 221 (2016) .........................................................13

*In re Federal Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123 (D.C.
Cir. 2020).............................................................................................................................19

*Greene v. Ablon*, 794 F.3d 133 (1st Cir. 2015)...........................................................................15

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) .................15, 19

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...........................................................................................4

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .......................................................8

*Massachusetts v. NIH*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025) ................8, 9, 10, 15, 18, 19, 20

*McAlpine v. United States*, 112 F.3d 1429 (10th Cir. 1997)..........................................................4

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994)....................................................................................................................................8

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ...............................................................................11

*Menkes v. Department of Homeland Security*, 486 F.3d 1307 (D.C. Cir. 2007) ...........................3

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) ........................................................4

*Motor Vehicle Manufactures Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co*., 463 U.S. 29 (1983)........................................................................11

*Murthy v. Missouri*, 603 U.S. 43 (2024) ................................................................................... 1-2

*National Consumer Information Center v. Gallegos*, 549 F.2d 822 (D.C. Cir. 1977) .......................................................................................................................................3

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998)..................................................2

*National Federation of Independent Business v. Department of Labor*, 595 U.S. 109 (2022)....................................................................................................................................5

*National Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127 (D.C. Cir. 1992)..............................20

*New York v. Wolf*, No. 20-CV-1127, 2021 WL 185190 (S.D.N.Y. Jan. 19, 2021) ......................19

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ..............................................................................10

*Nken v. Holder*, 556 U.S. 418 (2009) ..........................................................................................18

*Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018)......................................................................................................................11

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ........................20

*Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019) ...........................2

*Policy & Research, LLC v. United States Department of Health & Human Services*, 313 F. Supp. 3d 62 (D.D.C. 2018)...............................................................................................4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)..................................7

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004)......................................16

*Roberts v. Progressive Preferred Insurance Co.*, No. 1:23 CV 1597, 2024 WL 2295482 (N.D. Ohio May 21, 2024).........................................................................3

*Savantage Financial Services, Inc. v. United States*, 595 F.3d 1282 (Fed. Cir. 2010) .........................................................................................................................11

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ...............................................................14

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010)........................................................2

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)......................................................18

*South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003) .....................................3-4

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) .......................................16

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)............................................2

*Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23 (1st Cir. 2002) .........................................................................................................................19

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ......................................................2

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)................2

*Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020) ...................3, 4

*Webster v. Doe*, 486 U.S. 592 (1988) ...........................................................................4

*Weyerhaeuser Co. v. United States Fish & Wildlife Service*, 586 U.S. 9 (2018) ...........3

**STATUTES**

41 U.S.C. § 4708...........................................................................................................8

42 U.S.C. § 1873(e) .......................................................................................................5

Independent Offices Appropriation Act, 1966, Pub. L. No. 89-128, § 303, 79 Stat. 520, 543 (1965).........................................................................................................5

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 89-272 (1965)........................................................................................5

H.R. Rep. No. 89-320 (1965).........................................................................................5

H.R. Rep. No. 115-244 (2017)................................................................................12, 13

iv

S. Rep. No. 87-1826 (1962) ...........................................................................8

S. Rep. No. 115-150 (2017) ...................................................................12, 13

Sixteenth Annual Report of the NSF for the Fiscal Year Ended June 30, 1966, H.
    Doc. 102, 90th Cong. 1st Sess. (Apr. 7, 1967) ..........................................6

## OTHER AUTHORITIES

2 C.F.R. pt. 200, app. III ......................................................................13, 17

2 C.F.R. pt. 200, app. III(C)(4) ...................................................................7

2 C.F.R. pt. 200, app. III(C)(7) ...................................................................9

2 C.F.R. § 200.414 ......................................................................................17

2 C.F.R. § 200.414(c)(3) ..........................................................................9, 13

2 C.F.R. § 200.414(c)(4) .............................................................................13

2 C.F.R. § 200.501 ......................................................................................17

B-157584, 1965 WL 1919 (Comp. Gen. Nov. 26) ........................................7

Executive Office of the President, *Analysis of Facilities and administrative Costs
    at    Universities*    (July    2000),    https://clintonwhitehouse4.archives.gov/
    WH/EOP/OSTP/html/analysis_univ.html#Determining_the_F&A ...........6

Marcy E. Gallo & Laurie Harris, Cong. Rsch. Serv., R48540, Univs. & Indirect
    Costs for Federally Funded Rsch. (2025) .................................................6

National Science Board, NSB 09-20, *Investing in the Future: NSF Cost Sharing
    Policies for a Robust Federal Research Enterprise* (Aug. 3, 2009)..................6, 14

NSF, *NSF Grant Administration Manual* (1973) .........................................7

NSF, *Proposal and Award Policies and Procedures Guide* (effective May 20,
    2024), https://nsfgov-resources.nsf.gov/files/nsf24_1.pdf........................14

*Uniform Administrative Requirements, Cost Principles, and Audit Requirements
    for Federal Awards*, 78 Fed. Reg. 78,590 (Dec. 26, 2013) ......................9

