# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-11231-IT |
| NATIONAL SCIENCE FOUNDATION, *et al*., | ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' REPLY IN SUPPORT OF
## <u>CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. NO. 60]</u>

**Table of Contents**

Introduction.................................................................................................................. 1

Argument ...................................................................................................................... 2

I.  The Court Lacks Jurisdiction Over Plaintiffs' Claims. ..................................... 2

    A.  Plaintiffs have not established standing. ..................................................... 2

    B.  The APA does not waive sovereign immunity for actions committed to agency discretion. ......................................................................................... 4

II.  The Policy Is Lawful.......................................................................................... 7

    A.  The Policy is authorized by the NSF Act and 41 U.S.C. § 4708. ............... 7

    B.  The Policy follows 2 C.F.R. § 200.414(c). ............................................... 11

    C.  The Policy is reasonable and reasonably explained................................... 12

III.  Any Remedy Should Be Limited To Remand and Vacatur............................. 15

IV.  Plaintiffs Have Not Satisfied the High Burden for Injunctive Relief. ........... 16

    A.  Plaintiffs have not shown irreparable harm. ............................................. 16

    B.  The other factors weigh against injunctive relief...................................... 18

V.  Because Injunction is an Extraordinary Remedy, Courts Should Tailor Any Injunction to IHEs that Have Shown Irreparable Harm. .................................. 19

VI.  Any Preliminary Injunction Should Be Conditioned on a Bond. ................... 19

Conclusion ................................................................................................................. 20

## Table of Authorities

Cases

*50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*,
   129 F.4th 1186 (9th Cir. 2025) ................................................................................ 2

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ............................................................................ 15

*Ariz. Christian Sch. Tuition Org. v. Winn*,
   563 U.S. 125 (2011) ................................................................................................ 2

*Ass'n of Am. Univs. v. DOE*,
   No. 25-cv-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ................... 17

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
   972 F.3d 83 (D.C. Cir. 2020) ............................................................................... 15

*Blanchette v. Conn. Gen. Ins. Corps.*,
   419 U.S. 102 (1974) ................................................................................................ 9

*Boston Celtics Ltd. Partnership v. Shaw*,
   908 F.2d 1041 (1st Cir. 1990) .............................................................................. 17

*Carcieri v. Salazar*,
   555 U.S. 379 (2009) .............................................................................................. 10

*Chapman v. United States*,
   500 U.S. 453 (1991) ................................................................................................ 8

*City & Cnty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ............................................................................... 3

*Dep't of Ed. v. California*,
   604 U.S. ----, 145 S. Ct. 966 (2025) .................................................................... 18

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................................................ 6

*DHS v. Regents of the University of California*,
   591 U.S. 1 (2020) .................................................................................................. 13

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) .............................................................................................. 13

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
    445 F.3d 13 (1st Cir. 2006) ................................................................. 19

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ............................................................... 14, 15

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .................................................................. 3

*Forsyth Cnty. v. Army Corp. of Eng'rs*,
    633 F.3d 1032 (11th Cir. 2011) .......................................................... 5

*FTC v. Browning*,
    435 F.2d 96 (D.C. Cir. 1970) ........................................................... 8

*Green v. U.S. Dep't of Justice*,
    No. 16-1492, 2021 WL 11637039 (D. D.C. July 15, 2021) ..................................... 18

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................ 4, 6

*Housatonic River Initiative v. U.S. EPA, New England Region*,
    75 F.4th 248 (1st Cir. 2023) .......................................................... 12

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*,
    71 F.4th 1028 (D.C. Cir. 2023) ........................................................ 9

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................. 4

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................. 4

*Massachusetts v. NIH*,
    25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ..................................... 17

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................. 19

*McAlpine v. United States*,
    112 F.3d 1429 (10th Cir. 1997) ........................................................ 7

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ......................................................... 5

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................................................................................... 16

*Morton v. Mancari,*
    417 U.S. 535 (1974) ..................................................................................................... 9

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) .................................................................................................. 2, 3

*Nat'l Juvenile Law Ctr., Inc. v. Regnery,*
    738 F.2d 455 (D.C. Cir. 1984) ................................................................................... 14

*New York v. Dep't of Com.,*
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...................................................................... 15

*New York v. Wolf,*
    No. 20-CV-1127, 2021 WL 185190 (S.D.N.Y. Jan. 19, 2021) .................................. 15

*Pinnacle Armor, Inc. v. United States,*
    648 F.3d 708 (9th Cir. 2011) ...................................................................................... 6

*Planned Parenthood of Greater Ohio v. Hodges,*
    917 F.3d 908 (6th Cir. 2019) ...................................................................................... 2

*Pol'y Rsch. LLC v. HHS,*
    313 F. Supp. 3d 62 (D.D.C. 2018) .............................................................................. 5

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ..................................................................................................... 9

*S. Dakota v. Ubbelohde,*
    330 F.3d 1014 (8th Cir. 2003) .................................................................................... 7

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ...................................................................................... 3

*St. Martin Evangelical Lutheran Church v. S. Dakota,*
    451 U.S. 772 (1981) ..................................................................................................... 8

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .................................................................................................. 2, 3

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.,*
    282 F.3d 23 (1st Cir. 2002) ....................................................................................... 19

*Together Emps. v. Mass. Gen. Brigham Inc.*,
    19 F.4th 1 (1st Cir. 2021)..................................................................... 16

