UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, et al., | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 1:25-cv-11231-IT |
| NATIONAL SCIENCE FOUNDATION and BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation, | * * * * | |
| Defendants. | * * | |

MEMORANDUM & ORDER

June 20, 2025

TALWANI, D.J.

Plaintiffs—the Association of American Universities, the Association of Public and

Land-Grant Universities, the American Council on Education, and 13 research universities—

filed this action challenging Defendant National Science Foundation's *Policy Notice:*

*Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034 ("the Policy Notice"

implementing the "15% Indirect Cost Rate").[1]

Pending before the court are Plaintiffs' Motion for a Preliminary Injunction and for

Summary Judgment [Doc. No. 40] and Defendants' Motion for Summary Judgment [Doc. No.

---

[1] This is the third of four actions filed in this District concerning agency actions seeking to cut indirect cost rates on federal grants. See Association of American Medical Colleges v. National Institutes of Health, 1:25-cv-10340-AK (preliminary injunction enjoining National Institutes of Health; entered on March 5, 2025, and converted to permanent injunction and final judgment; appeal pending); Association of American Universities v. Department of Energy, 1:25-cv-10912-ADB (preliminary injunction enjoining Department of Energy; entered on May 15, 2025); Association of American Universities v. Department of Defense, 1:25-cv-11740-BEM (temporary restraining order enjoining Department of Defense; entered on June 17, 2025).

60]. For the reasons set forth below, Plaintiffs' request for Summary Judgment is GRANTED,

Defendants' Motion for Summary Judgment is DENIED, and Plaintiffs' request for a

Preliminary Injunction is DENIED as moot.

## I.    Background

### A.    *The National Science Foundation and Grant-Supported Research*

The National Science Foundation Act of 1950, 42 U.S.C. §§ 1861, et seq. ("NSF Act"),

established the National Science Foundation ("NSF"). Congress has authorized and directed

NSF:

> to initiate and support basic scientific research and programs to strengthen scientific
> research potential and science education programs at all levels in the mathematical,
> physical, medical, biological, social, and other sciences, and to initiate and support
> research fundamental to the engineering process" and programs to strengthen such
> research, by making contracts or other arrangements (including grants . . . ) to
> support such scientific, engineering, and educational activities . . .

42 U.S.C. § 1862(a)(1). Congress has also specifically authorized NSF "to initiate and support

scientific and engineering research . . . at academic . . . institutions." Id. § 1862(c). Almost

seventy years later, Congress reaffirmed the essential nature of federal research grants, including

"the sense of Congress that . . . sustained, predictable Federal funding of basic research is

essential to United States leadership in science and technology[.]" American Innovation and

Competitiveness Act, Pub. L. No. 114-329, § 101(a)(1) 130 Stat. 2969, 2970 (2017).

Under the NSF Act, NSF has statutory authority "to enter into contracts or other

arrangements, or modifications thereof, for the carrying on, by organizations or individuals in the

United States and foreign countries, . . . of such scientific or engineering activities as [NSF]

deems necessary to carry out the purposes of this chapter[.]" 42 U.S.C. § 1870(c). Further, "[i]n

making contracts or other arrangements for scientific or engineering research," Congress has

directed NSF to:

utilize appropriations available therefor in such manner as will in its discretion best realize the objectives of (1) having the work performed by organizations, agencies, and institutions, or individuals in the United States or foreign countries, including Government agencies of the United States and of foreign countries, qualified by training and experience to achieve the results desired, (2) strengthening the research staff of organizations, particularly nonprofit organizations, in the United States, (3) adding institutions, agencies, or organizations which, if aided, will advance scientific or engineering research, and (4) encouraging independent scientific or engineering research by individuals.

42 U.S.C. § 1873(e).

B.    *Statutory Provisions Related to Public Contracts*

The relevant statutory scheme also includes a generally-applicable provision related to public contracts, codified at Title 41 of the United States Code. Under 41 U.S.C. § 4708, "[a] cost-type research and development contract (including a grant) with a university, college, or other educational institution may provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to the total of the reimbursable direct costs incurred or to an element of the total of the reimbursable direct costs incurred."

According to the Senate Report accompanying the proposed legislation, the bill allowed indirect cost rates to be set in advance as estimates of future costs, as had been the practice prior to a 1956 decision of the Comptroller General, rather than be retroactively adjusted after the fact based on actual costs, as had been the practice following that decision. S. Rep. No. 87-1826, at 1 (1962).

C.    *The Regulatory Scheme for Federal Grants*

Under regulations promulgated by the Office of Management and Budget ("OMB"), agencies initiate a competitive grantmaking process by issuing a notice of funding opportunity ("NOFO") for a specific research program. See 2 C.F.R. § 200.204. The agency receives applications for a period specified in the NOFO, which is typically at least 60 days. Id. § 200.204(b). The agency then conducts a "merit review process" to select grant recipients who

3

are "most likely to be successful in delivering results based on the program objectives . . . ." Id. § 200.205. After an agency selects a grant recipient, it issues a Notice of Award ("NOA") indicating the amount of funds awarded to the recipient. Id. § 200.211(c)(1)(iv).

The regulations provide for detailed cost accounting for grants. See 2 C.F.R. Pt. 200, App. III ("Indirect (F & A) Costs Identification and Assignment, and Rate Determination for Institutions Of Higher Education (IHEs)") ("Appendix III to Part 200"); 2 C.F.R. §§ 200.1, 200.414, 200.501(b), 200.504, 200.514. The regulations provide for two categories of costs: "allowable direct and allocable indirect costs[.]" 2 C.F.R. § 200.402.

Direct costs are those "that can be identified specifically with a particular final cost objective, such as a Federal award . . . or that can be directly assigned to such activities relatively easily with a high degree of accuracy." 200 C.F.R. § 200.413(a). Indirect costs are those "incurred for a common or joint purpose benefitting more than one cost objective and not readily assignable" to a specific project. 2 C.F.R. § 200.1. Indirect costs must be designated as either "facilities" or "administration." 2 C.F.R. § 200.414. "'Facilities' is defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." Id. "'Administration' is defined as general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" Id. Whether direct or indirect, to be reimbursed, costs must "[b]e necessary and reasonable for the performance of the Federal award" and must be adequately documented. 2 C.F.R. § 200.403.

"The total cost of a [f]ederal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." See 2 C.F.R. § 200.402. Generally, an institution

negotiates a pre-determined indirect cost rate with a federal agency. 2 C.F.R. Pt. 200, App. III (C)(4) ("[N]egotiation of predetermined rates for indirect (F & A) costs for a period of two to four years should be the norm . . . where the cost experience and other pertinent facts available are deemed sufficient to enable the parties involved to reach an informed judgment as to the probable level of indirect (F & A) costs during the ensuing accounting periods.") Federal regulations prescribe procedures and methodology for negotiating and determining the indirect cost rate. See generally 2 C.F.R. Pt. 200, App. III(C). An IHE negotiates its indirect cost rate with the Department of Health and Human Services ("HHS") or the Department of Defense's ("DOD") Office of Naval Research ("ONR"), normally depending on which of the two agencies has provided more funds directly to the educational institution for the most recent three years. 2 C.F.R. Pt. 200, App. III(C)(11)(a)(1). Where neither HHS nor ONR provides federal funding directly to an IHE, the cognizant agency for indirect costs assignment to that IHE defaults to HHS. Id. IHEs do not negotiate indirect cost rates with NSF.

Negotiated rates are effective for a specified period, often (but not always) between two and four years. See 2 C.F.R. Pt. 200, App. III (C)(4). Entities that expend more than $1,000,000 in federal awards must be audited. 2 C.F.R. §§ 200.501, 200.504, 200.514. An institution's covered indirect costs may be adjusted if an audit indicates that an institution has received funding in excess of its actual costs. See 2 C.F.R. Pt. 200, App. III(C)(11)(d) ("The cognizant agency for indirect costs must conduct any necessary negotiations with an educational institution regarding amounts questioned by audit that are due the Federal government related to costs covered by a negotiated agreement.").

Where an indirect cost rate has not been negotiated, an IHE may elect to cover indirect costs by charging a *de minimis* indirect cost rate of up to 15%. 2 C.F.R. § 200.414(f). The *de*

*minimis* rate does not require documentation by the IHE to justify the costs. Id. Use of a *de minimis* rate for indirect costs is at the election of the IHE, and federal agencies "may not require recipients . . . to use a *de minimis* rate lower than the negotiated indirect cost rate . . . unless required by Federal statute or regulation." Id.

The regulations detail federal agency acceptance of negotiated cost rates. See 2 C.F.R. § 200.414(c). Subsection (c)(1) provides first that "[n]egotiated indirect cost rates must be accepted by all Federal agencies." (Emphasis added). The regulation then allows federal agencies certain deviations from the accepted, negotiated rates "for either a class of Federal awards or a single Federal award" in two circumstances: when a different rate is required by federal statute or regulation, or when the awarding federal agency approves a different rate in accordance with specific procedures, see id., as discussed in detail below.

D.    *NSF Awards*

The grant review process at NSF typically takes six months for technical review plus one month for final administrative review. Coughlin-Piester Decl. ¶ 8 [Doc. No. 61]. Over 80% of NSF research grants are awarded to IHEs and about 5% are awarded to other nonprofit organizations. See id. ¶ 6 [Doc. No. 61] (stating NSF awarded approximately 9,400 of 11,000 competitive new and renewal grant awards to IHEs); Nat'l Ctr. for Sci. & Eng'g Statistics, Survey of Federal Funds for Research and Development (2023-2024), Table 7, https://ncses.nsf.gov/surveys/federal-funds-research-development/2023-2024# tableCtr13393 (last accessed June 20, 2025).[2] In Fiscal Year 2024, the average approval rate for grant proposals

---

[2] About 7% of funds are awarded to businesses, and less than 1% to state and local governments and non-U.S. performers. Approximately 6% of funds are awarded to federal agencies and federally-funded research and development centers. Id.

from Institutions of Higher Education ("IHE")[3] was 27%. Coughlin-Piester Decl. ¶ 9. [Doc. No. 61]

NSF grant recipients generally do not receive lump sum funding. Instead, recipients first incur expenses and then, using cost-based accounting systems, recover their actual, documented costs for conducting research. See id. ¶ 10 (explaining NSF grants "reimburse . . . costs on an as-needed basis based on costs a grantee incurs or expects to incur during a given period"). Generally, NSF has paid indirect costs in grants to IHEs based on indirect cost rates that those institutions negotiate with ONR or HHS. See id. ¶ 13; 2 C.F.R. Pt. 200, App. III(C)(11)(a)(1).

E.    *Plaintiffs and Member Institutions' Federally-Funded Research*

Plaintiffs are the Association of American Universities ("AAU"), the Association of Public and Land-Grant Universities ("APLU"), the American Council on Education ("ACE") (collectively "Organizational Plaintiffs"), and 13 research universities: Arizona Board of Regents on behalf of Arizona State University ("Arizona State"), Brown University ("Brown"), California Institute of Technology ("Caltech"), The Regents of the University of California ("UC"), Carnegie Mellon University ("Carnegie Mellon"), University of Chicago ("UChicago"), Cornell University ("Cornell"), Board of Trustees of the University of Illinois ("Illinois"), Massachusetts Institute of Technology ("MIT"), Regents of the University of Michigan ("Michigan"), Regents of the University of Minnesota ("Minnesota"), Trustees of the University of Pennsylvania ("Penn"), and The Trustees of Princeton University ("Princeton") (collectively "University Plaintiffs").