## INTRODUCTION

The government's defense of NSF's Rate Cap Policy—that it has picked a side in a "longstanding" "debate" over indirect costs, Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and for Summary Judgment, Doc. No. 62 at 1, 8 & n.7, 10 & n.20, 20, 31— only underscores its unlawful arbitrariness. Congress already picked a side, rejecting arbitrary caps. So have the regulations, which protect the system of carefully negotiated, individualized rates that has endured since 1965 by forbidding agencies from jettisoning those rates in favor of a one-size-fits-all approach. And it is hard to imagine what could be more inconsistent with the reasoned decisionmaking requirements of the Administrative Procedure Act ("APA") than discarding hundreds of exhaustively negotiated institution-specific rates based on a conclusory paragraph. The Policy says nothing about the immense harms it threatens, even though Congress rejected similar caps precisely because of those harms. And it never acknowledges that indirect costs are essential for research, nor that they differ from direct costs only in that they often *save* money by leveraging the same facilities and equipment for multiple projects. If NSF is going to sap research at institutions of higher education ("IHEs"), and handicap our competition with (for example) China over AI, it owes more. The government's standing and justiciability arguments are makeweights, and the Court must vacate and enjoin the Policy to avoid imminent harm. The government is staying the policy through June 20, 2025. *Id.* at 42 n.30. If the Court needs more time for summary judgment, Plaintiffs respectfully request a preliminary injunction.

## ARGUMENT

### I.    The Government's Threshold Arguments Fail.

#### A.    Plaintiffs Have Standing.

The government's standing argument—that Plaintiffs have not established a cognizable injury—is nonserious. A single plaintiff with standing suffices, *see Murthy v. Missouri*, 603 U.S.

43, 57 (2024), and here the injured plaintiffs are legion. Plaintiffs collectively represent over 1,600 schools that receive thousands of NSF grants. There is not just a risk, but a certainty, that the Rate Cap Policy will inflict immense harms on Plaintiffs. As the declarations in this case detail at length, the Policy has already undermined Plaintiffs' research, budgeting, and staffing, among other core functions, and those harms will only proliferate if NSF caps indirect costs for grants at 15%.

The government's theories—that no Plaintiff "is guaranteed or entitled to receive a new grant after May 5, 2025," and that Plaintiffs have no cognizable injury because they could choose to "reject federal funding … on any terms offered by NSF," Doc. No. 62 at 13—are wrong. If accepted, they would foreclose standing in any case involving school admissions or other competitive selection processes (where any individual plaintiff is not guaranteed to be picked), or the terms of any government grant, contract, or program where the plaintiff could decline to participate. That is of course not the law. Under Article III, threatened injuries constitute injury-in-fact, so long as there is a substantial risk that they occur. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435-36 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm."); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (threatened injuries sufficient for standing if they are "certainly impending, or there is a substantial risk that the harm will occur." (internal quotation marks omitted)). And plaintiffs routinely challenge unlawful program conditions even when there is no guarantee they will be selected.[1] Indeed, given the sweeping membership of Plaintiffs AAU, APLU, and ACE, the

---

[1] *See, e.g.*, *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

government's arguments are particularly meritless here.[2]

      **B.**      **Plaintiffs' Claims Are Justiciable Under The APA.**

      The decision to impose an across-the-board cap on indirect costs is not "committed to agency discretion by law." Doc. No. 62 at 14 (citing 5 U.S.C. § 701(a)(1)). Given the "strong presumption favoring judicial review," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018), this exception is narrow. It is "restrict[ed] to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's" action. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks omitted); *see Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020) (exception "quite narrow"). Indeed, the Supreme Court has "generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Com.*, 588 U.S. at 772 (internal quotation marks omitted).

      The Rate Cap Policy does not fall within a category of traditionally nonreviewable decisions, as is evident from the statutes and regulations that have long circumscribed agencies' discretion on indirect costs. The governing statutes provide law to apply. *Infra* Part II.A. So do the regulations, as another court found as to another agency's rate cap policy. *See Ass'n of Am. Univs. v. Dep't of Energy* ("*DOE*"), No. 25-cv-10912, 2025 WL 1414135, at *10 n.2 (D. Mass. May 15, 2025); *infra* Part II.B. Agencies are obligated to follow their regulations, and actions that violate such regulations are *ultra vires*, as many cases confirm. *E.g.*, *Menkes v. Dep't of Homeland Sec.*, 486 F.3d 1307, 1313 (D.C. Cir. 2007); *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1027 (8th Cir.

---

[2] *Roberts v. Progressive Preferred Insurance Co.*, No. 23 CV 1597, 2024 WL 2295482, at *8 (N.D. Ohio May 21, 2024), cited by Defendants, *see* Doc. No. 62 at 13, concerned an allegedly "racially exclusionary" grant program that the defendant had no plans to "ever offer[] … again." Meanwhile, *National Consumer Information Center v. Gallegos*, 549 F.2d 822 (D.C. Cir. 1977), concerns not standing but the scope of the Fifth Amendment's protection for grants. *Id.* at 828.

2003); *Ellison v. Connor*, 153 F.3d 247, 251-52 (5th Cir. 1998); *McAlpine v. United States*, 112 F.3d 1429, 1434 (10th Cir. 1997); *accord Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (K.B. Jackson, J.). Otherwise, there would be no point in having regulations, or in requiring—as the APA does—agencies to follow them.