*Transcon. Gas Pipe Line Co., LLC v. Beckman*,
    No. 24-1099, 2024 WL 4661593 (3d Cir. Nov. 4, 2024) ........................ 10

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................ 3

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ............................................................................. 2, 3

*Union of Concerned Scientists v. Wheeler*,
    954 F.3d 11 (1st Cir. 2020) ..................................................................... 6

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ................................................................................ 8

*Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014) ................................................................ 8

*Virginia v. American Booksellers Association*,
    484 U.S. 383 (1988) ................................................................................ 3

*Webster v. Doe*,
    486 U.S. 592 (1988) ................................................................................ 5

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................. 19

**Statutes**

5 U.S.C. § 701(a)(1)................................................................................... 4

41 U.S.C. § 4708............................................................................ i, 1, 7, 9, 10

42 U.S.C. § 1870(c) ................................................................................... 5

42 U.S.C. § 1873(e) ............................................................................. 1, 5, 9

**Regulations**

2 C.F.R. § 200.414(c)..................................................................... i, 1, 7, 11, 13

78 Fed. Reg. 78,590 (Dec. 26, 2013) ...................................................... 11

## INTRODUCTION

Directed by Congress to use "its discretion" to spend federal money to "best realize" its mission of promoting scientific research, 42 U.S.C. § 1873(e), NSF reasonably established a *forward-looking* policy to provide indirect costs at 15 percent of direct costs to IHEs to streamline funding practices, increase transparency, and ensure that more resources are directed toward direct scientific and engineering research activities, Doc. No. 61-1. The turbocharged rhetoric in Plaintiffs' Reply, Doc. No. 63, cannot disguise that Plaintiffs, improperly ask the Court to substitute *their* policy preferences for the agency's judgment.

Plaintiffs naturally seek to maximize the government funding they receive and understandably IHEs oppose even a penny reduction of their indirect cost rates, many of which exceed 50 percent of direct funding for research.  But NSF's change in policy, respecting any reliance interests in ongoing grants, does not, alone, violate the law; there is no right to "business as usual," particularly when NSF has rationally determined that spending *more* money on direct research costs will enhance research outcomes.  Once the Court looks behind Plaintiffs' rhetoric, there is no law that prohibits, or even limits, NSF's determination to change how it funds indirect costs in the grants it awards.  NSF's enabling act, 42 U.S. Code Chapter 16, broadly authorizes it to promote scientific research, and 41 U.S.C. § 4708 authorizes it to "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage . . . of the reimbursable direct costs."  And, far from disallowing a deviation from any individual IHE's negotiated indirect cost rate, 2 C.F.R. § 200.414(c) specifically authorizes NSF to establish "a rate different from [an IHE's] negotiated rate."  The key questions for this Court are whether it possesses jurisdiction—it does not—and if so, whether NSF complied with the cited regulation – it did.  NSF is entitled to summary judgment.

**ARGUMENT**

**I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims.**

**A.    Plaintiffs have not established standing.**

Plaintiffs do not dispute—and therefore implicitly concede—that (1) NSF has not altered the terms of any existing grant, (2) no plaintiff has been awarded a new grant award at the 15 percent indirect cost rate, and (3) no plaintiff is guaranteed or entitled to receive a new grant after May 5, 2025.  *Compare* Doc. No. 62 at 21–22 *with* Doc. No. 63 at 7–9.  Plaintiffs therefore have not established standing.  *See* Doc. No. 62 at 21–22; *see also, e.g.*, *50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*, 129 F.4th 1186, 1188 (9th Cir. 2025) (a plaintiff "has not sustained an actionable injury before the extent of any disputed loss has been determined").

The six court decisions Plaintiffs cite do not suggest otherwise.  Three were based on grant applications that had already been denied or grant awards that had been cancelled and do not address standing at all.  *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 456 (2017); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 577 (1998); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019); *see also, e.g.*, *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.").  If anything, those cases support Defendants' position by showing that Plaintiffs, at best, jumped the gun by filing this litigation when none of Plaintiffs' pending grant applications has yet been awarded or rejected.  The remaining three decisions rely on two standing doctrines that are irrelevant: (a) pre-enforcement standing, which applies when a plaintiff intends to engage in proscribed conduct implicating a constitutional interest and an "actual arrest, prosecution, or other enforcement action" is "sufficiently imminent," *Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 158–59 (2014), *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018)[1]; and (b) competitor standing, which applies where "the complainant show[s] an actual or imminent increase in competition," *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010). Neither doctrine applies here. Pre-enforcement standing is inapposite, as the Policy does not proscribe any conduct or target any plaintiff for enforcement and Plaintiffs have not brought any constitutional claims. And Plaintiffs have not even attempted to allege or show any increased competition resulting from the Policy.