---

[3] Institutions of Higher Education are defined at 2 C.F.R. § 200.1, with a reference to 20 U.S.C. 1001.

AAU is an association composed of 71 leading research universities that collectively receive billions of dollars in competitively-awarded federal funding for scientific research. AAU Decl. ¶ 3 [Doc. No. 40-1]. For example, in fiscal year 2023, AAU members received approximately $3.7 billion in NSF research and development funding across fields that include artificial intelligence, novel simulations to aid drug discovery, and biomedical engineering to advance drug delivery. Id. ¶ 4. Many AAU member universities have negotiated indirect cost rates that are significantly higher than 15% and often between 50% and 60%. Id. ¶ 12.

APLU is a membership organization that consists of more than 230 public research universities, land-grant institutions, state university systems, and affiliated organizations spanning all 50 U.S. states, the District of Columbia, and six U.S. territories. APLU Decl. ¶ 3 [Doc. No. 40-3]. APLU members received more than $4.6 billion in research and development funds from NSF in fiscal year 2023. Id. ¶ 5. NSF-funded research at APLU member institutions has supported technological advancements such as artificial intelligence, nanotechnology, 3-D printing, next generation computer chips, MRI scans, LASIK eye surgery, and improved Geographic Information Systems. Id. ¶ 6.

ACE is a membership organization composed of over 1,600 colleges and universities, related associations, and other organizations, and it has members in all 50 states and the District of Columbia. ACE Decl. ¶¶ 3, 5 [Doc. No. 40-2]. ACE member universities collectively received more than $6.1 billion from NSF in research and development funds in 2023. Id. ¶ 7. Member universities rely on these funds to advance fundamental research and accelerate technology and innovation that help ensure national security. Id.

Member universities, which include the University Plaintiffs, conduct scientific research that supports advances in fields including national security, economic sciences, biomedical

sciences, medical technologies, materials science, artificial intelligence, natural disaster response, space physics, and manufacturing processes. See, e.g., AAU Decl. ¶ 4 [Doc. No. 40-1]; ACE Decl. ¶ 7 [Doc. No. 40-2]; APLU Decl. ¶ 6 [Doc. No. 40-3]; UC Decl. ¶ 3 [Doc. No. 40-7]; Caltech Decl. ¶ 5 [Doc. No. 40-8]; University of Colorado Boulder ("CU Boulder") Decl. ¶ 5 [Doc. No. 40-12]; Colorado State University ("Colorado State") Decl. ¶ 5 [Doc. No. 40-13]; Michigan Decl. ¶ 5 [Doc. 40-20]; Pennsylvania State University ("Penn State") Decl. ¶ 5 [Doc. No. 40-27]. Collectively, they receive hundreds of millions of dollars from NSF to support thousands of research projects. See, e.g., Arizona State Decl. ¶ 9 [Doc. No. 40-4]; UC Decl. ¶ 2 [Doc. No. 40-7]; Caltech Decl. ¶ 3 [Doc. No. 40-8]; Carnegie Mellon Decl. ¶ 3 [Doc. No. 40-9]; Cornell Decl. ¶ 4 [Doc. No. 40-14]; Illinois Decl. ¶ 4 [Doc. No. 40-17]; Michigan Decl. ¶ 3 [Doc. No. 40-20]; Minnesota Decl. ¶ 3 [Doc. No. 40-21]; University of Nevada, Reno ("UNR") Decl. ¶ 3 [Doc. No. 40-22]; University of Toledo ("Toledo") Decl. ¶ 5 [Doc. No. 40-34]; Tufts University ("Tufts") Decl. ¶ 3 [Doc. No. 40-35]. Member universities and University Plaintiffs can receive hundreds of new awards and tens of millions of dollars in new funding from NSF each year. See, e.g., Minnesota Decl. ¶ 3 [Doc. No. 40-21] (214 new awards in Fiscal Year ("FY") 2024 and 195 new awards in first ten months of FY 2025); MIT Decl. ¶ 10 [Doc. No. 40-19] (submits hundreds of proposals each year with "a significant success percentage in securing NSF awards under its proposals"); CU Boulder Decl. ¶ 15 [Doc. No. 40-12] (anticipates receiving $18.5 million over next two months of this fiscal year); University of Pittsburgh ("Pittsburgh") Decl. ¶ 3 [Doc. No. 40-28] (195 new awards totaling over $87 million from FY 2022–2024); The State University of New York ("SUNY") Decl. ¶ 6 [Doc. No. 40-32] ($104.8 million in NSF funding across 23 campuses in last full fiscal year). Further, member universities and University Plaintiffs intend to apply for new NSF awards and have thousands of proposals

pending worth tens of millions of dollars. See, e.g., AAU Decl. ¶ 10 [Doc. No. 40-1]; APLU
Decl. ¶¶ 5, 13 [Doc. No. 40-3]; Cornell Decl. ¶ 5 [Doc. No. 40-14] (260 proposals under
consideration); Illinois Decl. ¶¶ 6–7 [Doc. No. 40-17]; MIT Decl. ¶ 10 [Doc. No. 40-19]
(expecting decisions on dozens of proposals in next two months); Arizona State Decl. ¶ 10 [Doc.
No. 40-4] (almost 400 proposals outstanding totaling almost $275 million in requested funding);
Dartmouth College ("Dartmouth") Decl. ¶¶ 19–20 [Doc. No. 40-15] (nearly 100 proposals);
University of Kansas (Kansas") Decl. ¶ 4 [Doc. No. 40-18] (123 pending proposals); Minnesota
Decl. ¶ 15  [Doc. No. 40-21] (over 300 proposals); Oregon State University ("Oregon State")
Decl. ¶ 5 [Doc. No. 40-25] (169 proposals totaling almost $198 million); CU Boulder Decl. ¶ 15
[Doc. No. 40-12] (anticipated proposals amounting to an estimated $18.5 million over the next
two months of this fiscal year); University of Wisconsin-Madison ("UW Madison") Decl. ¶ 4
[Doc. No. 40-40] (awaiting final determination from NSF on $219,740,287 in grant proposals).

Many of the Plaintiffs and member universities here have negotiated indirect cost rates
for multiyear periods. See, e.g., CU Boulder Decl. ¶ 11–12 [Doc. No. 40-12] (56.5% negotiated
indirect cost rate for two-year period); Yale University ("Yale") Decl. ¶ 11 [Doc. No. 40-41]
(four year period, negotiated rate increases from 67.5% to 68.5% by FY 2028); Dartmouth Decl.
¶ 15–16 [Doc. No. 40-15] (negotiated indirect cost rates range from 63.5% to 64% over seven
years); Brown Decl. ¶ 12 [Doc. No. 40-5] (59.5% through FY 2027); Boston University ("BU")
Decl. ¶ 12 [Doc. No. 40-6] (26% to 63.5% through FY 2028 depending on type of grant);
Minnesota Decl. ¶ 12 [Doc. No. 40-21] (26% to 59% through FY 2028 depending on location
and type of project); UNH Decl. ¶ 12 [Doc. No. 40-23] (26% to 56.9% through FY 2029
depending on location and type of project); Penn Decl. ¶ 13 [Doc. No. 40-26] (62.5% for on-
campus research through FY 2027); Rice University Decl. ¶ 11 [Doc. No. 40-30] (56.5% through

FY 2025); Rutgers, State University ("Rutgers") Decl. ¶ 12 [Doc. No. 40-31] (57% through FY

2026); Stony Brook University Decl. ¶ 11 [Doc. No. 40-33] (58.5% to 62.5% through FY 2028);

University of Utah ("Utah") Decl. ¶ 12 [Doc. No. 40-36] (54% through FY 2026); Vanderbilt

University ("Vanderbilt") Decl. ¶ 12 [Doc. No. 40-37] (26% to 58.5% depending on location

through FY 2026); University of Vermont ("Vermont") Decl. ¶ 12 [Doc. No. 40-38] (21% to

53.5% through FY 2026).

      F.    *NSF's Indirect Cost Policies and the Policy Notice*

NSF has included on its website its "Indirect Cost Rate Policies" explaining indirect

costs. See NSF's Indirect Cost Rate Policies [Doc. No. 40-42]. The website explains that indirect

costs are "those costs which are not readily identifiable with a particular cost objective . . . but

nevertheless are necessary for the general operation of an organization." Id. at 3–4. The website

explains further that "[o]rganizations generally charge indirect costs to federal awards by

developing and applying an indirect cost rate, which is used consistently across an organization's

awards." Id. at 4. The website states further that "[a] predetermined indirect cost rate is a fixed

rate established for a future fiscal period, based on the actual costs from a representative prior

period." Id. at 5.

Additionally, NSF's Proposal and Award Policies and Procedures Guide specifies that "it

is NSF policy that recipients are entitled to reimbursement from award funds for indirect costs,"

which is "generally based upon a recipient's current Federally negotiated indirect cost rate

agreement." NSF, Proposal and Award Policies and Procedures Guide X-5 (effective May 20,

2024), https://nsfgov-resources.nsf.gov/files/nsf24_1.pdf? ("Award Guide") (last accessed June

20, 2025).

On May 2, 2025, NSF issued its *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034.[4] The Policy Notice's subject is: "Adoption of Standard 15% Indirect Cost Rate for NSF Grants and Cooperative Agreements awarded to Institutions of Higher Education (IHEs)." Id. at 1. The Policy Notice states that a 15% cap on indirect costs will apply to new awards made to IHEs on or after May 5, 2025. Id. The Policy Notice also asserts that NOFOs NSF issues after the effective date will include notice of the 15% cap on indirect cost rates. Id.

The Policy Notice acknowledges that the 15% Indirect Cost Rate is a change to NSF's policy regarding reimbursement of indirect costs, and states that the change "is intended to streamline funding practices, increase transparency, and ensure that more resources are directed toward direct scientific and engineering research activities." Id. at 2. The Policy Notice states that it "serves as public notification of the policies, procedures and general decision-making criteria that NSF has used to justify deviation from negotiated rates for all awards[.]" Id. at 2. As the rationale for the deviation, the Policy Notice states that the 15% Indirect Cost Rate supports NSF's commitment to efficiency, consistency, and effectiveness. Id. at 2.

## II.    Procedural History

Plaintiffs filed this action against the NSF and its Acting Director Brian Stone on May 5, 2025, challenging the Policy Notice and the 15% Indirect Cost Rate under the APA. See Compl.

---

[4] See https://www.nsf.gov/policies/document/indirect-cost-rate (accessed May 6, 2025, at 3:59 p.m.). Plaintiffs state that a copy of this Policy Notice is attached as Exhibit A to the Complaint, see Compl. ¶ 8 [Doc. No. 1], but the Complaint includes no Exhibit A. Defendants state that Exhibit 1 to the Declaration of Janis Coughlin-Piester [Doc. No. 61] is a true and correct copy of the May 2, 2025 Policy Notice, see [Doc. No. 61-1]. That version appears to have been accessed from the website on May 27, 2025, after the policy was stayed in connection with this lawsuit. See id. at 1 (noting that "NSF is temporarily pausing implementation of the [Policy Notice]").

¶¶ 72–105 [Doc. No. 1]. Specifically, Plaintiffs allege that the 15% Indirect Cost Rate violates authorizing statutes (Count I), departs from negotiated indirect cost rates in violation of 2 C.F.R. § 200.414 (Count II), departs from cost recovery regulations (Count III), and is arbitrary and capricious (Count IV). Id. On May 8, Plaintiffs filed a combined Motion for a Preliminary Injunction and for Summary Judgment [Doc. No. 40] supported by declarations from representatives of the Organizational Plaintiffs and their members, and from the University Plaintiffs.