The NSF Act's references to "discretion," Doc. No. 62 at 15 (quoting 42 U.S.C. § 1873(e)), do not satisfy the high bar for precluding judicial review. Because this case does not implicate the narrow categories of "traditionally" nonreviewable decisions, the government's citation to *Webster v. Doe*, 486 U.S. 592, 600 (1988)—which *did* concern such a decision—gets it nowhere. And outside of those categories, the Supreme Court has squarely rejected a nonreviewability argument based on language much like the NSF Act provisions here, which authorized the Secretary of Commerce to carry out a census in "such form and content as he may determine." *Dep't of Com.*, 588 U.S. at 771 (quoting 13 U.S.C. § 141); *see also Union of Concerned Scientists*, 954 F.3d at 18-19 (decision was not committed to agency discretion by law despite broad standards related to "fairness, balance, and influence"). Nor can the government gain from *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), which recognized that the "allocation of funds from a lump-sum appropriation" is presumptively nonreviewable. *Accord Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (similar). This case is not about allocating a lump-sum appropriation.

## II.    The Rate Cap Policy Is Unlawful.[3]

### A.    Congress Never Authorized NSF To Enact An Arbitrary Cap Unmoored From Actual Indirect Costs.

The government fails to show that Congress authorized NSF to impose an arbitrary 15% cap with no relationship to actual indirect costs. "Administrative agencies are creatures of statute.

---

[3] Because Plaintiffs have demonstrated that they prevail on the merits, the standard for a preliminary injunction is also met.

They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). The government says the NSF Act conveys "broad authority to set the terms of its grants," Doc. No. 62 at 17, but the statutes it cites only underscore the Rate Cap Policy's unlawfulness. The government fails to explain how an arbitrary cap furthers any of the "four objectives" that Congress directed NSF to pursue. 42 U.S.C. § 1873(e). In fact, the Policy patently violates three of the four, which tell NSF to distribute funds to the institutions *best able* to do the work and to advance U.S. science. *See id.* (directing NSF to channel work to organizations "qualified by training and experience to achieve the results desired," in a manner that will "strengthen[] the research staff of organizations," and that will "add[] institutions, … which, if aided, will advance … research"). Arbitrary caps do the opposite, by directing work not to the best institutions, but to those that can tolerate bearing a large share of the costs.

While the government insists that NSF must have authority to impose an arbitrary 15% rate based on a 1951 regulation from the agency's infancy, Doc. No. 62 at 17, it has no adequate answer to the double-barreled congressional actions that followed in the 1960s, which rebel against the notion that NSF can lawfully impose such a cap today. First, as Plaintiffs explained, Congress briefly imposed its own across-the-board cap in 1963, only to decisively reject such caps in 1966. Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction and Expedited Summary Judgment, Doc. No. 41, at 9-10. As NSF understood at the time, the intent and effect of that change was to *reject* indirect cost caps—which Congress deemed not "equitable"—and replace them with a cost-sharing requirement (which Congress then ultimately repealed).[4] That is

---

[4] Independent Offices Appropriation Act, 1966, Pub. L. No. 89-128, § 303, 79 Stat. 520, 543 (1965) ("None of the funds provided herein shall be used to pay any recipient of a grant for the conduct of a research project an amount equal to as much as the entire cost of such project."); *see* H.R. Rep. No. 89-320, at 16 (1965); H.R. Rep. No. 89-272, at 52-53 (1965).

why the government concedes that NSF, following Congress's lead, eliminated its own caps after "its first fifteen years" (*i.e.*, in 1966).[5] Doc. No. 62 at 8. NSF did not, as the government suggests, continue to enforce those caps on the theory that its authority to do so "remained unaffected." Doc. No. 62 at 20. Nor has NSF in the 60 years since *ever* relied on the statutes it now invokes to impose an arbitrary cap on indirect costs. The 26% cap on administrative costs imposed by the Office of Management and Budget ("OMB"), Doc. No. 62 at 19, if anything, undermines the government's argument: OMB relied on an estimate of average *actual* costs across institutions.[6] Nor does the 15% de minimis rate—designed primarily for new grant recipients without a negotiated rate—support NSF's claim that it can simply make up an arbitrary 15% rate and impose it on institutions whose documented costs are much higher. Meanwhile, Congress since 1966 has continued to debate and ultimately reject similar blunderbuss caps, underscoring that such caps present the type of major question that requires congressional legislation and may not be imposed via administrative fiat based on the vague language NSF invokes. Doc. No. 41 at 21.[7]

---

[5] Sixteenth Annual Report of the NSF for the Fiscal Year Ended June 30, 1966, H. Doc. 102, 90th Cong. 1st Sess. 6-7 (Apr. 7, 1967) (given Congress's decision to repeal its indirect costs cap, "instead of a uniform indirect cost allowance of 20 percent of direct costs, an overhead rate, generally expressed as a percentage of salaries and wages, is now negotiated separately with each institution"); *see also* National Science Board, NSB 09-20, Investing in the Future: NSF Cost Sharing Policies for a Robust Federal Research Enterprise at 27-28 (Aug. 3, 2009).

[6] *See* Exec. Off. of the President, *Analysis of Facilities and Administrative Costs at Universities* (July 2000), https://clintonwhitehouse4.archives.gov/WH/EOP/OSTP/html/analysis_univ.html#Determining_the_F&A (explaining that a university's indirect cost rate was determined by dividing its costs by its modified total direct costs).