The remainder of Plaintiffs' argument is simply unsubstantiated rhetoric. Plaintiffs' bald assertion that an adverse ruling here "would foreclose standing in any case involving school admissions or other competitive selection processes," Doc. No. 63 at 8, is belied by the very cases they cite, in which applicants brought actions that challenged the criteria by which their applications were categorically denied after their applications were adversely decided – not while their applications were still pending. *See Trinity Lutheran*, 582 U.S. at 456; *Finley*, 524 U.S. at 577. And, in any event, Plaintiffs provide no record citations for their assertion that "the Policy has already undermined Plaintiffs' research, budgeting, and staffing, among other core functions," nor legal citations recognizing a plaintiff's claimed harm to its own budgeting and staffing as an injury. Doc. No. 63 at 8; *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("An organization cannot manufacture its own standing."). At summary judgment, such conclusory assertions do not suffice. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("A plaintiff must demonstrate standing 'with the manner and degree of evidence required

---

[1] Although *San Francisco* does not self-identify as a pre-enforcement case, its reasoning heavily relies on *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), which is a quintessential pre-enforcement decision. *See Susan B. Anthony List*, 573 U.S. at 160 (identifying *American Booksellers* as applying pre-enforcement standing).

at the successive stages of the litigation.'") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, Plaintiffs have not met their burden to show an injury in fact and establish standing.

**B.     The APA does not waive sovereign immunity for actions committed to agency discretion.**

The Court lacks jurisdiction over Plaintiffs' claims because the APA's waiver of sovereign immunity is not available for agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(1); Doc. No. 62 at 23–26. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185–88, 191–2. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what *it sees as the most effective or desirable way*." *Id.* at 192 (emphasis added). Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; [and] whether a particular program 'best fits the agency's overall policies.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a

particular program "could best be distributed consistent with" the statute.[2]  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).  Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  *Id.* at 752 (quotation omitted); *see also Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018).

    NSF's grantmaking decisions clearly fit that mold, because the NSF Act authorizes NSF to issue grants NSF "deems necessary to carry out" its mission.  42 U.S.C. § 1870(c).  To that end, NSF is expressly empowered to "utilize appropriations . . . in such manner as will *in its discretion* best realize" four congressional objectives, none of which concern any funding mechanism or direct or indirect costs.  *Id.* § 1873(e) (emphasis added).  Statutory language that empowers action the agency head "'shall *deem* . . . necessary or advisable'" commits the action to agency discretion as it "fairly exudes deference to the" agency head.  *Webster v. Doe*, 486 U.S. 592, 600 (1988) (quoting 102(c) of the National Security Act with added emphasis).  And statutory language giving an agency "discretion" to act creates no law to apply.  *See Forsyth Cnty. v. Army Corp. of Eng'rs*, 633 F.3d 1032, 1041 (11th Cir. 2011).  Thus, nothing in the Act provides the "law to apply" to an analysis of any particular percentage of indirect costs selected by NSF – or, indeed, whether grants need to fund indirect costs at all.

    Plaintiffs suggest that there are "statutes and regulations that have long circumscribed agencies' discretion on indirect costs."  Doc. No. 63 at 9.  But the relevant question here is whether the statutes governing NSF's grantmaking restrict or circumscribe NSF's funding discretion.  They do not, and Plaintiffs fail to identify any that do.  Plaintiffs suggest that NSF's discretion is not

---

[2] And, thus, Plaintiffs' blithe assertion that "[t]his case is not about allocating a lump-sum appropriation," even if true, is without merit.  *See* Doc No. 63 at 10.

what it seems, but their cited authorities are not supportive.  For example, in *Department of Commerce v. New York*, the Supreme Court explained that the "[t]he Census Act constrains the Secretary's authority to determine the form and content of the census in a number of ways," such as "circumscrib[ing] [the Secretary's] power in certain circumstances to collect information through direct inquiries when administrative records are available."  588 U.S. 752, 772–73 (2019).  Those statutory constraints permitted APA review, but NSF's enabling statute does not similarly limit the agency's discretion to determine how to utilize appropriated funds to achieve its research objectives, and nothing in the NSF Act explicitly or implicitly constrains the agency's allocation of direct and indirect costs.  Similarly, in *Union of Concerned Scientists v. Wheeler*, the Supreme Court concluded that the Federal Advisory Committee Act provided a meaningful standard for review because it "was the result of Congress's determination that some fetters were needed" and the statute had "fair balance and inappropriate influence standards."  954 F.3d 11, 18 (1st Cir. 2020).  The NSF Act contains nothing of the sort.

Plaintiffs fare no better in suggesting that NSF's regulations render Supreme Court precedent inapplicable here.  *Heckler* underscores the starting point of any analysis under § 701(a)(2): the statute upon which the claim of agency illegality is based.  470 U.S. at 828-29.  At a threshold level, courts examine the statutory language to determine whether an act is committed to agency discretion by law.  *See Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011) (the court considers "the language of the statute and whether the general purposes of the statute would be endangered by judicial review") (citation omitted).  Where the statutory grant of discretion is clear-cut, as it is here, that should end the inquiry under § 701(a)(2).

Plaintiffs' cited authorities do not authorize further inquiry.  Executive branch regulations cannot properly create jurisdiction that Congress has withheld.  Doc. No. 62 at 25.  And even the

cases on which Plaintiffs rely demonstrate that courts that have reached a contrary conclusion have done so only where the agency has, through regulation, fleshed out a broad standard enacted by Congress.  *See S. Dakota v. Ubbelohde*, 330 F.3d 1014, 1020 (8th Cir. 2003) (agency Master Manual creating plan for managing river under the Flood Control Act); *McAlpine v. United States*, 112 F.3d 1429, 1434 (10th Cir. 1997) ("regulatory factors for evaluating trust land acquisition requests" under Indian Reorganization Act).  Here, in contrast, there is no such regulation.  Rather, the only regulation at issue—2 C.F.R. § 200.414(c)—does not interpret or establish standards for the use of NSF's discretion in determining which projects to fund and how to fund them.  Instead, that government-wide provision—which was authored by OMB (and only adopted by NSF)—establishes *procedures*.  There is thus no regulation constraining NSF from deciding how to allocate direct and indirect costs in exercising its broad discretion to promote scientific research.