Defendants subsequently filed their own Motion for Summary Judgment [Doc. No. 60], arguing that Plaintiffs have not demonstrated standing to sue, that this court lacks jurisdiction because NSF's grant-related decisions are committed to agency discretion by law and are not reviewable under the APA, and that the 15% Indirect Cost Rate is authorized by statute and supported by reasoned explanation. Defendants' Motion is supported by a declaration from the NSF's Chief Financial Officer and Head of the Office of Budget, Finance, and Award Management.

Defendants have agreed to voluntarily stay implementation of the 15% Indirect Cost Rate through June 20, 2025. See Defs.' Notice [Doc. No. 50]; Mem. ISO Defs.' Mot. 42 n.30 [Doc. No. 62].

## III.    Standard of Review

In the administrative law context, a motion for summary judgment is "simply a vehicle to tee up a case for judicial review." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). Therefore, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious" or otherwise unlawful. Id.; see Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) (explaining court's task on summary judgment in

administrative law context "is only to determine" whether agency's action was "consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record").

## IV.    Discussion

### A.    *Jurisdiction*

#### 1.    Standing

Defendants argue that Plaintiffs lack standing because they have not established that any Plaintiff has suffered an injury in fact. Mem. ISO Defs.' Mot. 12 [Doc. No. 62]. Defendants contend that because the 15% Indirect Cost Rate applies only to new awards, any injury Plaintiffs can identify stems from potentially being offered a grant award at the 15% indirect cost rate (which they would have discretion to accept or reject), submitting proposals at that rate in the future, or deciding not to submit grant proposals at that rate. Id. at 13. Defendants assert that claims concerning hypothetical, future grants that Plaintiffs may or may not receive constitute generalized grievances about NSF's policy, which are not sufficient to confer standing. Id.

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. art. III, § 2, cl. 1; TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." Dep't of Com. v. New York, 588 U.S. 752, 766 (2019).

Establishing standing requires a showing that a plaintiff "has suffered, or will suffer, an injury that is '[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.'" Murthy v. Missouri, 603 U.S. 43, 57 (2024) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)).

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself[.]" Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry

Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); see also Warth v. Seldin, 422 U.S. 490, 511 (1975) ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.").

Whether an association has standing to sue on behalf of its members "depends in substantial measure on the nature of the relief sought." Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274, 287 (1986) (quoting Warth, 422 U.S. at 515). Actions seeking prospective relief are generally "particularly suited to group representation." Camel Hair & Cashmere Inst., 799 F.2d at 12.

To establish the first element of standing, an injury-in-fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." TransUnion, 594 U.S. at 435.

Here, Plaintiffs have sufficiently demonstrated that University Plaintiffs and the Organizational Plaintiffs have standing based on an imminent and substantial future injury to IHEs. Qualifying for less federal funding is a "future injur[y]" that is sufficient to confer standing where "the threatened injury is certainly impending, or there is a substantial risk that the

harm will occur." <u>Dep't of Com.</u>, 588 U.S. at 767; <u>accord</u> <u>New Jersey v. Trump</u>, 131 F.4th 27, 37

(1st Cir. 2025); <u>cf.</u> <u>Sherley v. Sebelius</u>, 610 F.3d 69, 74 (D.C. Cir. 2010) (concluding plaintiffs

had standing where agency action increased competition for federal grants such that plaintiffs

"face[d] a substantial enough probability [of losing funding] to deem the injury to them

imminent"). Under the 15% Indirect Cost Rate, Organizational Plaintiffs and member

institutions, including the University Plaintiffs, will have to cover a significant portion of their

indirect costs for NSF research despite ONR and HHS's recognition of those actual, indirect

costs, as reflected in the negotiated indirect cost rates. Defendants provide an example that

illustrates: If NSF awards $100 in direct costs to an institution with whom ONR or HHS has

negotiated a 30% indirect cost rate, the total award is $130. Mem. ISO Defs.' Mot. 29 [Doc. No.

62]. But if NSF caps the indirect cost rate at 15%, the institution can only receive $15 in indirect

costs from the same grant award, for a total award of $115, with the institution responsible for

covering the remaining $15. <u>See</u> <u>id.</u>

Plaintiffs have also demonstrated that this injury is sufficiently imminent. Even though

the 15% Indirect Cost Rate only cuts indirect costs as to future grants that NSF has not yet

awarded, any IHE that has negotiated an indirect cost rate with HHS or ONR above 15%

becomes <u>eligible</u> for less federal funding if NSF implements the 15% Indirect Cost Rate.

Nor is it merely hypothetical that at least some University Plaintiffs and members of the

Organizational Plaintiffs institutions will receive less indirect cost funding from NSF under the

15% Indirect Cost Rate. Although no university is guaranteed to receive any grant award for

which it applies, some University Plaintiffs (who are also members of the Organizational

Plaintiffs) each have dozens of proposals pending, and NSFs average approval rate for grant

proposals from IHEs was 27%. Coughlin-Piester Decl. ¶ 9 [Doc. No. 61]. Such institutions are

highly likely to receive at least a portion of the awards for which they have applied. Further, where members of the Organizational Plaintiffs received approximately $14.4 billion in awards in 2023, and where IHEs have received 80% of grants historically, the suggestion that no University Plaintiff or member of an Organizational Plaintiff would be awarded any grant in the future is fanciful. Indeed, Defendants themselves point out that "[r]eview of awards from 2024 can illustrate the impact of the policy on future awards. . . . If indirect costs had been limited to 15% for IHEs in FY24, then, at the time of award, the budgeted indirect costs would have been $432,298,644 less." Id. ¶ 18. Given the magnitude of awards to members of the Organizational Plaintiffs, it is highly likely that some members would be among the institutions affected.

Further, Plaintiffs have demonstrated that the 15% Indirect Cost Rate will cause a host of additional injuries, beginning with a disruption to ongoing research. Although the 15% Indirect Cost Rate does not affect existing or continuing grant awards, Plaintiffs and member institutions collectively have thousands of proposals pending before NSF, which they submitted in reliance on their negotiated indirect cost rates. AAU Decl. ¶ 10 [Doc. No. 40-1]; APLU Decl. ¶ 5 [Doc. No. 40-3]; Cornell Decl. ¶ 6 [Doc. No. 40-14]; Illinois Decl. ¶¶ 6–7 [Doc. No. 40-17]; MIT Decl. ¶ 10 [Doc. No. 40-19]; Arizona State Decl. ¶ 10 [Doc. No. 40-4]; Dartmouth Decl. ¶¶ 19-20 [Doc. No. 40-15] (nearly 100 proposals); Kansas Decl. ¶ 4 [Doc. No. 40-18]; Minnesota Decl. ¶ 15 [Doc. No. 40-21]; Oregon State Decl. ¶ 5 [Doc. No. 40-25]; CU Boulder Decl. ¶ 18 [Doc. No. 40-12]. And Plaintiffs' declarations establish that many proposed research projects and future projects cannot proceed as budgeted with indirect costs funded at a 15% rate. Brown Decl. ¶¶ 7–8 [Doc. No. 40-5]; Cornell Decl. ¶¶ 13–15 [Doc. No. 40-14]; Dartmouth Decl. ¶ 21 [Doc. No. 40-15]; Illinois Decl. ¶ 8 [Doc. No. 40-17]; Kansas Decl. ¶ 19 [Doc. No. 40-18]; MIT Decl. ¶¶ 11–12 [Doc. No. 40-19]; Minnesota Decl. ¶ 15–16 [Doc. No. 40-21]; UNR Decl. ¶¶ 5–6

[Doc. No. 40-22]; Oregon State Decl. ¶ 16 [Doc. No. 40-25]; Yale Decl. ¶¶ 6–7, 17 [Doc. No. 40-41]. Consequently, those projects would not occur under the 15% Indirect Cost Rate, either because NSF will deny proposals based on their reliance on negotiated indirect cost rates, or because a 15% indirect cost rate is insufficient to support the research. See, e.g., MIT Decl. ¶¶ 11–12 [Doc. No. 40-19]. And if particular projects cannot proceed, progress in various research areas will be disrupted, and in some cases, will end, particularly where IHEs are reliant on new grants to continue ongoing projects. See, e.g., Caltech Decl. ¶¶ 5–6 [Doc. No. 40-8] (15% Indirect Cost Rate will "end or seriously jeopardize" existing research developing new concepts in battery technology and other areas planned for renewal at the end of current funding period); see also UChicago Decl. ¶ 19 [Doc. No. 40-10]; Cleveland State University ("Cleveland State") Decl. ¶¶ 5, 7, 15 [Doc. No. 40-11]; Michigan Decl. ¶¶ 5–6 [Doc. No. 40-20]; UNR Decl. ¶¶ 5–6 [Doc. No. 40-22]; University of New Mexico Decl. ¶¶ 4–6 [Doc. No. 40-24]; Penn State Decl. ¶¶ 5–6, 14–15 [Doc. No. 40-27].

This disruption causes additional, corresponding injuries. The Rate Cap Policy will cause institutions to lay off specialized researchers and necessary staff to leave for other institutions. See, e.g., Cleveland State Decl. ¶ 15 [Doc. No. 40-11]; UNR Decl. ¶ 15 [Doc. No. 40-22] (will be required to "lay off an estimated 20–30 grant support and technical personnel within a matter of weeks"); University of Rhode Island Decl. ¶ 14 [Doc. No. 40-29] ("If NSF F&A rates were capped at 15% we would have to start laying off staff within a matter of weeks."); Michigan Decl. ¶ 15 [Doc. No. 40-20] ("A sudden loss of support would prompt specialized researchers, technicians, and graduate students to leave for better-funded programs."); MIT Decl. ¶ 13 [Doc. No. 40-19] ("Already, some of MIT's top researchers are receiving increased outreach from colleagues at institutions in Europe and other nations that seek to take advantage of reductions in

U.S. federal research funding to attract top science minds"); UC Decl. ¶ 18 [Doc. No. 40-7]; University of Florida ("Florida") Decl. ¶ 15 [Doc. No. 40-16]; University of Washington ("Washington") Decl. ¶ 15 [Doc. No. 40-39].

Further, Plaintiffs have shown that implementation of the 15% Indirect Cost Rate will immediately inhibit planning, hiring, and operations: Universities will have to cut graduate student and trainee positions, damaging critical talent pipelines. Caltech Decl. ¶ 15 [Doc. No. 40-8] ("We would immediately begin a process of reducing the number of graduate student researchers at Caltech," totaling "250 positions over the first year, with no prospect of new appointments"); CU Boulder Decl. ¶ 17 [Doc. No. 40-12] (explaining "CU Boulder has long-term obligations" including "433 PhD students funded on NSF awards—and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments"); ACE Decl. ¶¶ 10–11 [Doc. No. 40-2] ("If the NSF Policy remains in place, ACE member schools will no longer be able to carry out all their sponsored activities, including supporting the next generation of research scientists . . . ."); APLU Decl. ¶ 15 [Doc. No. 40-3] (similar). And in general, the inability to rely on NSF's utilization of negotiated indirect cost rates disrupts budgeting and planning processes. Dartmouth Decl. ¶ 20 [Doc. No. 40-15] ("The reduction of the previously negotiated indirect cost recovery rate . . . would need to be factored into our institutional projections now . . . and would result in a dramatic restructuring and realignment away from doing research."); UC Decl. ¶ 14 [Doc. No. 40-7]; Cornell Decl. ¶ 22 [Doc. No. 40-14]; Illinois Decl. ¶ 18 [Doc. No. 40-17]; Michigan Decl. ¶ 16 [Doc. No. 40-20]; Rice University Decl. ¶ 14 [Doc. No. 40-30].