[7] NSF badly misconstrues both a CRS report and a 2009 National Science Board report in suggesting that Congress has *supported* indirect cost caps. *See* Doc. No. 62 at 8 n.7. The CRS report, for example, notes that in the 1980s and early 1990s, amid calls in multiple congressional reports to contain indirect costs, "Congress did *not* implement limits to [indirect costs] as recommended by the General Accounting Office … and agency proposals." Marcy E. Gallo & Laurie Harris, Cong. Rsch. Serv., R48540, *Universities & Indirect Costs for Federally Funded Research* 8 (2025).

Second, around the time it rejected indirect cost caps, Congress enacted 41 U.S.C. § 4708, which today governs the use of fixed reimbursement rates in grants to IHEs. The government barely tries to defend the idea that 41 U.S.C. § 4708 authorizes the Rate Cap Policy, principally arguing that the Court need not reach that question because, it says, the above-cited statutes independently do so. Doc. No. 62 at 17-20. But as explained, the government is wrong that those statutes authorize the Policy. And in all events, the government is also wrong that NSF may impose fixed indirect cost rates on grants to IHEs in a manner that does not comply with Section 4708. Doc. No. 62 at 15-16. Where "a general authorization and a more limited, specific authorization exist side-by-side," the "terms of the specific authorization must be complied with." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). That rule is essential to avoid the "superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *Id.* And the government's argument would have exactly that forbidden effect: Section 4708 specifically addresses "grant[s]" to IHEs, 41 U.S.C. § 4708, yet on the government's reading, NSF would never have to comply with that section in making grants to IHEs.[8] Tellingly, the government rests its position entirely on a 1965 Government Accountability Office ("GAO") decision authorizing the use of predetermined rates, pegged to estimated costs, "in making grants to nonprofit institutions." B-157584, 1965 WL 1919 (Comp. Gen. Nov. 26, 1965). But even assuming that GAO permissibly authorized NSF to use such rates in grants to nonprofits,[9] nonprofits fall *outside* Section 4708. And this decision certainly does not support NSF just making up a cap unmoored from estimated costs.

---

[8] That is why, as to IHEs, OMB's uniform guidance cites *only* Section 4708 in explaining why agencies can use "predetermined rates." 2 C.F.R. pt. 200, app. III, (C)(4). That renders even more remarkable the claim that the government may use fixed rates that violate Section 4708.

[9] NSF, *NSF Grant Administration Manual* 33 (1973) ("*By statute* (Public Law 87-638; 41 U.S.C. § 254a) predetermined fixed rates are available only to universities, colleges, and other educational

The government's reticence to rest the Rate Cap Policy on Section 4708 is understandable, as it has no answer to how the Policy violates that Section. Although the government claims the reference to "predetermined fixed-percentage rates," 41 U.S.C. § 4708, authorizes agencies to conjure any rate they wish, the government ignores that Congress told agencies to use this authority to provide "for payment of reimbursable indirect costs"—the costs "not directly attributable to the performance of a particular contract but[] which nevertheless benefit the contract," S. Rep. No. 87-1826, at 3 (1962). And the government ignores, too, the mountain of history showing that Congress and the Executive Branch have always understood a "predetermined" percentage to be one that attempts to approximate actual indirect costs (*i.e.*, by predetermining them in advance), not an invented number with zero relationship to actual indirect costs. Doc. No. 41 at 19-20. That decades-long shared understanding is hardly "immaterial," Doc. No. 62 at 19; rather, even in a post-*Chevron* world, it remains essential to sound interpretation and good judging. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). So contra the government, this is indeed a case where the Executive Branch has once again newly discovered authority in broadly worded statutes to abandon a longstanding understanding that a more specific approach is necessary. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994).

### B.    The Rate Cap Policy Violates The Regulations Governing Indirect Cost Rates.

The government's cavalier noncompliance with the regulations betrays the important purposes those regulations further: ensuring that grant recipients can rely on negotiated indirect cost rates that fairly attempt to approximate actual costs. *See Massachusetts v. NIH ("NIH")*, No. 25-CV-10338, 2025 WL 702163, at \*9-10 (D. Mass. Mar. 5, 2025), *judgment entered*, 2025 WL

---

institutions. However, the Comptroller General, *by decision* B-15784 of November 26, 1965, authorized the NSF Director to use predetermined overhead rates in cost-sharing grants to nonprofit, noneducation organizations under certain circumstances." (emphasis added)).

1063760 (D. Mass. Apr. 4, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025). Outside the limited exception in Section 200.414(c)(1), "[f]ederal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the [f]ederal award." 2 C.F.R. pt. 200, app. III(C)(7). While the regulations allow NSF to depart from negotiated rates in narrow circumstances, OMB has explained that the regulations impose "stringent" requirements to ensure that deviations "do not occur without strong justification." *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). The government's brief posits just the opposite—that agencies can erase negotiated cost rates based on a fig leaf, if any, justification. Two courts have already rejected that argument, and this Court should too. *DOE*, 2025 WL 1414135, at *15-16; *NIH*, 2025 WL 702163, at *10.