## II.    The Policy Is Lawful.

### A.    The Policy is authorized by the NSF Act and 41 U.S.C. § 4708.

Congress, in the National Science Foundation Act, gave NSF broad discretionary authority over the grants it issues; authority that has been understood from enactment to include capping reimbursement for indirect costs at 15 percent.  Doc. No. 62 at 12, 26–27.  That same statutory authority continues in effect today.  *See id.*  Tellingly absent from Plaintiffs' opposition is a citation to any statute that amends or eliminates that authority.  *See* Doc. No. 63 at 10–14.  That should end the matter.

Plaintiffs' arguments to the contrary are smoke and mirrors.  The NSF Act does not direct NSF to "distribute funds to the institutions *best able* to do the work," regardless of cost.  Doc. No. 63 at 11.  The Act does not say and has never been understood to mean that costs are irrelevant even though appropriations are finite.  *See* Doc. No. 62 at 12, 17–19, 26–27.  Next, the "double-barreled" appropriations riders passed in the 1960s—that did not themselves restrict NSF's

authority to cap indirect cost rates and that Congress abandoned 18 years ago—certainly did not permanently strip NSF of its authority to cap costs under the Act. *See* Doc. No. 63 at 11. As a preliminary matter, the appropriations riders did not "decisively reject" caps on indirect costs. Doc. No. 63 at 11. The 1963 rider itself capped indirect cost rates, and the 1966 rider said nothing about caps at all. *See* Doc. No. 63 at 11 n.4. If Congress had wanted to prohibit NSF from capping indirect costs in 1966, it would have done so explicitly. Needless to say, Congress's decision to abandon *legislative* caps does not strip NSF of its authority to impose *its own* caps. *See St. Martin Evangelical Lutheran Church v. S. Dakota*, 451 U.S. 772, 788 (1981) ("[I]ndefinite congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication."). Moreover, even if the riders had "decisively reject[ed]" caps on indirect costs— which they did not—the riders are no longer in effect. The NSF Act now stands unrestrained. And congressional debates that do not result in legislation, *see* Doc. No. 63 at 12, have always served as "an unreliable guide to legislative intent." *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) (citing *Chapman v. United States*, 500 U.S. 453, 464 n.4 (1991)).

Plaintiffs then pivot, arguing that NSF divested *itself* of the discretionary grantmaking authority it was given by Congress by not "impos[ing] an arbitrary cap on indirect costs" for the past 60 years. Doc. No. 63 at 12. But discretionary statutes are not muscles: they do not atrophy if an agency does not flex them. *See FTC v. Browning*, 435 F.2d 96, 99 n.7 (D.C. Cir. 1970) (statutory powers "are not lost by being allowed to lie dormant") (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 647 (1950)). Regardless, as Plaintiffs recognize, the Guidance and predecessor OMB circulars have long imposed a 26 percent cap on the administrative portion of indirect costs and permitted use of a flat de minimis rate, undermining the premise that NSF has ever understood flat rates or indirect cost ceilings to be unlawful. *See* Doc. No. 63 at 12. Plaintiffs

8

therefore carefully cabin their position, as they must, arguing it is only "arbitrary" caps not based on an assessment of actual costs that are unlawful, except when they are used for new grant recipients.  Doc. No. 63 at 12.  Unsurprisingly, and fatally, Plaintiffs cite no statute that splits those hairs.[3]

Plaintiffs next tout 41 U.S.C. § 4708 as undermining the authority granted by the NSF Act.  But § 4708 provides a second, independent source of authority for the Policy.  *See* Doc. No. 62 at 27.  Plaintiffs' premise that § 4708 restricts the authorities granted by the NSF Act (42 U.S.C. § 1873(e)) because they "exist side-by-side" is wrong.  *See* Doc. No. 63 at 13 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).  They are not side-by-side; they are not even part of the same Title, making *RadLAX* inapposite.  *See* 566 U.S. at 645–46.  As described in Defendants' opening brief, § 4708 was enacted as a correction for statutes prohibiting a cost-plus-a-percentage-of-cost system of contracting that had nothing to do with NSF.  *See* Doc. No. 62 at 26–27.  Plaintiffs have cited no authority holding that a single agency action cannot be independently authorized by more than one statute.  To the contrary, where, as here, two laws are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to reward each as effective."  *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133–34 (1974) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)); *see also, e.g.*, *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1036 (D.C. Cir. 2023) (finding "[t]wo distinct grants of authority" independently authorized an agency action).[4]

---

[3] Moreover, Plaintiffs' premise that the 26 percent cap was not "arbitrary" because it was based "on an estimate of average actual costs across institutions" is nowhere found in the source Plaintiffs cite.  Doc. No. 63 at 12.  And, in any event, Plaintiffs' entire position depends on the proposition that indirect costs vary across institutions—making any flat rate "arbitrary" on Plaintiffs' definition.