Ultimately, where Plaintiffs have shown that they are eligible for less federal funding of indirect costs under the 15% Indirect Cost Rate such that their research programs will face

significant disruption, they have demonstrated an injury that is sufficient to confer standing. See Murthy v. Missouri, 603 U.S. 43, 57 (2024) (explaining standing requirements "help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant . . . invocation of federal-court jurisdiction'") (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)).

Defendants do not contest traceability or redressability. Regardless, where the 15% Indirect Cost Rate reduces NSF funding for indirect costs on grants for which University Plaintiffs and members of the Organizational Plaintiffs are eligible, and where Plaintiffs seek an order vacating and enjoining implementation of that Policy, those elements are satisfied, and Plaintiffs have standing to pursue their claims.

Defendants also do not contest—and Plaintiffs have shown—that the Organizational Plaintiffs have standing to sue on behalf of their members. First, member institutions would have standing to sue in their own right based on the injuries discussed above. Second, challenging the 15% Indirect Cost Rate is germane to the Organizational Plaintiffs' missions. AAU seeks to "provide a forum for the development and implementation of institutional and national policies promoting strong programs of academic research and scholarship . . . ." AAU Decl. ¶ 3 [Doc. No. 40-1]. ACE's mission includes advocating for public policies that support its members' interests in obtaining support for academic research. ACE Decl. ¶ 4 [Doc. No. 40-2]. And APLU advocates for "public impact research" and strives to help university leaders emphasize the value of collaborative research with communities. APLU Decl. ¶ 4 [Doc. No. 40-3]. Where Plaintiffs argue that the 15% Indirect Cost Rate reduces the level of support available for necessary research costs and impedes university research programs, a lawsuit seeking to prevent implementation of the Policy is consistent with the Organizational Plaintiffs' stated goals. And

where Plaintiffs' suit seeks prospective relief and raises pure questions of law—i.e. whether the

15% Indirect Cost Rate is contrary to law and arbitrary and capricious—the court can determine

Plaintiffs' claims and craft appropriate relief without participation of member institutions. See

Brock, 477 U.S. at 287–88.

  2. APA Jurisdiction

  Defendants claim that the 15% Indirect Cost Rate constitutes an exercise of agency

discretion that is unreviewable under the APA and that this court therefore lacks jurisdiction.

Mem. ISO Defs.' Mot. 14 [Doc. No. 62].

  "The APA 'sets forth the procedures by which federal agencies are accountable to the

public and their actions subject to review by the courts.'" Dep't of Homeland Sec. v. Regents of

the Univ. of California, 591 U.S. 1, 16 (2020) (quoting Franklin v. Massachusetts, 505 U.S. 788,

796 (1992). The APA thus waives sovereign immunity in actions "seeking relief other than

money damages," and provides a cause of action to those "suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action within the meaning of a

relevant statute." 5 U.S.C. § 702. This language embodies a "basic presumption of judicial

review." Lincoln v. Vigil, 508 U.S. 182, 190 (1993) (quoting Abbott Laboratories v. Gardner,

387 U.S. 136, 140 (1967)). The APA's waiver of sovereign immunity does not apply to the

extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). At

the same time, the APA directs a reviewing court to "hold unlawful and set aside agency action"

that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." Id. § 706(2)(A) (emphasis added).

  The Supreme Court has noted "tension" between the command to set aside agency action

that constitutes an abuse of discretion and the prohibition of judicial review for actions

committed to agency discretion, explaining that "[a] court could never determine that an agency

abused its discretion if all matters committed to agency discretion were unreviewable."

Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018). Consequently, "[t]o give

effect to § 706(2)(A) and to honor the presumption of review," the Court has "read the exception

in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute

is drawn so that a court would have no meaningful standard against which to judge the agency's

exercise of discretion.'" Id. (quoting Lincoln, 508 U.S. at 191). Such circumstances exist where a

court has "no law to apply" to an exercise of agency discretion. Citizens to Pres. Overton Park,

Inc. v. Volpe, 401 U.S. 402, 410 (1971), abrogated on other grounds by Califano v. Sanders, 430

U.S. 99 (1977). But where "[a]n agency issues an order affecting the rights of a private party,

and the private party objects that the agency did not properly justify its determination under a

standard set forth in the statute[,]" the case presents "the sort of routine dispute that federal

courts regularly review." Weyhaeuser, 586 U.S. at 23–24.

    Further, the reviewability exception for discretionary agency action is generally limited to

"certain categories of administrative decisions that courts traditionally have regarded as

committed to agency discretion." Dep't of Com., 588 U.S. at 772 (collecting cases). Such actions

include an agency's allocation of funds from a lump-sum appropriation, see Lincoln, 508 U.S. at

191, or an agency's decision not to reconsider a final action on the same record, see I.C.C. v.

Bhd. of Locomotive Eng'rs, 482 U.S. 270, 280 (1987).

    NSF's decision to stop awarding indirect costs based on the rates that ONR and HHS

have negotiated with IHEs is not of the type "traditionally regarded as committed to agency

discretion." The 15% Indirect Cost Rate does not allocate funds from particular appropriations.

Cf. Lincoln, 508 U.S. at 193–94 (holding allocation of lump-sum appropriation such that Indian

Children's Program was discontinued was unreviewable); Milk Train, Inc. v. Veneman, 310 F.3d 747, 749–51, (D.C. Cir. 2002) (holding agency's chosen method to distribute appropriations to assist dairy farmers was unreviewable). Instead, the 15% Indirect Cost Rate dictates the terms of grant awards—presumably without regard to the source from which the funds are awarded.

Further, even construing the 15% Indirect Cost Rate as a decision allocating appropriations, the 15% Indirect Cost Rate is reviewable because statutory standards cabin the agency's exercise of the discretion Congress has given it. See Lincoln, 508 U.S. at 193 ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ."). The NSF Act gives NSF authority to enter into contracts it "deems necessary to carry out" specific statutory purposes. 42 U.S.C. § 1870(c); see id. § 1873(e). NSF's decision to cap indirect cost rates in grants to IHEs (and its reasoning for that decision) is reviewable for consistency with those purposes. See California v. U.S. Dep't of Educ., 132 F.4th 92, 98 (1st Cir. 2025) denial of stay pending appeal rev'd on other grounds by Dep't of Educ. v. California, 145 S. Ct. 966 (2025).

The 15% Indirect Cost Rate is also reviewable where regulations—namely 2 C.F.R. § 200.414(c)—dictate when and how NSF may deviate from negotiated indirect cost rates. See California v. U.S. Dep't of Educ., 132 F.4th at 97 (holding decision to terminate grants reviewable where regulation governed agency discretion to do so); Physicians for Soc. Resp. v. Wheeler, 956 F.3d 634, 643 (D.C. Cir. 2020) (explaining regulations provide "judicially manageable standards" that permit judicial review) (quoting Steenholdt v. F.A.A., 314 F.3d 633, 638 (D.C. Cir. 2003)); e.g., Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs., 313 F. Supp. 3d 62, 82–83 (D.D.C. 2018) (concluding agency regulations provided "meaningful standards" for court to apply to review of agency's shortening of grant award project period).

The 15% Indirect Cost Rate acknowledges that NSF is "deviati[ng] from negotiated rates for all awards" to IHEs. NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034. Under Section 200.414(c), NSF may only do so "when required by Federal statute or regulation, or when approved by [NSF] in accordance with" specific procedures. NSF's implementation of the 15% Indirect Cost Rate is reviewable for compliance with those procedures.

At bottom, the 15% Indirect Cost Rate is "an order affecting the rights of . . . private part[ies]," i.e. IHEs, where it deviates from those institutions' negotiated indirect cost rates. Those parties' challenge to the Policy on the grounds that NSF lacked authority to implement it and that the Policy is arbitrary and capricious presents "the sort of routine dispute that federal courts regularly review." See Weyhaeuser, 586 U.S. at 23–24.

B.     *The Merits*

The APA requires courts to "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs assert that they are entitled to judgment on their APA claims for four reasons. First, Plaintiffs argue that the 15% Indirect Cost Rate is contrary to the statutes that authorize the NSF to award grants. Mem. ISO Mot. 19 [Doc. No. 41]. Second, Plaintiffs claim that the 15% Indirect Cost Rate violates 2 C.F.R. § 200.414, which requires all federal agencies to accept negotiated indirect cost rates unless specific circumstances apply. Id. at 22. Third, Plaintiffs argue that the 15% Indirect Cost Rate violates regulatory requirements for indirect cost recovery. Id. at 25. Finally, Plaintiffs argue the Policy is arbitrary and capricious. Id. at 27. Defendants oppose each of these arguments.

1.  Contrary to Authorizing Statutes (Count I)

Plaintiffs argue that Congress has not authorized NSF to impose a cap on indirect cost rates that is "unmoored from actual indirect costs," Reply ISO Pls.' Mot. 4 [Doc. No. 63] (capitalization omitted), and that 41 U.S.C. § 4708 does not authorize the 15% Indirect Cost Rate, Mem. ISO Pls.' Mot. 19–22 [Doc. No. 41]. Defendants contend that the NSF Act and 41 U.S.C. § 4708 each provide NSF with statutory authority to cap indirect cost rates. See Mem. ISO Defs.' Mot. 2, 17 [Doc. No. 62]. Specifically, Defendants assert that the NSF Act grants the agency "broad authority to set the terms of its grants, including by requiring predetermined indirect cost rates that do not exceed 15 percent," id. at 17, and that Section 4708 provides NSF authority to fix the indirect cost rate at 15% where the statute "provides no guidance on which predetermined fixed-percentage rates may be used[.]" Id. at 18.

"Administrative agencies are creatures of statute," and thus "possess only the authority that Congress has provided. Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin., 595 U.S. 109, 117 (2022). Consequently, an agency "'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." Fed. Election Comm'n v. Cruz, 596 U.S. 289, 301 (2022) (citations omitted).

In determining whether Congress authorized a particular agency action, courts are not confined to examining particular statutory provisions in isolation. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000). "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." Id. Relatedly, "[i]t is a commonplace of statutory construction that the specific governs the general." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) (citation omitted). This canon applies where, as here, "a general authorization and a more

limited, specific authorization exist side-by-side" to avoid superfluidity of a more specific

provision that is swallowed by a general one. Id. In such cases, "[t]he terms of the specific

authorization must be complied with." Id.

The text of the NSF Act does not address indirect costs at all. Under 42 U.S.C. § 1870(c),

NSF has authority "to enter into contracts . . . for the carrying on, by organizations or individuals

in the United States and foreign countries . . . of such scientific or engineering activities as the

Foundation deems necessary to carry out the purposes of this chapter." In making such contracts,

NSF must "utilize appropriations available therefor in such manner as will in its discretion best

realize the objectives of (1) having the work performed by organizations, agencies, and

institutions, or individuals . . . qualified by training and experience to achieve the results desired,

(2) strengthening the research staff of organizations, particularly nonprofit organizations, in the

United States, (3) adding institutions, agencies, or organizations which, if aided, will advance

scientific or engineering research, and (4) encouraging independent scientific or engineering

research by individuals." 42 U.S.C. § 1873(e). Although these provisions provide NSF broad,

general grant-making authority, they do not address the methods by which NSF may provide for

the payment of indirect costs.