*First*, the government's brief rewrites the requirement that agencies "implement, and make publicly available, the policies, procedures and general decision-making criteria that [NSF's] programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3). Per the government, NSF can simply announce a "policy" that it is jettisoning negotiated rates, and because this policy renders every other fact irrelevant, it can dispense with everything else the regulation requires. But the regulation requires "policies, procedures *and* general decision-making criteria," not just a policy—precisely because the regulation contemplates narrow deviations based on the specific costs of particular grants or groups of grants, not an across-the-board diktat. Indeed, the regulation was especially careful in requiring agencies to announce the procedures they will follow and the criteria they will employ ahead of time because of the significant reliance interests in negotiated rates. NSF's "one fell swoop" approach is irreconcilable with that framework. *DOE*, 2025 WL 1414135, at *15; *see NIH*, 2025 WL 702163, at *10 (HHS's parallel provision mandates a "step-by-step process"). "If [people] must turn square corners when

they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).

*Second*, the Rate Cap Policy is repugnant to the regulations' limited authorization of "deviations" for a "class" of federal awards. Damning with faint praise, one court has observed that the government's reading—identifying as a "class" institutions accounting for, here, 80% of the agency's total R&D obligations—is "not inherently antithetical to the English language." *DOE*, 2025 WL 1414135, at *13-14, *14 n.4. But that court correctly rejected the government's position because it would render the word "class" largely "superfluous and meaningless." *NIH*, 2025 WL 702163, at *11; *see also DOE*, 2025 WL 1414135, at *14 n.4. So, too, does the government's position distort beyond all recognition the word "deviation"—which, as the government simply ignores, connotes a modest departure and not wholesale rejection of the negotiated rates that must remain the norm. Doc. No. 41 at 24.

*Third*, the government's reading would violate Section 200.414(c)(4)'s requirement to "include" indirect cost rate policies in "notice[s] of funding opportunity." *DOE*, 2025 WL 1414135, at *15. As in prior cases, the government concedes, as it must, that it did not comply with Section 200.414(c)(4)—here, as to awards issued after May 5, 2025, with earlier-published notices. Doc. No. 62 at 23. Although the government posits the Policy will affect "at most a small subset of grants," *id.*, it ignores Plaintiffs' "thousands" of pending award proposals, Doc. No. 41 at 25. Nor can the government defend its unlawful conduct on the ground that Section 200.414(c)(4) does not expressly state "what should happen in the event of noncompliance." Doc. No. 62 at 23. Few regulations do, as the APA provides the necessary recourse.[10]

---

[10] While the government argues that "any impact on these in-progress grants supports enjoining or vacating the Policy with respect to those grants," Doc. No. 62 at 23 n.25, for the reasons stated

### C.    The Rate Cap Policy Is Arbitrary And Capricious.

The government also has no adequate answer to the Rate Cap Policy's arbitrariness and lack of reasoned decisionmaking. The government's brief spills much more ink than (and makes more than a few new arguments not contained in) the Policy itself, which in a few hundred conclusory words overturned an approach to indirect cost rates dating to 1965. But post hoc arguments from counsel cannot supply an explanation the agency failed to provide. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 49-50 (1983); *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024). And regardless, no amount of counsel's argument can rehabilitate a decision that is arbitrary at its core.[11]

*First*, the government cannot hide from the "important aspect[s] of the problem," *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020), the Rate Cap Policy fails to address. For one thing, the Policy and the government's brief take the view that direct costs are more worthy than indirect costs. But the Policy never explains why that is so (and indeed it is false). A cutting-edge computing center to support AI research used by a dozen NSF-sponsored projects is no less worthy than printer paper consumed by a single project. For another, the Policy ignores that different institutions have very different indirect costs—reflecting, among other things, the different research they conduct (for example, institutions focusing on social science research generally have lower indirect costs than institutions focusing on applied physics). Blithely positing that the "Policy treats 'like cases alike,'" Doc. No. 62 at 29, the government ignores its basic duty to

---

below, an injunction preventing implementation of the Policy as to all grants (along with vacatur of the Policy) is the proper and only sufficient remedy here. *Infra* Part III.C.

[11] Contrary to the government's suggestion in its brief, Doc. No. 62 at 27, courts do not apply a more lenient arbitrary-and-capricious analysis in cases relating to contracting. The cited cases involve contracting officers' discretion to select bids—a far cry from this context. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010).

explain why institutions whose costs differ in such fundamental ways are, in its view, alike. Those differences are exactly why indirect costs have for decades been negotiated on an individualized basis, and NSF cannot simply discard that approach on the paltry explanation provided here.

Nor can the government defend the Rate Cap Policy's failure to grapple with the immense harm it inflicts. Pointing out this failure does not, as the government urges, "attempt to substitute [Plaintiffs'] judgment for that of the agency." Doc. No. 62 at 29. It holds NSF to its burden under the APA. And NSF's failure to engage with these issues is particularly indefensible given that Congress in 2017 emphasized that a similarly draconian cap would "radically change the nature of the Federal Government's relationship with the research community," "throw[] research programs across the country into disarray," and "abandon[] the Government's long-established responsibility for underwriting much of the Nation's research infrastructure." S. Rep. 115-150 at 109; *see* H.R. Rep. No. 115-244, at 50 (2017).