[4] Plaintiffs speculate that § 4708 must restrict NSF's discretion under its Act because OMB's Guidance cites "*only* Section 4708 in explaining why agencies can use 'predetermined rates'" for

Regardless, contrary to Plaintiffs' suggestion, NSF complied with the permissive direction of § 4708, as Defendants explicitly demonstrated in our opening brief, Doc. No. 62 at 27–29, belying Plaintiffs' baseless suggestions that the "government barely tries to defend the idea that" § 4708 authorizes the Policy. Doc. No. 63 at 13. Plaintiffs' argument to the contrary is inconsistent with the plain language of the statute. Plaintiffs would require payment of some knowable amount of indirect costs, or some approximation of actual, knowable indirect costs, when § 4708 says no such thing—as underscored by the fact that it leaves it to an agency whether to key the indirect cost rates to total reimbursable direct costs or only to some "element" thereof. 41 U.S.C. § 4708; *see also Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (statute must be applied "according to its terms"). And Defendants similarly have not "ignore[d] . . . history showing that Congress and the Executive Branch have always understood a 'predetermined' percentage to be one that attempts to approximate actual indirect costs." Doc. No. 63 at 14. As Defendants have already pointed out, Plaintiffs' interpretation of the legislative history is revisionist. *See* Doc. No. 62 at 28. And it is also immaterial, "even in a post-*Chevron* world," Doc. No. 63 at 14, because the statute is clear on its face. *See Transcon. Gas Pipe Line Co., LLC v. Beckman*, No. 24-1099, 2024 WL 4661593, at *2 n.3 (3d Cir. Nov. 4, 2024) (rejecting idea that *Loper Bright* requires courts to look beyond the "plain meaning of the statutory text" to "afford more weight to legislative history").

In sum, both the NSF Act and 41 U.S.C. § 4708 separately and independently authorize the Policy, and Plaintiffs' protestations to the contrary dissolve under scrutiny.

---

IHEs. *See* Doc. No. 63 at 13 n.8 (emphasis in original). The logical—indeed, natural—explanation, however, is that the NSF Act applies only to NSF, whereas the Guidance and § 4708 apply to agencies across the federal government.

**B.    The Policy follows 2 C.F.R. § 200.414(c).**

That Congress has not prohibited NSF from establishing an indirect cost rate of 15 percent is evidenced by the fact that OMB's grant guidance, adopted by NSF, specifically permits NSF to do exactly that.  As we explained in our Motion, Doc. No. 62 at 29-32, § 200.414(c) outlines how NSF may establish a fixed indirect cost rate, and NSF's Policy complies with the plain language of the grant guidance regulation.

Plaintiffs largely ignore that plain language, speculating about the purpose of the regulation.  Doc. No. 63 at 14 (noting "important purposes" of the regulations); *id.* at 15 ("the regulation *contemplates* narrow deviations") (emphasis added); *id.* ("regulation was especially *careful* . . . because of the significant reliance interests in negotiated rates") (emphasis added); *id.* at 16 ("'deviation' . . . *connotes* a modest departure") (emphasis added).[5]  But Plaintiffs' speculation does not establish legal standards.

Plaintiffs next claim that NSF "rewrites" the requirements of § 200.414(c)(3).  *Id.* at 15. But it is Plaintiffs who seek to rewrite the plain language of that subsection, which NSF complied with.  That NSF's policy requires limited, generally applicable "criteria" and "procedures"—

---

[5] Plaintiffs rely upon OMB's 2013 final guidance for the amendments to the grant guidance, which included establishing the § 200.414(c) exception, but that guidance confirms that NSF's Policy, which promotes consistency and transparency in making indirect cost reimbursement uniform, is compliant.  Doc No. 63 at 15 (citing *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78 Fed. Reg. 78,590 (Dec. 26, 2013)).  In that guidance, OMB set out its goals of a "more efficient, effective and transparent" government that would "more effectively focus Federal resources on improving performance and outcomes while ensuring the financial integrity of taxpayer dollars in partnership with non-Federal stakeholders." 78 Fed. Reg. at 78,590.  In addressing the new § 200.414(c) exception, OMB noted that comments "were mostly positive, and indicated that these provisions would likely lead to greater consistency, and transparency in the application of indirect cost rates governmentwide." *Id.* at 78,600.  While there were recommendations that the use of deviating rates "be subject to OMB approval" – that recommendation was rejected, with the responsibility resting "with the Federal awarding agencies." *Id.*

identification of a potential grantee as an IHE and selection of a rate up to 15 percent by that grantee—to implement does not render it invalid.  Section 200.414(c) does not require an agency to needlessly add complicated procedures for a simple policy.  And, in any event, the regulatory phrase "policies, procedures and general decision-making criteria" merely provides a general description of how an agency may implement and publicize a deviation.  Here, NSF's Policy makes perfectly clear how the policy works – § 200.414(c)(3) is satisfied.