To support their interpretation of the NSF Act, Defendants point out that NSF capped

indirect cost rates at 15% in a 1951 regulation that first implemented NSF's grant-making

authority. Mem ISO Defs.' Mot. 17 [Doc. No. 62]; see 16 Fed. Reg. 12835, § 620.3 (Dec. 21,

1951). But Defendants offer no information as to whether this regulation withstood judicial

scrutiny and they do not contend that this regulation remained in place after it was first

promulgated.

Congress subsequently implemented Section 4708, which does address agency authority to reimburse indirect costs at pre-determined rates. Where Section 4708 specifically governs agencies' power to set predetermined indirect cost rates, and where the 15% Indirect Cost Rate sets a predetermined maximum indirect cost rate across grants to all IHEs, the relevant question is whether Section 4708 authorizes the 15% Indirect Cost Rate that NSF has promulgated. See RadLAX Gateway Hotel, 566 U.S. at 645.

The 15% Indirect Cost Rate limits the reimbursement of actual costs incurred by the awardee and is not authorized by the text of Section 4708. Section 4708 provides federal agencies authority to "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates applied to the total of the reimbursable direct costs incurred or to an element of the total of the reimbursable direct costs incurred." 41 U.S.C. § 4708. This language authorizes agencies (including NSF) to pay a grantee its "reimbursable indirect costs" using a particular methodology (namely, a predetermined rate), but it does not authorize NSF to determine that it will not reimburse "reimbursable indirect costs." By capping indirect cost rates for IHEs at the *de minimis* rate, which is untethered from the actual indirect costs that an institution incurs and well below typical negotiated indirect cost rates, the 15% Indirect Cost Rate effectively limits the portion of an IHE's indirect costs that are reimbursable. In limiting the portion of an IHE's indirect costs that NSF will reimburse, the 15% Indirect Cost Rate imposes indirect cost sharing on the institution. Section 4708 does not provide NSF authority to require indirect cost sharing.

Further, the Executive Branch has consistently read the language in Section 4708 to indicate that HHS and ONR should negotiate and set indirect cost rate with reference to an institution's actual costs. Although it is not determinative, "the longstanding practice of the

government" is an interpretive aid that "can inform a court's determination of what the law is."

Loper Bright Enters. v. Raimondo, 603 U.S. 369, 386 (2024) (internal quotation marks and

citations omitted). Here, Executive guidance implementing the relevant statutory language has

consistently stated that HHS and ONR should negotiate predetermined indirect cost rates with

IHEs where there is sufficient information to approximate the actual indirect costs the institution

will incur.[5] And as recently as May 8, 2025, NSF itself understood "predetermined indirect cost

rate" as "a fixed rate established for a future fiscal period, based on the actual costs from a

representative prior period." NSF's Indirect Cost Rate Policies 5 [Doc. No. 40-42] (emphasis

added).

Defendants respond that OMB revised its guidance regarding HHS and ONR's negotiated

indirect cost rates to cap the rate for "administrative costs" at 26% of an institution's modified

---

[5] See *Principles for Determining Costs Applicable to Research and Development Under Grants and Contract With Educational Institutions*, 30 Fed. Reg. 9676, 9681 (Aug. 4, 1965) ("[N]egotiation of predetermined fixed rates for indirect costs in those situations where the cost[,] experience[,] and other pertinent facts available are deemed sufficient to enable the contracting parties to reach an informed judgment as to the probable level of indirect costs during the ensuing accounting period."); OMB Circular A-21, Revised, *Principles for Determining Costs Applicable to Grants, Contracts, and Other Agreements With Educational Institutions*, 44 Fed. Reg. 12368, 12374 (March 6, 1979) (same); OMB Circular A-21, Revised, *Principles for Determining Costs Applicable to Grants, Contracts, and Other Agreements With Educational Institutions*, 58 Fed. Reg. 39996, 39998 (July 26, 1993) (same, but adding that rates should be negotiated for periods of two to four years); OMB Circular A-21, Revised, *Principles for Determining Costs Applicable to Grants, Contracts, and Other Agreements With Educational Institutions*; 61 Fed. Reg. 20880, 20901 (May 8, 1996) (same); cf. OMB Circular A-122, Cost Principles for Nonprofit Organizations, 45 Fed. Reg. 46,022, 46,026 (July 8, 1980) ("'Predetermined rate' means an indirect cost rate, applicable to a specified current or future period, usually the organization's fiscal year. The rate is based on an estimate of the costs to be incurred during the period."); 2 C.F.R. Pt. 200 App. IV(C)(1)(b) (same); id., App. III(C)(1)(a)(3) ("each allocation method used to identify and allocate the indirect (F & A) cost pools . . . must contain the full amount of the institution's modified total costs or other appropriate units of measurement used to make the computations. In addition, the final rate distribution base . . . for each major function . . . must contain all the programs or activities which utilize the indirect (F & A) costs allocated to that major function.").

total direct costs. Mem. ISO Defs.' Mot. 10, 19 [Doc. No. 62]; see OMB Circular A-21, Revised,

*Principles for Determining Costs Applicable to Grants, Contracts, and Other Agreements With*

*Educational Institutions*, 56 Fed. Reg. 50224, 50228 (Oct. 3, 1991). Plaintiffs contend that OMB

relied on an estimate of average actual costs across institutions to calculate that number, see

Reply ISO Pls.' Mot. 6 [Doc. No. 63], and Defendants have not disagreed. Moreover,

"administrative costs" may be classified as either direct or indirect costs. See 2 C.F.R. Pt. 200,

App. III(6)(b) (providing guidelines for "the determination of departmental administrative costs

as direct or indirect (F & A) costs"). And in any event, notwithstanding the cap on

"administrative costs," the portion of OMB's current guidance that references Section 4708

maintains that "negotiation of predetermined indirect rates for indirect [Facilities and

Administration] costs for a period of two to four years should be the norm" where there is

sufficient "cost experience and other pertinent facts" to base that rate on the actual indirect costs

an institution will probably incur. See 2 C.F.R. Pt. 200, App. III(C)(4). Accordingly, the court

cannot conclude that this provision explicitly authorizes agencies to mandate indirect cost-

sharing as Defendants' 15% Indirect Cost Rate would do here.

In sum, the statutory text and executive interpretations of Section 4708 do not support

Defendants' contention that this statute authorizes NSF to set a flat rate across all IHEs that

imposes cost-sharing and instead support Plaintiffs' assertion that neither the NSF Act nor

Section 4708 authorizes the 15% Indirect Cost Rate. However, to the extent Plaintiffs argue

further that NSF is statutorily barred from imposing any across-the-board cap on indirect cost

rates, the court declines to resolve the issue where the parties have not addressed whether 31

U.S.C. § 503 vests exclusive authority in OMB to establish policies regarding reimbursement of

indirect research costs in federal grant awards, see id. § 503(a), (b)(2)(C), (c)(1)(A), and where

the 15% Indirect Cost Rate must in any event be vacated pursuant to each of Plaintiffs' three

further arguments.

    2.   Violation of 2 C.F.R. § 200.414 (Count II)

Plaintiffs argue that the 15% Indirect Cost Rate violates 2 C.F.R. § 200.414(c), which

requires NSF to accept negotiated indirect cost rates except in specific circumstances and after

complying with certain requirements. Mem. ISO Pls.' Mot. 22 [Doc. No. 41]. The court agrees.

Section 200.414 establishes a clear norm regarding funding of indirect research costs:

Once an IHE negotiates an indirect cost rate with HHS or ONR, all agencies accept that rate.

Section 200.414(c) provides:

> (1) Negotiated indirect cost rates <u>must be accepted</u> by all Federal agencies. A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section.
>
> (2) The Federal agency must notify OMB of any approved deviations. The recipient or subrecipient may notify OMB of any disputes with Federal agencies regarding the application of a federally negotiated indirect cost rate.
>
> (3) The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates.
>
> (4) The Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved under paragraph (e). As appropriate, the Federal agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity.

2 C.F.R. § 200.414(c) (emphasis added).

Section 200.414(f) reinforces that norm. Where a grant recipient or subrecipient <u>does not</u>

<u>have a current negotiated indirect cost rate</u>, that institution may elect to charge a *de minimis* rate,

which can be no more than 15 percent of its modified total direct costs. 2 C.F.R. § 200.414(f).

"Once elected, the recipient or subrecipient must use the de minimis rate for all Federal awards

until the recipient or subrecipient chooses to receive a negotiated rate." <u>Id.</u> But once an institution has a negotiated rate in place, "[f]ederal agencies . . . may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate[.]" <u>Id.</u>

With the 15% Indirect Cost Rate, NSF has rejected the regulatory framework for funding indirect research costs and has limited the recovery of actual costs by imposing a de minimis rate on IHEs with negotiated indirect cost rates with ONR or HHS in violation of Section 200.414(f). Contrary to subsection 200.414(f), which allows for this rate only on the IHE's election where there is no negotiated rate, the 15% Indirect Cost Rate "app[lies] a standard indirect cost rate not to exceed 15%"—i.e. a de minimis rate—"to all grants and cooperative agreements awarded to IHEs for which indirect costs are allowable." NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034.

The 15% Indirect Cost Rate is also inconsistent with Section 200.414(c)'s limitations on the scope of permitted deviations from negotiated indirect cost rates. An agency may only deviate from an IHE's negotiated rate "for either a class of Federal awards or a single Federal award[.]" 2 C.F.R. § 200.414(c). "Class of Federal awards means a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1. It is conceivable to consider IHEs "a specific type of recipient." But construing "a group of federal awards" to IHEs to encompass <u>all awards</u> to all IHEs would allow the exception to swallow the whole.

Nor is the 15% Indirect Cost Rate a "deviation" authorized by subsection (c)(3) if the word "deviation" is given its ordinary meaning. "Deviate" means "to stray . . . from a standard, principle, or topic" or "to depart from an established course or norm." *Deviate*, Merriam-

31

Webster's Collegiate Dictionary (10th ed. 1993). But the 15% Indirect Cost Rate eliminates the existing norm (acceptance of negotiated indirect cost rates) and imposes a new standard (a flat, 15 percent cap on indirect cost rates) as to all NSF grants to IHEs with negotiated indirect cost rates. In NSF's reading, the baseline requirement that "[n]egotiated indirect cost rates <u>must be accepted</u> by all Federal agencies[,]" is flatly ignored. <u>See</u> 2 C.F.R. § 200.414(c) (emphasis added).

Further, NSF has not complied with the process contemplated by Section 200.414(c) for deviating from negotiated indirect cost rates. As an initial matter, where subsection (c)(4) requires that a NOFO include "policies relating to indirect cost rate reimbursement," the 15% Indirect Cost Rate violates that subsection to the extent that it applies to grant opportunities for which NSF had issued a NOFO before it announced the 15% Indirect Cost Rate. Defendants effectively concede this, arguing that they need not comply with this requirement because "it says nothing about what should happen in the event of noncompliance." Mem. ISO Defs.' Mot. 23 [Doc. No. 62]. But the APA does impose a consequence for agency action that fails to comply with applicable regulations: a reviewing court shall set that action aside. 5 U.S.C. § 706(2).