The government's claim that NSF considered "reliance interests," Doc. No. 62 at 30, is plainly wrong. The Rate Cap Policy says not *one word* about institutions' reliance interests in the settled approach to individualized indirect costs that has endured for decades. The government's core argument is instead that the Rate Cap Policy does not implicate any reliance interests because it applies only to new grants and Plaintiffs have no reliance interests in such grants that are "protected by law." *Id.* But as Plaintiffs already explained, yet the government ignores, the Supreme Court has rejected the identical argument, holding that the government had to consider "reliance interests" in the Deferred Action for Childhood Arrivals program even though that program was discretionary, the government retained authority to revoke it entirely, and the plaintiffs had no "substantive rights" to its continuation. *Regents*, 591 U.S. at 30-31. Agencies still must consider relevant reliance interests, including all those NSF ignored here—how universities

have relied on the government's longstanding approach to indirect cost rates, to hire and compensate staff, build and maintain facilities, and generally advance their scientific agendas. NSF thus fell miles short of the law's requirement that it "determine whether [the reliance interests] were significant, and weigh any such interests against competing policy concerns," as well as consider obvious ways to "accommodat[e] particular reliance interests." *Regents*, 591 U.S. at 33; *accord Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).[12] Indeed, NSF's failure is particularly glaring given the regulatory protections for reliance interests in this context, including that the rates must be disclosed upfront and not changed during the lifetime of the grant. C.F.R. § 200.414(c)(3), (4); *id.* Appendix III to Part 200. And the omission is all the more inexcusable given that reliance interests figured prominently in Congress's decision to reject the proposal to cap NIH indirect-cost rates at 10%. *See* H.R. Rep. 115-244, at 50; S. Rep. 115-150, at 109.

*Second*, even leaving aside what NSF ignored, the government fails to rehabilitate the wholly deficient justification NSF provided. The government effectively concedes that one of the Rate Cap Policy's principal justifications—that it "improves government efficiency by eliminating the need for individualized indirect cost negotiations"—is just wrong; the government does not dispute that "IHEs must still negotiate rates with other agencies and NSF must negotiate rates with non-university recipients." Doc. No. 62 at 28. Meanwhile, the government's claim that the Rate Cap Policy is a boon to universities because it "alleviates the burden of tracking indirect costs with respect to NSF grants," *id.*, appears nowhere in the Policy itself.

---

[12] The government's claim that Plaintiffs have no cognizable reliance interests because "only 27 percent of grant applications are successful," Doc. No. 62 at 30, is a particularly egregious attempt to defend NSF's decision via reasoning NSF never provided. And it is unpersuasive too. Plaintiffs and their members include thousands of institutions, many of which are large and receive hundreds of NSF awards. Even if these institutions do not know in advance exactly which applications will succeed, they can rely on decades of experience to assess their likely prospects. *See also supra* Part I.A; *infra* Part III. A.

13

*Third*, NSF barely attempts to dispute the basic arbitrariness of limiting the Policy to universities. The government asserts that universities make up a large portion of NSF funding recipients, Doc. No. 62 at 32-33, which is yet another justification that the Rate Cap Policy itself did not provide and that therefore cannot now sustain NSF's decision. *See SEC v. Chenery Corp.*, 332 U.S. 194, 199-202 (1947). And like the government's other newly minted arguments, this one too does not actually address the point that matters—why NSF permitted non-university funding recipients to keep rates above 15%, while forbidding only universities from doing so. Indeed, the Rate Cap Policy's gerrymandered approach irrationally authorizes higher payments to institutions that rely *less* on government funding, which is the opposite of reasoned decisionmaking.

*Fourth*, the government has no adequate response to the Rate Cap Policy's arbitrary departure from NSF's cost-sharing policy. As Plaintiffs have explained, NSF has properly concluded that using an "indirect cost rate lower than the organization's current negotiated indirect cost rate" is substantively the same as forced cost sharing. NSF, *Proposal and Award Policies and Procedures Guide* II-20 (effective May 20, 2024), https://nsfgov-resources.nsf.gov/files/nsf24_1.pdf; *see* Doc. No. 41 at 11, 31. And NSF has stringently limited mandatory cost sharing for important reasons, explaining that such requirements "should be the exception rather than the rule," are appropriate only in limited circumstances, and are categorically inappropriate for "unsolicited proposals"—"because NSF funding for awards generated from unsolicited proposals is intended to be sufficient to achieve project objectives." National Science Board, NSB 09-20, *Investing in the Future: NSF Cost Sharing Policies for a Robust Federal Research Enterprise* at 9 (Aug. 3, 2009). Under the APA, NSF cannot ignore this policy and the important reasons underlying it by appending to the Rate Cap Policy a boilerplate notice that the Policy "takes precedence over inconsistent policies and procedures set forth" elsewhere. Doc. No. 62 at 6.

14

III.    **The Government's Remedial Arguments Fail.**

A.    **Plaintiffs Have Established Irreparable Harm.**

Plaintiffs and their members have submitted dozens of declarations demonstrating that the Rate Cap Policy will cause significant, imminent and ongoing, and irreparable harm. *See* Doc. No. 41 at 33-41.[13] The government does not seriously respond to that overwhelming showing. It demands evidence from each member of the organizational Plaintiffs. Doc. No. 62 at 35. But associations may assert harms to their members and obtain relief running to those members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Indeed, courts routinely issue relief against unlawful policies, including with nationwide scope, on that basis. *E.g.*, *NIH*, 2025 WL 702163, at *28-31; *DOE*, 2025 WL 1414135, at *20; *see infra* Part III.C. (explaining why nationwide relief is appropriate). The government relies on an inapposite Third Circuit case finding no irreparable harm where "only a small percentage of the plaintiffs testified," and where even those who did failed to assert harms. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000). Here, Plaintiffs have detailed significant and wide-ranging harms that flow from the Rate Cap Policy—all shortly after the Rate Cap Policy was announced. Whatever the differences among declarants, one feature is the same: Any institution receiving grant funding from NSF will be seriously harmed by the Policy.