Also missing the mark is Plaintiffs' assertion that a deviation has to be "modest."  Doc. No. 63 at 16.  The regulation does not limit or cabin "deviation" – and the Court should give the word its ordinary meaning: a noticeable or marked departure from accepted norms.  *Merriam-Webster.com*. 2011. https://www.merriam-webster.com/dictionary/deviation (June 10, 2025).  To the extent NICRAs are "accepted norms," NSF's determination to reimburse indirect costs for IHEs at 15 percent is both a "noticeable and marked departure" from those norms.  Regardless of whether Plaintiffs' characterization of NSF's deviation as extreme is accurate, the regulation permits it.[6]

### C.    The Policy is reasonable and reasonably explained.

Plaintiffs express dissatisfaction with the Policy, but the APA neither permits substitution of Plaintiffs' judgment for that of the NSF nor requires NSF to explain the Policy to Plaintiffs' satisfaction.  Instead, "[a]n agency may change its existing position on an issue 'as long as [it] provide[s] a reasoned explanation for the change.'"  *Housatonic River Initiative v. U.S. EPA, New*

---

[6] As to § 200.414(c)(4), to the extent the Court concludes that NSF failed to adhere to this subsection's requirement for pending grant applications, those applications are for a universe of grants (that Plaintiffs are at liberty to decline if awarded) unquestionably small in comparison to all NSF ongoing grants and future grant awards that will be issued based upon notices of funding opportunities that set forth the 15 percent indirect cost rate.  If the Court concludes that these limited number of funding notices fail to comply with § 200.414(c)(4), it should, at most, fashion narrow relief to address this issue.

*England Region*, 75 F.4th 248, 270 (1st Cir. 2023) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).  NSF demonstrated its awareness of its change of position and rationally set forth the bases for it.  *See* Doc. No. 61-1 at 2 (stating that "[t]his change is intended to streamline funding practices, increase transparency, and ensure that more resources are directed toward direct scientific and engineering research activities.").  Under the APA, this explanation is sufficient.

NSF is not hiding from "important aspects of the problem."  The "aspects" to which Plaintiffs refer are nothing more than Plaintiffs' own conclusions about how NSF should award grants.  Doc. No. 63 at 17-18.  In *DHS v. Regents of the University of California*, 591 U.S. 1, 30 (2020), cited by Plaintiffs, the Supreme Court found that the government failed to consider an "important aspect of the problem" by failing to "[discuss] forbearance or the option of retaining forbearance without benefits" when it rescinded the Deferred Action for Childhood Arrivals policy (citations omitted).  Here, in contrast, Plaintiffs simply insist that NSF should adhere to negotiated rates—an existing policy that NSF obviously "considered" (as necessary for a departure) and which would do nothing to advance the policy goals or effectiveness, efficiency, and consistency set forth in the Policy Notice.

Plaintiffs' invocation of reliance interests fares no better, as it is at war with the purely prospective nature of the Policy.  The Policy does not apply to existing grants (or amendments of existing grants); rather, it is limited to future grants to which no one has any legitimate expectation—and which the governing regulations make clear are subject to deviations from negotiated rates.  2 C.F.R. § 200.414(c).  This case is therefore wholly unlike *Encino Motorcars, LLC v. Navarro,* 579 U.S. at 222, in which the change to overtime compensation under the Fair Labor Standards Act disrupted existing contracts, and *Regents*, 591 U.S. at 31, in which the Government abandoned DACA, which provided ongoing benefits to a class of aliens.  A contrary

13

conclusion would hamstring the Government by substantially locking the Government into existing policies governing government contracts, where flexibility is crucial.  *See Nat'l Juvenile Law Ctr., Inc. v. Regnery*, 738 F.2d 455, 464-65 (D.C. Cir. 1984) (noting that the prospects of changes in circumstances, changes in agency's perceptions, and electoral changes weigh against treating funding decisions as long-term commitments).  And, in any event, there was no way for regulated entities to protect themselves in *Encino Motorcars* and *Regents* because the Government had complete control over the issues addressed by the policies; would-be grantees, in contrast, can control costs or use other sources of funds, including endowments, to pay for indirect costs.  In short, the purported reliance interests in this case are nothing like those in Plaintiffs' cited authorities—and are fully and adequately addressed by the prospectivity of the Policy.

Other accusations of the Policy's arbitrariness likewise fail.  For example, Plaintiffs cast the Policy's application to only IHEs as "basic arbitrariness."  Doc. No. 63 at 20.  But as Plaintiffs acknowledge, "[m]ost NSF-funded research occurs at outside institutions, and about 80% occurs at universities."  Doc. No. 41 at 12.  In FY 2024, approximately 9,400 out of 11,000 NSF awards were awarded to IHEs.  Doc. No. 61 at 2.  The Policy naturally focuses on IHEs, where the Policy's impact on NSF's funding will be greatest.  Plaintiffs demand that NSF explain with particularity why the Policy only applies to IHEs, but courts must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations*, 556 U.S. 502, 513-14 (2009).  Plaintiffs' other arguments regarding NSF's "failure to grapple with the immense harm" of the Policy, its "deficient justification," and "arbitrary departure from NSF's cost-sharing policy," Doc. No. 63 at 18–20, similarly demand more rationale and justification from NSF than what the APA requires: that "the new policy is permissible under the statute, that there

are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations*, 556 U.S. at 515.