The 15% Indirect Cost Rate otherwise violates Section 200.414(c) where NSF announced and imposed a cap on indirect cost rates in one fell swoop. The language in Section 200.414(c) requires agencies to follow a sequential process in deviating from negotiated indirect cost rates. As two other sessions in this District have explained, "[t]he provision states that the awarding agency seeking a deviation '"must"—present tense—make available the policies, procedures, and decision-making criteria that [it] "will follow"—future tense—to seek and justify the deviation.'" <u>Ass'n of Am. Universities v. Dep't of Energy</u>, 2025 WL 1414135, at *15 (D. Mass.

May 15, 2025) (quoting <u>Massachusetts v. NIH</u>, 770 F. Supp. 3d 277, 298 (D. Mass. 2025)).[6]

Contrary to subsection (c)(3), the Policy Notice states that the 15% Indirect Cost Rate makes

public "the policies, procedures and general decision-making criteria <u>that NSF has used</u>"—past

tense—"to justify deviation from negotiated rates[.]" NSF *Policy Notice: Implementation of*

*Standard 15% Indirect Cost Rate*, NSF 25-034 (emphasis added).

      Additionally, there is no indication that NSF "approved" the 15% Indirect Cost Rate in

the manner required by subsection (c)(1). The Federal Register notice promulgating Section

200.414(c) explains that the regulation "provides for the consistent application of negotiated

indirect cost rates, and articulates the conditions under which a Federal awarding agency may

use a different rate[,]" which "include approval . . . <u>based on documented justification</u>" in

addition to the conditions set forth in subsections (c)(2), (c)(3), and (c)(4). *Uniform*

*Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 78

Fed. Reg. 78590, 78600 (Dec. 26, 2019) (emphasis added). The Federal Register notice explains

further that a proposal to require OMB to approve all deviations from negotiated rates was

rejected on the basis that "the conditions set by OMB for these determinations are stringent

enough to ensure that they do not occur <u>without strong justification</u>." <u>Id.</u> (emphasis added). As

explained in more detail below, the administrative record before the court, which includes only

the Policy Notice for the 15% Indirect Cost Rate itself, <u>see</u> Defs.' Opp'n to Pls.' Mot. to

Expedite 3 [Doc. No. 47], does not indicate NSF deviated from the indirect cost rates negotiated

by HHS and ONR and imposed a 15% cap based on a "strong" or "documented justification."

Instead, it merely concludes that the 15% Indirect Cost Rate will effectuate several agency goals

---

[6] The <u>NIH</u> court was discussing a different regulation, 45 C.F.R. § 75.414(c), which is similar to
2 C.F.R. § 200.414(c).

without information indicating how NSF determined that the Policy will help accomplish those goals.

In sum, the 15% Indirect Cost Rate is not a deviation permitted by Section 200.414(c), and NSF failed to implement it in accordance with the procedures that the regulation prescribes.

3.    Departure from Cost Recovery Regulations (Count III)

Plaintiffs assert that the 15% Indirect Cost Rate is inconsistent with the regulatory framework governing recovery of indirect costs. Mem. ISO Pls.' Mot. 25 [Doc. No. 41]. Specifically, the 15% Indirect Cost Rate departs from the "existing, complex process for negotiating an indirect cost recovery rate." Id. at 26.

Defendants' response is largely premised on the assumption that the 15% Indirect Cost Rate is otherwise compliant with Section 200.414(c): They assert that the regulatory framework cannot prohibit the 15% Indirect Cost Rate where Section 200.414(c) "expressly allows" it. Mem. ISO Defs.' Mot. 24 [Doc. No. 62]. Further, Defendants argue that invalidating the 15% Indirect Cost Rate, which they characterize as a "deviation from negotiated rates[,]" on the ground that it is inconsistent with provisions governing negotiations of indirect cost rates would nullify Section 200.414(c), which permits deviations from negotiated rates. Mem. ISO Defs.' Mot. 26 [Doc. No. 62].

As explained above, the 15% Indirect Cost Rate is not a permissible deviation from negotiated indirect cost rates. Consequently, Defendants' argument fails to the extent it relies on Section 200.414(c).

Defendants also argue that the law imposes no requirement that grantees recover in full their actual indirect costs, explaining that predetermined indirect cost rates implemented under Section 4708 will not necessarily reflect the actual indirect costs associated with a particular

federal award. Mem. ISO Defs.' Mot. 24 [Doc. No. 62]. True, but as explained above, Section 4708 does not authorize the use of indirect cost rates that require an institution to bear a share of its indirect costs. Further, "[a]n agency may not . . . simply disregard rules that are still on the books." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). And here, the Uniform Guidance for computing indirect cost rates for IHEs imposes a detailed process in which agencies engage with individual institutions that includes steps designed to calculate negotiated rates that approximate actual indirect costs. See, e.g., 2 C.F.R. Pt. 200, App. III(A)(2)(d)(1) ("Actual conditions must be taken into account in selecting the method or [cost distribution base period] to be used in distributing individual cost groupings."); id. ("The essential consideration in selecting a base is that it be the one best suited for assigning the pool of costs to cost objectives in accordance with benefits derived; with a traceable cause-and-effect relationship . . . ."); id. App. III(C)(1)(a)(3) (explaining "each allocation method used to identify and allocate the indirect (F&A) cost pools . . . must contain the full amount of the institution's modified total costs or other appropriate units of measurement used to make the computations" and "the final rate distribution base . . . for each major function . . . must contain all the programs or activities which utilize the indirect (F & A) costs allocated to that major function"). The 15% Indirect Cost Rate ignores that process and the rates negotiated by HHS and ONR, which are based on demonstrated actual indirect research costs approved by HHS and DOE, and imposes instead a *de minimis* rate for all IHEs without regard to the actual indirect costs that IHEs incur. The 15% Indirect Cost Rate thus deviates from a regulatory framework that ties indirect cost rates to actual indirect costs.

4.   Arbitrary and Capricious (Count IV)

Plaintiffs argue that the 15% Indirect Cost Rate's justifications are conclusory and alternatively nonsensical. Mem. ISO Pls.' Mot. 27 [Doc. No. 41]. Defendants respond that the Policy sets out NSF's reasons for the policy change and explains how it will accomplish those goals, whereas Plaintiffs merely express disagreement with NSF's decision, which is insufficient to satisfy the arbitrary and capricious standard. Mem. ISO Defs.' Mot.27–28 [Doc. No. 62].

Under the APA, courts must "hold unlawful and set aside" an agency action, findings, and conclusions that are arbitrary or capricious. 5 U.S.C. § 706(2). "An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded an important aspect of the problem, offered an explanation that runs counter to the evidence, or when a reasonable explanation for the agency's decision cannot be discerned." Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (internal quotations and citations omitted). "[A] court 'is not to substitute its judgment for that of the agency' but rather determine 'whether there has been a clear error of judgment.'" Id. (quoting Fox Television Stations, 556 U.S. at 513). Though the scope of review is narrow,[7] the agency must "examine the relevant data and articulate a satisfactory explanation for its action." Fox Television Stations, 556 U.S. at 513 (citation omitted). And an agency cannot "entirely fail[] to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

---

[7] Defendants argue that "a particularly lenient standard of review" applies "to agency action in the contracting context," citing a case from the Court of Federal Claims. Mem. ISO Defs.' Mot 27 [Doc. No. 62]; see Palantir USG, Inc. v. United States, 129 Fed. Cl. 218, 260–61 (2016), aff'd, 904 F.3d 980 (Fed. Cir. 2018). However, that case involved an agency's exercise of discretion in soliciting and selecting bids during a particular procurement process. See id. at 261. That case thus has no relevance here, where Plaintiffs challenge an agency's decision to implement a new policy that applies across its entire grant-making program.

There is no heightened standard of review where an agency changes its policy. Fox Television Stations, 556 U.S. at 514–15. However, "the requirement that an agency provide reasoned explanation for its action . . . demand[s] that it display awareness that it is changing position," and the agency must show that there are "good reasons" for the new policy. Id. at 515 (emphasis in original). Further, an agency must provide a more detailed justification than would suffice for a policy "created on a blank slate" where "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." Id. In such cases, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." Id. at 516.

In determining whether the 15% Indirect Cost Rate is arbitrary and capricious, the court is limited to considering the administrative record; "courts may not accept appellate counsel's post hoc rationalizations for agency action." State Farm, 463 U.S. at 50. In this case, the record consists only of the Policy Notice for the 15% Indirect Cost Rate. See Defs.' Opp'n to Pls.' Mot. to Expedite 3 [Doc. No. 47].

The Policy Notice acknowledges that the 15% Indirect Cost Rate is an update to NSF's policy "regarding the reimbursement of indirect costs in federally funded financial assistance." NSF Policy Notice: Implementation of Standard 15% Indirect Cost Rate, NSF 25-034. It continues, "[t]his change is intended to streamline funding practices, increase transparency, and ensure that more resources are directed toward direct scientific and engineering research activities." Id. As rationale, the Policy Notice states:

This policy supports NSF's commitment to:

- Efficiency: Reducing administrative burdens for awardee institutions.

- Consistency: Ensuring consistent treatment of all IHE financial assistance recipients.
- Effectiveness: Increasing the proportion of federal funds allocated to direct research costs.

This policy allows NSF and its awardees to focus more on scientific progress and less on administrative overhead by aligning with common federal benchmarks. Applying a standard indirect cost rate also improves government efficiency by eliminating the need for individualized indirect cost negotiations.

Id.

These statements express goals and conclusions, not reasoning. To be sure, pursuing efficiency, consistency, and effectiveness are valid agency objectives. But "[s]tatements of aspirational goals . . . are not the same as reasoned explanations for why an action is chosen or how the chosen action will effectuate the stated goals." Dep't of Energy, 2025 WL 1414135, at *12. The 15% Indirect Cost Rate is arbitrary and capricious because it fails to explain how NSF concluded it will further the objectives it asserts.

First, NSF has not explained how it will achieve efficiency in the grant awards process. NSF is not the agency that negotiates indirect cost rates with IHEs. See 2 C.F.R. Pt. 200, App. III(C)(11)(a)(1). The 15% Indirect Cost Rate does nothing to eliminate any burden on other agencies that do negotiate indirect cost rates, or on universities that must still negotiate rates with other agencies. And NSF still must negotiate indirect cost rates for organizations that are not IHEs. See NSF, NSF's Indirect Cost Rate Policies, https://www.nsf.gov/funding/proposal-budget/indirect-costs (last visited May 6, 2025) (explaining NSF negotiates indirect cost rate agreements "for ~100 organizations"); see also Defs.' Notice in Response to Court's Inquiry 2 [Doc. No. 74] (for-profit grantees may recover indirect costs). In light of the apparent continuing need for government agencies—including NSF—to continue to negotiate indirect cost rates, the court cannot discern how NSF concluded that the 15% Indirect Cost Rate will "eliminate the need for individualized indirect cost negotiations."

38

Second, NSF failed to explain how the 15% Indirect Cost Rate "[e]nsur[es] consistent treatment of all IHE financial assistance recipients." IHEs incur different amounts of indirect costs, and thus negotiate different indirect cost rates reflecting those different actual costs. And institutions incur varying levels of indirect costs based on the type of research they perform, and the sort of facilities that research requires. The existing framework thus provides consistency among IHEs in that it strives to ensure that no IHE bears a disproportionate amount of its indirect costs because of the type of research that it pursues and that all IHEs have indirect costs covered. The 15% Indirect Cost Rate seemingly does the opposite: IHEs will be forced to bear differing shares of their actual indirect costs depending on the facilities and administration resources that their research requires.