The government cannot shrug off these significant harms simply because the Policy applies to new awards, or because the harms arise from the infeasibility of accepting NSF awards at a 15% rate. Doc. No. 62 at 36, 40. As detailed at length in their declarations, Plaintiffs collectively have thousands of pending proposals at NSF and cannot sustain those proposed projects at a 15% rate.

---

[13] Plaintiffs must show irreparable harm for both a preliminary injunction and a permanent injunction. *See Greene v. Ablon*, 794 F.3d 133, 156-57 (1st Cir. 2015).

*See* Doc. No. 41 at 34 & nn.10, 11. Those lost opportunities *are* irreparable harm. *Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997); *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" sufficient for injunction); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). And the Policy's application to new awards does not save institutions from the need to—immediately—start accounting for losses from any awards they *do* accept at a 15% rate. As explained in multiple declarations, the Policy requires changes to budgeting and planning at this moment, resulting in a "dramatic restructuring and realignment away from doing research." Doc. No. 41 at 36 (quoting Dartmouth Decl., Doc. No. 40-15 ¶ 20). That frustration of intelligent planning is also irreparable harm. *Bos. Celtics Ltd. P'ship v. Shaw*, 908 F.2d 1041, 1048 (1st Cir. 1990).

Moreover, as another court in this district considering a similar policy recognized, the idea that institutions like Plaintiffs "have nothing but a speculative interest" in future grants is "divorced from reality" because institutions and grantmaking agencies like NSF "co-exist in a symbiotic, mutually beneficial relationship, fostered over decades, which is built on the [government]'s need for cutting edge research and the IHEs' ability to provide it." *DOE*, 2025 WL 1414135, at *19. As a result, "each IHE has a reasonable, non-speculative assumption that it will obtain future grants," and "[t]hese grants are forthcoming to IHEs because, unless the [agency] intends to stop funding this type of research, they must be." *Id.* But the Policy upends that relationship, leaving IHEs without the ability to sustain research the government has invested in over decades.

The government is just wrong that the prospect of reimbursement obviates Plaintiffs' harms. Doc. No. 62 at 37-38. Other courts have rejected similar arguments. *DOE*, 2025 WL

1414135, at *18 (reasoning that "temporary loss of funding … might in fact be the least of" Plaintiffs' alleged harms compared to "inordinately delay[ing] in some instances and entirely abandon[ing] in others" the "research they are conducting pursuant to [agency] grants"). The losses accruing now cannot be compensated via money damages. *See* Doc. No. 41 at 35-38.

Equally wrong is the government's cherry-picking of lines from a handful of declarations to suggest Plaintiffs' harms are "speculative" or "surmise." Doc. No. 62 at 36-38. Reading each declaration as a whole paints picture after devastating picture of real and imminent harms. Doc. No. 41 at 33-41. Critical research programs—ranging from drug development to America's energy future—will be disrupted or stopped altogether and cannot simply be restarted. *Id*. at 38. This harm will accrue to real people: students, staff, researchers, and others who ensure these vital projects can continue. *Id*. at 38-39. The sea change enacted by the Policy is so disruptive in part because negotiated rates bind the federal government for a specified period, typically two to four years. Appendix III to Part 200; 2 C.F.R. §§ 200.414, 200.501; *see* Doc. No. 41 at 8. Those periods— and the regulations specifying how changes to negotiated rates are to be effectuated with advance notice, *supra* Part II.B.—underscore the devastation universities face from the Policy's immediate slash-and-cap approach. The associated losses will irreversibly damage Plaintiff universities' academic communities, talent pipelines, and ability to cultivate the next generation of scientists. Doc. No. 41 at 39.

Finally, the government is wrong to discount the ripple effects across communities, and as to our economy and national security, on the theory that those harms concern the public interest, rather than (in the government's view) the Plaintiffs. Doc. No. 62 at 38-39. In fact, they concern both. Undermining these goals undermines Plaintiffs' missions to advance science and improve

17

lives through education, research, and innovation. *See, e.g.*, AAU Decl. ¶¶ 3-4. Courts routinely

recognize similar harms. *See NIH*, 2025 WL 702163, at *31; *DOE*, 2025 WL 1414135, at *20.

**B.    Other Factors Warrant Injunctive Relief.**

The balance of the equities and public interest also favor an injunction. *Nken v. Holder*,

556 U.S. 418, 435 (2009) (factors "merge when the Government is the opposing party"). If the

Rate Cap Policy goes into effect, it will inflict significant harm not only on Plaintiffs, but also to

research across the United States, whose very purpose—from cancer research to energy efficiency

innovation—is to benefit the public. *E.g.*, *NIH*, 2025 WL 702163, at *32 (public interest favored

injunctive relief in similar circumstances); *Sherley v. Sebelius*, 644 F.3d 388, 398-99 (D.C. Cir.