### III.    Any Remedy Should Be Limited To Remand and Vacatur.

Even if the Court determines the Policy to be unlawful, remedy should be limited to remand and vacatur of the Policy.   "Vacatur 'is the normal remedy' when [courts] are faced with unsustainable agency action." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).   Nothing here justifies deviation from this normal remedy by granting the extraordinary remedy of a permanent injunction.  Plaintiffs cite *New York v. Wolf*, No. 20-CV-1127, 2021 WL 185190, at *2 (S.D.N.Y. Jan. 19, 2021), to support their demand for a permanent injunction.  Doc. No. 63 at 25.  But that court denied injunctive relief because Plaintiffs "fail[ed] to demonstrate that vacatur and remand is insufficient to redress their injuries." *Wolf*, 2021 WL 185190, at *2.  The "immediate recourse" referenced by Plaintiffs (Doc. No. 63 at 25) and discussed by *Wolf* (citing *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 676 (S.D.N.Y. 2019) (concerning the inclusion of a citizenship question in the census questionnaire)) was "'critical' given the 'looming printing deadline' for the census questionnaire." *Wolf*, 2021 WL 185190, at *2*.  Plaintiffs here do not demonstrate how vacating the Policy would not sufficiently address their purported injuries (and preclude a finding of irreparable harm).

It would therefore be improper for this Court to issue an injunction.  And doing so would needlessly invite interbranch conflict: an injunction might, due to imprecise language and the threat of an overaggressive plaintiff and contempt, effectively hamstring the Government from adopting a lawful policy in the future.  Hence the wisdom of the settled rule making vacatur the default remedy for APA violations:  NSF will retain its freedom to address policy concerns it sees

fit in compliance with law, and "any party aggrieved by a hypothetical future [policy] will have ample opportunity to challenge it, and to seek appropriate preliminary relief, if and when such decision is made." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 164 (2010).

## IV.    Plaintiffs Have Not Satisfied the High Burden for Injunctive Relief.

### A.    Plaintiffs have not shown irreparable harm.

In any event, Plaintiffs do not demonstrate the type of imminent and irreparable harm that would justify injunctive relief of *any* kind. The "significant harms" asserted by Plaintiffs boil down to speculation about assumed harms that *may* result *if* Plaintiffs receive *and* accept new NSF Awards. *See* Doc. No. 62 at 45–49. Two consistent allegations stand out from the dozens of declarations submitted by Plaintiffs: the Policy would create "long-term budget pressure" (*see, e.g.*, Doc No. 40-1 at ¶ 20; Doc No. 40-28 at ¶ 28; Doc No. 40-30 at ¶ 19) and have long-term effects that are "cumulative and cascading." *See, e.g.*, Doc. No. 40-26 at ¶ 18; Doc No. 40-33 at ¶ 16; Doc No. 40-38 at ¶ 17. But long-term budget pressures do not justify injunctive relief. Nearly all Plaintiffs acknowledge having at least some unrestricted endowments and other sources of revenue. *See, e.g.*, Doc No. 40-10 at ¶ 20; Doc No. 40-17 at ¶ 22; Doc No. 40-30 at ¶ 18. While Plaintiffs generally assert that it would be "neither feasible nor sustainable" to use endowments or other sources to revenue to cover shortfalls in indirect cost recovery (*see, e.g.*, Doc No. 40-8 at ¶ 21). Plaintiffs do not explain why even a temporary reduction, if any, of their anticipated indirect cost recovery during the pendency of this case will inevitably lead to the alleged disastrous outcomes while Plaintiffs' endowments and revenues remain undisturbed.[7]

---

[7] In any event, a preliminary injunction "preserves the court's ability to grant final relief" and courts "require a showing of irreparable harm before granting a preliminary injunction since that harm would 'impair the court's ability to grant an effective remedy' following a decision on the merits." *Together Emps. v. Mass. Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021) (citations omitted). The Court should consider whether any alleged harms between the expiration of NSF's

The "cumulative and cascading" long-term effects claimed by Plaintiffs also cannot justify injunctive relief. For example, Plaintiffs assert that the Policy would threaten their ability to train the next generation of scientists and researchers. *See, e.g.*, Doc No. 40-5 at ¶ 17, Doc No. 40-16 at ¶ 16; Doc No. 40-26 at ¶ 9; Doc No. 40-40 at ¶ 17. In addition to being speculative, these potential effects are also not imminent and do not justify injunctive relief, especially when the case is already at the summary judgment stage. Similarly, Plaintiffs assert that frustration of intelligent planning is irreparable harm, citing *Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041, 1048 (1st Cir. 1990). Doc No. 63 at 22. But that case concerns whether a basketball player would honor a contract to play for the Boston Celtics where the contract explicitly provided that "any breach by the Player of this contract will cause irreparable injury to the Club." *Shaw*, 908 F.2d at 1048. NSF has not agreed to such terms.

Plaintiffs reference the "ripple effects" of the Policy and state that courts "routinely recognize similar harms," citing to *NIH* and *DOE*. Doc No. 63 at 23–24. Defendants respectfully disagree that those decisions properly applied the law, but even on their own terms *NIH* or *DOE* do not bind this Court's independent analysis of the Policy. The policies being challenged in those cases must be distinguished from the NSF Policy: The *DOE* court disagreed with the United States that Plaintiffs' alleged harms are "downstream or speculative" because the court found the DOE policy states that "'the Department is undertaking action to terminate all grant awards to IHEs that do not conform to this updated policy,' . . . Plaintiffs will immediately have to make the difficult choices." *Ass'n of Am. Univs. v. DOE*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *18 (D. Mass. May 15, 2025) (emphasis in original); *see also Massachusetts v. NIH*, No. 25-CV-10338,

_____

voluntary stay of the Policy on June 20, 2025 and the Court's final disposition of the case are irreparable. For the reasons already stated, they are not.