Third, the court cannot discern how NSF determined that the 15% Indirect Cost Rate will make NSF grant funding more effective. While the 15% Indirect Cost Rate states that it will "[i]ncreas[e] the proportion of federal funds allocated to direct research costs," it is doing that by ensuring that IHEs will not be fully reimbursed for research costs. Nor is it clear that IHEs could utilize that funding if they need to cost-share as this 15% Indirect Cost Rate requires. The uncontradicted record demonstrates that many Plaintiffs and member institutions would have to reject or stop applying for NSF funding because their research cannot proceed at the 15% indirect cost rate. See, e.g., AAU Decl. ¶ 17 [Doc. No. 40-1] (explaining members "will often have to choose not to apply for future awards—as many institutions will not be able to sustain the research . . . at that rate"); UNH Decl. ¶ 13 [Doc. No. 40-3] ("The University of New Hampshire has already been notified of one award it will likely not be able to accept at a 15% indirect cost rate simply because there are no other sources of funds to cover the indirect costs of that research."); MIT Decl. ¶ 12 [Doc. No. 40-19]; UNR Decl. ¶ 23 [Doc. No. 40-22]; Vanderbilt

Decl. ¶ 15 [Doc. No. 40-37]. Because it is unclear how NSF concluded that its change in policy will make funding "more effective," the Policy is not sufficiently explained. See NIH, 770 F. Supp. 3d at 305 (finding justification that policy would ensure more funds go toward direct scientific research costs was conclusory where agency "fail[ed] to address how the money [not spent on indirect costs] will actually be directed to cover direct costs and how that research will be conducted absent the necessary indirect cost reimbursements provided by the federal government").

In sum, because the court cannot discern from the Policy Notice how NSF concluded the 15% Indirect Cost Rate would further NSF's stated goals, the 15% Indirect Cost Rate is arbitrary and capricious. See Fox Television Stations, 556 U.S. at 514.

The 15% Indirect Cost Rate is also arbitrary and capricious because it ignores important aspects of the problem, namely NSF's statutory directive to "support basic scientific research and programs to strengthen scientific research potential and scientific education programs." 42 U.S.C. § 1862(a)(1); see Gulluni, 85 F.4th at 82;. The Policy Notice asserts that 15% Indirect Cost Rate "allows NSF and its awardees to focus more on scientific progress and less on administrative overhead by aligning with common federal benchmarks." NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034. NSF is entitled to reach its own judgment as to how to best accomplish its statutory goals. Fox Television Stations, 556 U.S. at 515 (explaining an agency "need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one") (emphasis in original). But NSF must explain how it came to that judgment. See id. at 513 (explaining an agency must "examine the relevant data and articulate a satisfactory explanation for its action") (quoting State Farm, 463 U.S. at 43). Here it did not. The Policy Notice includes no support for its assertion that "aligning with common

federal benchmarks"—presumably referring to the *de minimis* indirect cost rate—allows awardees to focus more on scientific progress. Nor does it explain how NSF's decision to cap the amount of actual indirect research costs incurred by IHEs will allow them to focus less on administrative overhead. These are critical deficiencies where the *de minimis* rate bears no relationship to the actual indirect costs required to perform much of the research that leads to such progress.

Further, the Policy Notice offers insufficient explanation because it fails to meaningfully address Plaintiffs' reliance interests. As Defendants point out, the Policy Notice acknowledges the 15% Indirect Cost Rate is an update to NSF's approach to indirect cost funding and does not apply to existing or continuing grants that NSF has already awarded. Mem. ISO Defs.' Mot. 30 [Doc. No. 62]; see NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034. But Plaintiffs' reliance interest extends beyond its dependence on the terms of existing grants. Though Plaintiffs are not entitled to receive future NSF grants at their negotiated indirect cost rates, nor are they guaranteed to receive any particular NSF grant award, "longstanding policies may . . . engender[] serious reliance interests" that the agency must take into account when it decides to change that policy. Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 30 (2020) (internal quotation marks and citations omitted). And an agency must consider such reliance interests even where the policy at issue "confer[s] no substantive rights." See id. at 31.

Indeed, Plaintiffs have long relied on NSF's policy, which NSF failed to meaningfully address in eliminating it. Specifically, Plaintiffs and member universities have relied on NSF's longstanding approach to indirect cost rates in making long-term financial commitments, hiring and compensating staff, building and maintaining facilities, and generally advancing their

scientific agendas. See, e.g., Caltech Decl. ¶ 17 [Doc. No. 40-8]; CU Decl. ¶ 17 [Doc. No. 40-12]; Dartmouth Decl. ¶ 10 [Doc. No. 40-15]; Florida Decl. ¶ 17 [Doc. No. 40-16]; UIC Decl. ¶ 18 [ Doc. No. 40-17]; Michigan Decl. ¶ 16 [Doc. No. 40-20]; UNR Decl. ¶ 17 [Doc. No. 40-22]; UNH Decl. ¶ 16 [Doc. No. 40-23]. The Policy Notice does not acknowledge this, asserting only that "[i]nstitutions are not required to amend budgets for awards issued before [the] effective date, nor will they be required to return previously reimbursed indirect costs." NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034 (emphasis removed).

Where, as here, there has been "decades of industry reliance" on NSF's prior policy, NSF's summary treatment of that reliance interest "[falls] short of the agency's duty to explain why it deemed it necessary to overrule its previous position[,]" Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 223 (2016), and NSF failed "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," Regents of the Univ. of Cal., 591 U.S. at 33.

Plaintiffs offer a host of additional reasons why the 15% Indirect Cost Rate is arbitrary and capricious: it departs from the NSF's policy against mandatory cost sharing, it rests upon unexplained factual findings that contradict those behind the NSF's prior policy, it fails to explain why the auditing process would not achieve government efficiency, and it singles out universities without explanation. Mem. ISO Mot. 30–32 [Doc. No. 41]. These are all examples of the overarching problem: Defendants have not sufficiently explained why they concluded capping indirect cost rates for IHEs at 15% will further the objectives stated in the Policy Notice. For instance, NSF need not demonstrate that the 15% Indirect Cost Rate will better achieve government efficiency than the audit-and-recovery process. Fox Television Stations, 556 U.S. at

515. But NSF does need to explain why NSF believes the 15% Indirect Cost Rate provides a better approach, particularly where affected institutions have long relied on NSF's existing policy. See id. In failing to do so, the 15% Indirect Cost Rate is not sufficiently reasoned.

      C.     *The Nature and Scope of Relief*

           1.  Vacatur or Remand

Defendants argue that if the court concludes that the 15% Indirect Cost Rate does not comply with all relevant statutes and regulations and is not reasonable and reasonably explained, "any remedy should be limited to remand" to NSF. Mem. ISO Defs.' Mot. 33 [Doc. No. 62] (capitalizations omitted).

Courts need not necessarily vacate agency action that is inadequately explained. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993); accord Cent. Maine Power Co. v. FERC, 252 F.3d 34, 48 (1st Cir. 2001). Under the APA, remand is generally the proper remedy "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it[.]" Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); see I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002) (explaining court generally should remand to an agency "for decision of a matter that statutes place primarily in agency hands"). Whether to vacate the action "rests in the sound discretion of the reviewing court," Cent. Maine Power, 252 F.3d at 48, and depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 966–67 (D.C. Cir. 1990); accord Cent. Maine Power, 252 F.3d at 48 (1st Cir. 2001).

Here, these factors weigh against remand. As explained above, the deficiencies in NSF's reasoning are severe. Further, NSF committed errors of law that cannot be mended without altering the 15% Indirect Cost Rate; the court has determined that the Policy is directly contrary to the relevant regulations and is not authorized by the relevant statutes. Accordingly, remand is insufficient. And where vacating the 15% Indirect Cost Rate, which NSF voluntarily stayed, keeps in place NSF's longstanding policy regarding indirect research cost reimbursement, vacatur is not a disruptive "interim change." Int'l Union, United Mine Workers of Am., 920 F.2d at 966–67.

Although Defendants suggest that the court only remand the matter, they do recognize that, based on the court's findings that the 15% Indirect Cost Rate is unlawful, vacatur would be appropriate. See Mem. ISO Defs.' Mot. 33–34 [Doc. No. 62]. This concession is unremarkable: The APA empowers federal courts to "hold unlawful and set aside agency action" that, as relevant here, the reviewing court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] without observance of procedure required by law[.]" 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules[.]" Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 826 (2024) (Gorsuch, J., concurring). Accordingly, "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." NIH, 770 F.Supp.3d at 329 (collecting cases). Here, the court finds the 15% Indirect Cost Rate unlawful and sets it aside, granting Plaintiffs' request for vacatur of the 15% Indirect Cost Rate.

2.   Declaratory Judgment

Plaintiffs also seek a Declaratory Judgment that the 15% Indirect Cost Rate is invalid, arbitrary and capricious and contrary to law. Defendants disagrees on the merits of Plaintiffs' claims but offer no opposition to a declaratory judgment as an appropriate remedy based on the court's findings. Accordingly, the court also grants Plaintiffs' request for a declaratory judgment.

3.   Injunctive Relief

Plaintiffs also request a permanent injunction "[(a)] prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the 15% Indirect Cost Rate in any form, including in rejecting or treating adversely proposals for NSF funding submitted at universities' negotiated rates rather than the 15% rate; and [(b)] from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB." Mem. ISO Pls.' Mot. 40 [Doc. No. 41]. Plaintiffs argue that nationwide relief is necessary to provide complete relief where "nearly every U.S. university is either a party to this case or a member of a party." Reply ISO Pls.' Mot. 19 [Doc. No. 63].

Defendants claim Plaintiffs' requested injunction is improper for two reasons: (1) it could be read as prohibiting NSF from ever promulgating a rule setting the indirect cost rate at 15% even if it later provides a reasoned explanation that satisfies the APA's requirements; and (2) Plaintiffs have not shown that their harms cannot be adequately addressed by vacatur and remand. Mem. ISO Defs.' Mot 33–34 [Doc. No. 62]. Defendants also urge the court to limit any remedy to Plaintiff institutions, or institutions represented by Plaintiff associations, that have shown irreparable harm, asserting that "universal injunctions" violate Article III, "stretch traditional principles of equity[,]" and "take a toll on the federal court system." Id. at 43.

As set forth below, Plaintiffs have established the need for nationwide relief, but the court finds that vacatur and a declaratory judgment will address Plaintiffs' harms such that a permanent injunction is not necessary.

Plaintiffs have demonstrated the prerequisites for equitable relief. To obtain a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010) (citation omitted). The final two factors merge when the government is the opposing party. Nken v. Holder, 556 U.S. 418, 435 (2009) (factors merge in stay context); accord NIH, 770 F. Supp. 3d at 295 (factors merge in preliminary injunction context); Perkins Coie LLP v. U.S. Dep't of Just., __ F. Supp. 3d __, 2025 WL 1276857, at *47 (D.D.C. May 2, 2025) (factors merge in permanent injunction context).

As explained in Section IV.A.1 above, Plaintiffs will suffer a variety of harms from the 15% Indirect Cost Rate, including disruption of ongoing research, loss of essential and specialized staff, and disruption to hiring, budgeting and planning. Those harms are irreparable. See New York v. Trump, 133 F.4th 51, 73 (1st Cir. 2025) (denying stay of preliminary injunction where district court found plaintiffs would "would irreparably suffer . . . impediments to planning, hiring, and operations[,] and disruptions to research projects by state universities") cf. Bos. Celtics Ltd. P'ship v. Shaw, 908 F.2d 1041, 1048 (1st Cir. 1990) (concluding losing services of athlete with "unique skill and ability" would constitute irreparable harm).