2011) (similar). Meanwhile, "[i]t is well established that the Government 'cannot suffer harm from

an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218

(D.D.C. 2020). As for the argument that the Court should "defer[]" to the Executive's spending

choices or judgment about national security, Doc. No. 62 at 38-39, it is hard to imagine a

proposition more at odds with our system of government than the claim that courts should withhold

relief for clear violations of law because the Administration believes its violations will serve the

national interest.

**C.    The Government's Miscellaneous Remedial Arguments Fail.**

*1. An Injunction Is Warranted.* The government's newfound concern about the propriety

of a permanent injunction, Doc. No. 62 at 2, is curious given the government's agreement, in the

*NIH* case, to convert a preliminary injunction into a permanent injunction. *See* Defs' Assented to

Mot. to Convert Order, *Massachusetts v. NIH*, No. 25-cv-10338 (D. Mass.), ECF No. 108. And in

all events, an injunction, in addition to vacatur of the Rate Cap Policy, is warranted. Permanent

injunctions are appropriate in APA cases as in other cases: that is, where an applicant has suffered

irreparable injury that cannot be compensated at law and where the balance of equities and public

interest weighs in favor of such relief. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020). That is so here. *Supra* Parts III.A, III.B. Indeed, an injunction is important to ensure Plaintiffs obtain the relief to which they are entitled. Following vacatur, without an injunction, NSF might attempt to impose the unlawful 15% cap even apart from the Rate Cap Policy. *See New York v. Wolf*, No. 20-CV-1127, 2021 WL 185190, at *2 (S.D.N.Y. Jan. 19, 2021) (explaining that injunction is appropriate where necessary to prevent agency from enacting same policy without curing problems identified by the court and to ensure plaintiffs can seek immediate recourse should agency undertake any activity inconsistent with judgment).

  *2. The Scope of the Injunction Is Proper.* The government's alternative remedial argument—that every member of Plaintiffs AAU, APLU, and ACE must produce their own declaration to obtain an injunction, Doc. No. 62 at 43—is just a backdoor attack on the settled rule that associations may sue and obtain relief for their members. *Hunt*, 432 U.S. at 343. Nor do concerns about "universal injunctions," Doc. No. 62 at 43, have force here. Between associational and individual Plaintiffs in this case, nearly every U.S. university is either a party to this case or a member of a party. On these facts, nationwide relief is necessary to provide "complete relief." *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 40 (1st Cir. 2002). The government has not even attempted to identify any IHE that receives NSF funding and is not either a Plaintiff here or a member of a Plaintiff. And even if the government did, it is at best unclear whether an injunction could exclude those institutions given that many NSF grants are collaborations across institutions. Hence, any narrower relief than Plaintiffs have sought would yield needless complexity for no gain. Thus, here, as in similar cases, the appropriate remedy is an injunction and vacatur of the policy. *NIH*, 2025 WL 702163, at *33-35.

***3. The Court Should Not Require a Bond.*** This Court should reject the government's request for a bond. Courts have "broad discretion … to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). Bonds are generally appropriate where a case "involve[s] commercial or financial transactions," while "no bond is required" in cases—like this one—in suits to "enforce important federal rights or 'public interests.'"[14] The government's inapposite cases concern commercial disputes and bid protests.[15]

## CONCLUSION

Plaintiffs respectfully urge this Court to expedite resolution of this action; vacate the Rate Cap Policy; enter a declaratory judgment finding the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law; and enter a preliminary and permanent injunction prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form, including in rejecting or treating adversely proposals for NSF funding submitted at universities' negotiated rates rather than the 15% rate; and from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB.

---

[14] *Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). Indeed, nominal bonds are commonplace in similar cases. *See, e.g.*, *NIH*, 2025 WL 702163; *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, __ F. Supp. 3d __, 2025 WL 842360 (D.D.C. Mar. 18, 2025); *Am. First Legal Found. v. Becerra*, No. 24-CV-1092, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024); *Bailey v. Fed. Bureau of Prisons*, No. 24-CV-1219, 2024 WL 3219207, at *13 n.5 (D.D.C. June 28, 2024).

[15] Doc. No. 62 at 44-45 (citing cases). No more on point is *National Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127 (D.C. Cir. 1992). That case involves a recitation of a previous bond decision reasoning that a $1,000 bond was inadequate where the agency had already "paid over $18 million to vendors" under an injunction. *Id.* at 1129.

Dated: June 3, 2025

JENNER & BLOCK LLP

By: */s/ Lindsay Harrison*

Shoba Pillay, BBO No. 659739
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice granted*)
Lindsay C. Harrison (*pro hac vice granted*)
Lauren J. Hartz (*pro hac vice granted*)
Elizabeth Henthorne (*pro hac vice granted*)
Anjali Motgi (*pro hac vice granted*)
Zachary C. Schauf (*pro hac vice granted*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
AMotgi@jenner.com
ZSchauf@jenner.com
*Attorneys for All Plaintiffs*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice granted*)
James Y. Xi (*pro hac vice granted*)
Kyle R. Eiswald (*pro hac vice granted*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com
*Attorneys for Association of American Universities,*
*Association of Public and Land-grant Universities,*
*and American Council on Education*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of June, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ *Paul D. Clement*
Paul D. Clement (*pro hac vice*)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com

Dated: June 3, 2025