2025 WL 702163, at *30 (D. Mass. Mar. 5, 2025) (noting that the harms alleged are particularly irreparable because the ICR cap is immediately affecting existing awards). But NSF's Policy applies the 15 percent rate cap *only* to new awards made after the issuance of the Policy, and existing awards are not subject to the rate cap. Nor does NSF seek to alter or terminate any existing awards that exceed the 15 percent rate cap. The alleged harms from the NSF's solely forward-facing Policy are distinct from the alleged harms at issue in *NIH* and *DOE*. The Court, therefore, should not adopt the rationales of the *NIH* and *DOE* courts. Any uncertainty between now (really, given the stay, June 20) and the disposition of this case is limited to a brief period and cannot be the basis for the type of irreparable harm asserted by Plaintiffs. And of course, again, vacatur would eliminate any purported harms after final judgment.

### B.    The other factors weigh against injunctive relief.

The balance of the equities and public interest factors weigh against injunctive relief here "because the government's interest *is* the public interest." *Green v. U.S. Dep't of Justice*, No. 16-1492, 2021 WL 11637039, at *11 (D. D.C. July 15, 2021) (emphasis in original) (citation omitted). Plaintiffs state that the Policy will inflict significant harm "to research across the United States, whose very purpose . . . is to benefit the public." Doc No. 64 at 24. But Plaintiffs substitute their own judgment for that of the United States. The United States must consider the promotion of scientific research as one among numerous crucial interests, including its mandate to steward taxpayer money. *See Dep't of Ed. v. California*, 604 U.S. ----, 145 S. Ct. 966, 968–69 (2025) (finding harm to public interest when United States might not recover disbursed funds). Moreover, the Policy does not reflect any change in the United States' goal of promoting scientific research, but merely the United States' judgment that taxpayer moneys should pay for more direct research and less overhead and other indirect costs. Plaintiffs assert that the United States cannot be harmed by an injunction because the Policy is illegal, but this presupposes the illegality of the Policy and

fails to address why, if the Policy were indeed found unlawful, the normal remedy of remand and vacatur would not suffice.

## V.    Because Injunction is an Extraordinary Remedy, Courts Should Tailor Any Injunction to IHEs that Have Shown Irreparable Harm.

Plaintiffs confuse the United States' argument against a universal injunction with a "backdoor attack" on Plaintiffs' standing.  Doc No. 63 at 25.  Even if Plaintiffs have standing to bring this suit, that does not resolve the question concerning the scope of any injunction: injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  "[C]ourts must 'closely tailor injunctions to the harm that they address.'"  *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 40 (1st Cir. 2002) (citation omitted), *see also* Doc No. 62 at 51–52.  And while Plaintiffs fault Defendants for not identifying IHEs that either have not suffered irreparable harm or who are not members of the associational plaintiffs, that gets the burden backward: the party seeking an injunction bears the burden of proving its propriety.  *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (stating that "party seeking the preliminary injunction bears the burden of establishing that these four [preliminary injunction] factors weigh in its favor.").  Plaintiffs have done nothing to prove an entitlement to universal injunction, and the Court should tailor any injunction to the parties to this case (and the IHEs they represent) that have proved irreparable harm.  But all of this should be a moot point because the possibility of vacatur makes an injunction improper.

## VI.    Any Preliminary Injunction Should Be Conditioned on a Bond.

Plaintiffs ask the Court to ignore the plain text of Rule 65(c) by declining to condition any preliminary injunction on a bond.  But Plaintiffs concede that, even under the case law departing

from the Rule's plain requirements, "[b]onds are generally appropriate when a case involves a commercial or financial transaction." Doc. No. 63 at 26. This case involving reimbursement under federal grant awards clearly fits that bill, as confirmed by cases requiring bonds where a dispute concerns government funding or procurement decisions.[8]  *See* Doc. No. 62 at 53–54.  And Plaintiffs do not dispute that the $3 million requested by Defendants adequately represents Defendants' anticipated loss during the first month of a preliminary injunction.  *See* Doc. No. 63 at 26.  The Court therefore should require Plaintiffs to post security in the amount of $3 million if the Court issues a preliminary injunction.

## CONCLUSION

Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

---

[8] Although Plaintiffs briefly contend that this is a "public interests" case instead of a "financial transactions" case, neither Plaintiffs' brief nor any of the cases they cite include any analysis supporting that characterization.  *See* Doc. No. 63 at 26.

Dated: June 10, 2025                    Respectfully submitted:

                                        YAAKOV M. ROTH
                                        Principal Deputy Assistant Attorney General

                                        LEAH B. FOLEY
                                        United States Attorney

                                        BRIAN C. LEA
                                        Deputy Associate Attorney General

                                        KIRK T. MANHARDT
                                        Director

                                        MARC S. SACKS
                                        Deputy Director

                                        By: /s/ *Bethany R. Theriot*
                                        BETHANY R. THERIOT (D.C. Bar 1022065)
                                        I-HENG HSU (NY Reg. No. 4904033)
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division
                                        Corporate/Financial Litigation Section
                                        P.O. Box 875
                                        Ben Franklin Station
                                        Washington, D.C. 20044-0875
                                        (202) 307-0244
                                        bethany.theriot@usdoj.gov
                                        i-heng.hsu@usdoj.gov

                                        *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 10, 2025

/s/ *Bethany R. Theriot*
BETHANY R. THERIOT
Trial Attorney