Defendants suggest Plaintiffs injuries are financial and redressable with monetary relief, citing two declarations from institutions indicating that they can cover funding deficiencies caused by the 15% Indirect Cost Rate for some amount of time. See Mem. ISO Defs.' Mot. 37 [Doc. No. 62]. That argument may have some bearing in opposing a motion for a preliminary injunction in a non-APA case, but is of no moment here, where the court is considering the need for a permanent injunction, and money damages are, in any event, unavailable under the APA. And contrary to Defendants' suggestion, the significant weight of the declarations demonstrates that, because of donor restrictions, competing demands, lack of surplus, and other limitations, endowments and other funding sources are insufficient to compensate for reduced indirect cost funding from NSF such that Universities cannot avoid the irreparable injuries discussed above. See, e.g., APLU Decl. ¶ 16 [Doc. No. 40-3]; BU Decl. ¶ 17 [Doc. No. 40-6]; UC Decl. ¶ 18 [Doc. No. 40-7]; Caltech Decl. ¶ 21 [Doc. No. 40-8]; Carnegie Mellon Decl. ¶ 21 [Doc. No. 40-9]; Colorado State Decl. ¶¶ 20, 22 [Doc. No. 40-13]; Illinois Decl. ¶¶ 23–25 [Doc. No. 40-17]; Kansas Decl. ¶¶ 22–23 [Doc. No. 40-18]; UNR Decl. ¶¶ 21–22 [Doc. No. 40-22]; Pitt Decl. ¶ 18 [Doc. No. 40-28]; Toledo Decl. ¶¶ 18–19 [Doc. No. 40-34]; Utah Decl. ¶¶ 22–23 [Doc. No. 40-36]; Vanderbilt Decl. ¶¶ 20–21 [Doc. No. 40-37]; Vermont Decl. ¶¶ 20, 22 [Doc. No. 40-38]; Washington Decl. ¶¶ 21–22 [Doc. No. 40-39]. And even where institutions can replace lost NSF funding from other sources, the reallocation of existing resources disrupts University budgeting processes, which is an irreparable injury itself.

Further, the fact that Plaintiffs are not guaranteed any particular future NSF award does not render their claims of injury speculative or conjectural:

> [The agency] and IHEs co-exist in a symbiotic, mutually beneficial relationship, fostered over decades, which is built on the [agency's] need for cutting edge research and the IHEs' ability to provide it. As a result of this relationship, each IHE has a reasonable, non-speculative assumption that it will obtain future grants

> because, through the past grants and its own investment, it has built the highly
> technical, often one-of-a-kind infrastructure needed to conduct the research with
> the assistance of those future grants, as well as assembled a team of specially
> trained, uniquely qualified researchers and support staff needed to operate and
> maintain that equipment. These grants are forthcoming to IHEs because, unless the
> DOE intends to stop funding this type of research, they must be. The [15% Indirect
> Cost Rate] itself manifests an intent on the [agency's] part to continue funding
> IHEs; all that has changed is that the [agency] now wants IHEs to foot more of the
> bill, without regard to the individual circumstances and overhead costs of each IHE,
> which Plaintiffs have adequately established they cannot do.

Dep't of Energy, 2025 WL 1414135, at *19. Here, Plaintiffs and member institutions have

longstanding funding relationships with NSF, and the agency has long accepted their negotiated

indirect cost rates. IHEs have made long-term financial commitments, developed research

infrastructure, and engaged in multi-year budgeting processes in reliance on that relationship.

See, e.g., Caltech Decl. ¶ 17 [Doc. No. 40-8]; Dartmouth Decl. ¶ 10 [Doc. No. 40-15]; Florida

Decl. ¶ 17 [Doc. No. 40-16]; UIC Decl. ¶ 18 [ Doc. No. 40-17]; Michigan Decl. ¶ 16 [Doc. No.

40-20]; UNR Decl. ¶ 17 [Doc. No. 40-22]; UNH Decl. ¶ 16 [Doc. No. 40-23]. Given that NSF

has long accepted IHEs' negotiated indirect cost rates, it is reasonable for Plaintiffs and member

institutions to rely on that policy in research planning and development. And because those

institutions have developed infrastructure to support NSF research, they can expect to receive

NSF funding in the future, even if they are not guaranteed a particular award.

Nor are Plaintiffs' injuries merely "downstream consequences" of the 15% Indirect Cost

Rate. See Mem. ISO Defs.' Mot. 38 [Doc. No. 62]. Instead, the lost opportunities and disruption

occurs with the implementation of the 15% Indirect Cost Rate. Plaintiffs have thus demonstrated

irreparable harm without an adequate remedy at law.

Plaintiffs have also shown that the balance of hardships and the public interest weigh in

favor of awarding equitable relief. Plaintiffs and member institutions engage in research aimed at

improving human health and quality of life in addition to advancing this country's energy,

economic, and national security. See, e.g., AAU Decl. ¶ 4 [Doc. No. 40-1]; ACE Decl. ¶ 7 [Doc. No. 40-2]; APLU Decl. ¶ 6 [Doc. No. 40-3]. Whatever the Executive's views may be about what sort of research advances the United States' economic or national security interests, Defendants do not suggest that diminishing or discontinuing NSF-funded research at IHEs is in the public interest, particularly where the 15% Indirect Cost Rate's stated goals to "[i]ncreas[e] the proportion of federal funds allocated to direct research costs" and allow "NSF and its awardees to focus more on scientific progress[.]" NSF *Policy Notice: Implementation of Standard 15% Indirect Cost Rate*, NSF 25-034. And where IHEs—through their NSF-funded research—impact their local and regional communities via employment and innovation that attracts additional spending and investment, halting or disrupting such research will have negative impacts on those communities. See, e.g., APLU Decl. ¶ 14 [Doc. No. 40-3]; UC Decl. ¶ 15 [Doc. No. 40-7]; Minnesota Decl. ¶ 19 [Doc. No. 40-21]; Vanderbilt Decl. ¶ 17 [Doc. No. 40-37].

Defendants argue that injunctive relief is not in the public interest where an injunction would force the United States to pay out funds that it may not be able to recover. Mem. ISO Defs.' Mot. 42 [Doc. No. 62]. Defendants cite Department of Education v. California, which concerned a temporary restraining order enjoining the government from terminating grants and requiring it to pay out past-due grant obligations. 604 U.S. __, 145 S. Ct. 966, 968 (2025). In contrast, where the court's determination is a final judgment, not a preliminary injunction, and where NSF has not terminated or reduced the amount of any existing or continuing grants, equitable relief merely prevents NSF from continuing an unlawful policy. "There is generally no public interest in the perpetuation of unlawful agency action." League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). Relatedly, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'"

See C.G.B. v. Wolf, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting Open Cmties. Alliance v. Carson, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Accordingly, the public interest and balance of hardships favor equitable relief.

Moreover, nationwide relief is necessary. Associations may pursue relief that "will inure to the benefit of those members of the association actually injured[.]"Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274, 288 (1986) (quoting Warth v. Seldin, 422 U.S. 490, 515 (1975)). Where two of the Organizational Plaintiffs represent institutions in every state, APLU Decl. ¶¶ 3, 5 [Doc. No. 40-3]; ACE Decl. ¶ 3 [Doc. No. 40-2], nationwide relief is necessary to prevent member institutions from suffering harm. Relatedly, where Plaintiffs and member institutions are dispersed throughout the United States, nationwide relief avoids the "'chaos and confusion' of a patchwork of [relief]," which impacts NSF as well as IHEs. See NIH, 770 F. Supp. 3d at 327 (quoting Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281–82 (11th Cir. 2021)); id. at 328–29 (explaining a "patchwork of injunctions would cause administrability problems, not only for the institutions relying on consistency to prevent the harm discussed above but also for NIH as it attempts to comply with varying injunctions across the country").

Nonetheless, Plaintiffs have not established that injunctive relief is necessary. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." Monsanto, 561 U.S. 139 at 166 (citations omitted). "If a less drastic remedy (such as partial or complete . . . vacatur of [the agency's] decision) [is] sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." Id. 165–66 (internal citations omitted).

Here, vacatur of the 15% Indirect Cost Rate and a judgment declaring it unlawful will provide the Plaintiffs complete relief.[8] Where the 15% Indirect Cost Rate causes Plaintiffs to suffer the harms described above, vacating the Policy redresses those injuries. See Action on Smoking & Health v. C.A.B., 713 F.2d 795, 797 (D.C. Cir. 1983) ("To 'vacate[]' . . . means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'") (quoting 91 C.J.S. Vacate (1955)). And because vacatur voids and rescinds the Policy itself, it provides nationwide relief that redresses injuries suffered by members of the Organizational Plaintiffs. Enjoining Defendants from implementing or enforcing a policy that has been vacated would be duplicative.

A declaratory judgment obviates the need to enjoin defendants from reimplementing a substantively identical policy where a declaratory judgment declares the rights and obligations of the parties and has "the force and effect of a final judgment or decree." 28 U.S.C. § 2201(a); Union de Empleados de Muelles de Puerto Rico, Inc. v. Int'l Longshoremen's Ass'n, 884 F.3d 48, 58 (1st Cir. 2018) (explaining purpose of declaratory judgment "is to determine the rights and obligations of the parties so that they can act in accordance with the law"). Indeed, "[b]ecause '[a] declaratory judgment is binding on the parties before the court and is res judicata in subsequent proceedings as to the matters declared,' it can be used by a party to later obtain further relief." Id. (quoting Am. Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 122 n.11 (1st Cir. 1998)). To the extent Plaintiffs seek to ensure Defendants do not otherwise unlawfully

---

[8] To be clear, a permanent injunction would be warranted, if despite foregoing the argument here, Defendants successfully contend on appeal that vacatur is not available under the APA. See United States v. Texas, 599 U.S. 670, 693 (2023) ("The federal government vigorously disputes [that vacatur is available under the APA], arguing that the law does not contemplate this form of relief. The reasons the government offers are plenty and serious enough to warrant careful consideration") (Gorsuch, J. concurring).

modify negotiated indirect cost rates "except as permitted by statute and by the regulations of OMB," see Mem. ISO Pls.' Mot. 40 [Doc. No. 41], an injunction is not required. If Defendants modify negotiated indirect cost rates in a manner contrary to this court's findings, the Declaratory Judgment and principles of *res judicata* will ensure that Plaintiffs "will have ample opportunity to challenge [such an action], and to seek appropriate preliminary relief." Monsanto, 561 U.S. at 164.

## V.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction and for Summary Judgment [Doc. No. 40] is granted in part and denied in part: Plaintiffs' request for Summary Judgment is GRANTED, and their request for a Preliminary Injunction is DENIED as moot. Defendants' Motion for Summary Judgment [Doc. No. 60] is DENIED.

The 15% Indirect Cost Rate and Policy Notice: Implementation of Standard 15% Indirect Cost Rate, NSF 25-034 are vacated and declared invalid, arbitrary and capricious, and contrary to law. The court further orders that within 72 hours of entry of this Order, Defendants provide written notice of the Order to all funding recipients affected by the 15% Indirect Cost Rate and that, further, Defendants notify the court that they have done so promptly thereafter.

IT IS SO ORDERED.

June 20, 2025                                   /s/Indira Talwani
                                               United States District Judge